## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TECHNOLOGY RISK RETENTION GROUP, INC.**,** an Arizona corporation, CORGI INSURANCE SERVICES, INC.**,** a Delaware corporation,<br><br>*Plaintiffs,*<br><br>v.<br><br>VOUCH, INC., a Delaware corporation, VOUCH SPECIALTY INSURANCE SERVICES, LLC**,** a Delaware limited liability company, VOUCH US INSURANCE SERVICES HOLDINGS, LLC**,** a Delaware limited liability company, VOUCH RISK MANAGEMENT SERVICES, LLC**,** a Delaware limited liability company, KELLY WULFF**,** an individual, AUGMENTA ADVISORY, LLC, a Delaware limited liability company,<br><br>*Defendants.* | C.A. No. 1:26-cv-00426-RGA |

## <u>OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

June 4, 2026

OF COUNSEL:

KEKER, VAN NEST & PETERS LLP
Warren A. Braunig
Cody Gray
Jacqueline Concilla
Michaela Firmage
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
wbraunig@keker.com
cgray@keker.com
jconcilla@keker.com
mfirmage@keker.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Robert M. Vrana (No. 5666)
Parks L. Kingery (No. 7416)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
rvrana@ycst.com
pkingery@ycst.com

*Attorneys for Defendants Vouch, Inc., Vouch Specialty Insurance Services, LLC, Vouch US Insurance Services Holdings, LLC, Vouch Risk Management Services, LLC, Kelly Wulff, and Augmenta Advisory, LLC*

6207609

## TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.   INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

III.  STATEMENT OF FACTS ................................................................................................3

IV.   ARGUMENT.....................................................................................................................4

      A.    Corgi's federal trade secret claim should be dismissed. .........................................4

          1.    Corgi fails to allege protectable trade secrets. .............................................5

          2.    Corgi fails to allege that Defendants obtained any information that was the subject of reasonable measures to protect its secrecy.....................8

      B.    Corgi's Delaware trade secret claim must be dismissed because it lacks sufficient connection to Delaware. ..........................................................................12

      C.    Corgi's common law claims are preempted by California or Delaware trade secret law. .......................................................................................................13

      D.    Even if not preempted, Corgi could not sustain its fraud claim.............................17

          1.    Corgi fails to meet the heightened pleading standard for fraud.................17

          2.    Ms. Wulff cannot be liable for fraud because she had no legal obligation to disclose the supposedly omitted facts..................................19

      E.    Corgi's declaratory relief claim is unnecessary and moot. ...................................20

V.    CONCLUSION.................................................................................................................20

i

6207609

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*1nteger LLC v. Almeida*,
2025 WL 3691887 (C.D. Cal. Dec. 11, 2025) ...................................................................5, 6, 15

*Agency Solutions.Com, LLC, v. TriZetto Group, Inc.*,
819 F. Supp. 2d 1001 (E.D. Cal. 2011)........................................................................................7

*Almatar v. Reyes*,
2026 WL 719161 (C.D. Cal. Mar. 12, 2026)..............................................................................18

*Battaglia Mgmt., Inc. v. Abramowicz*,
2024 WL 3183063 (D. Del. June 26, 2024)................................................................................16

*Benihana of Tokyo, Inc. v. Benihana, Inc.*,
828 F. Supp. 2d 720 (D. Del. 2011)...........................................................................................14

*Briggs v. United States*,
564 F. Supp. 2d 1087. (N.D. Cal. 2008) ....................................................................................20

*Buck v. Hampton Twp. Sch. Dist.*,
452 F.3d 256 (3d Cir. 2006)..........................................................................................................4

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)..............................................................................................4, 9, 12

*Carr v. AutoNation, Inc.*,
798 Fed. Appx. 129 (9th Cir. 2020)..............................................................................................9

*Clear Blue Specialty Ins. Co. v. Ozy Media, Inc.*,
669 F. Supp. 3d 907 (N.D. Cal. 2023) .......................................................................................20

*Destfino v. Reiswig*,
630 F.3d 952 (9th Cir. 2011) ......................................................................................................18

*Dow Chem. Canada, Inc. v. HRD Corp.*,
909 F. Supp. 2d 340 (D. Del. 2012).............................................................................................5

*Elias Indus., Inc. v. Kissler & Co. Inc.*,
2021 WL 2141509 (W.D. Pa. May 26, 2021).............................................................................11

*Ethypharm S.A. Fr. v. Bentley Pharm., Inc.*,
388 F. Supp. 2d 426 (D. Del. 2005)....................................................................................15, 17

*Genasys Inc. v. Vector Acoustics, LLC*,
638 F. Supp. 3d 1135 (S.D. Cal. 2022)................................................................................16, 17

ii

*Huber v. Taylor*,
  469 F.3d 67 (3d Cir. 2006)..................................................................................13, 14

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
  2020 WL 4584354 (D. Del. Aug. 10, 2020) ...........................................................14

*James v. GlobalTelLink Corp.*,
  852 F.3d 262 (3d Cir. 2017)...................................................................................10

*Lloyd v. HOVENESA, LLC*,
  369 F.3d 263 (3d Cir. 2004).....................................................................................1

*Mallet & Co. Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ........................................................................5, 6, 7, 11

*Maxim Inc. and Maxim Licensing Inc. v. Playboy, Inc.*,
  2026 WL 1361773 (S.D.N.Y. May 15, 2026) ........................................................10

*MBIA Ins. Corp. v. Royal Indem. Co.*,
  221 F.R.D. 419 (D. Del. 2004) ...............................................................................17

*Montway LLC v. Navi Transp. Servs. LLC*,
  809 F. Supp. 3d 200 (D. Del. 2025)...................................................................12, 13

*National Risk Management, Inc. v. Bramwell*,
  819 F. Supp. 417 (E.D. Pa. 1993) ..........................................................................11

*Nautilus Ins. Co. v. Day to Day Fashion, Inc.*,
  2017 WL 5643182 (C.D. Cal. Aug. 8, 2017).....................................................19, 20

*Nova Chemicals, Inc. v. Sekisui Plastics Co.*,
  579 F.3d 319 (3d Cir. 2009)......................................................................................8

*Oakwood Lab'ys LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021).......................................................................................5

*Profit Point Tax Tech., Inc. v. DPAD Group, LLP*,
  2020 WL 759952 (W.D. Pa. Jan. 29, 2020)............................................................12

*Prostar Wireless Group, LLC v. Domino's Pizza, Inc.*,
  360 F. Supp. 3d 994 (N.D. Cal. 2018) ....................................................................15

*Quanzhou New Hunter Bags & Luggages (Light Industry) Co., Ltd. v. Spray Moret, LLC*,
  2026 WL 538578 (S.D.N.Y. Feb. 26, 2026)..............................................................7

*SI Handling Sys. Inc. v. Heisley*,
  753 F.2d 1244 (3d Cir. 1985)................................................................................9, 11

iii

*Snapkeys, Ltd. v. Google LLC*,
    442 F. Supp. 3d 1196 (N.D. Cal. 2020) ................................................................15, 17

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ...............................................................................18

*Tortilla Factory LLC v. Trader Joe's Co.*,
    2018 WL 8367468 (C.D. Cal. Oct. 11, 2018).........................................................18

*Vertical Bridge REIT, LLC v. Everest Infrastructure Partners, Inc.*,
    2024 WL 2392896 (W.D. Pa. May 23, 2024)........................................................8, 9

**State Cases**

*250ok, Inc. v. Message Sys., Inc.*,
    2021 WL 225874 (Del. Ch. Jan. 22, 2021)...........................................................14, 16

*AlixPartners, LLP v. Mori*,
    2022 WL 1111404 (Del. Ch. 2022) .....................................................................13

*Beard Rsch., Inc., v. Kates*,
    8 A.3d 573 (Del. Ch. 2010)................................................................................14, 15

*Blue Beach Bungalows DE, LLC v. State of Del.*,
    351 A.3d 1007 (Del. 2025) .................................................................................19

*Focus Financial Partners, LLC v. Holsopple*,
    250 A.3d 939 (Del. Ch. 2020).............................................................................12

*Incyte Corp. v. Flexus Biosciences, Inc.*,
    2017 WL 7803923 (Del. Super. Ct. Nov. 1, 2017)..................................................16

*K.C. Multimedia, Inc. v. Bank of America Tech. & Operations., Inc.*,
    171 Cal. App. 4th 939 (2009) .............................................................................14, 15

*Opus Bank v. First Found. Bank*,
    2016 LEXIS 25433 (Cal. Super. Ct. Oct. 4, 2016) .................................................14

*Renovaro Inc. v. Gumrukcu*,
    2025 WL 3134533 (Del. Ch. Nov. 7, 2025) ..........................................................18, 19

*Spread Your Wings, LLC v. Tran*,
    2025 LEXIS 80395 (Cal. Super. Ct. Dec. 15, 2025) ..............................................15

*Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*,
    245 Cal. App. 4th 821 (2016) .............................................................................19

**Federal Statutes**

18 U.S.C. § 1836, *et seq*...................................................................................... *passim*

iv

18 U.S.C. § 1836(b)(1) ....................................................................................................4

18 U.S.C. § 1839(3) .......................................................................................................4

18 U.S.C. § 1839(5) .......................................................................................................5

**State Statutes**

6 Del. C. § 2001 et seq. ........................................................................... *passim*

6 Del. C. § 2007(a) ........................................................................................................14

Cal. Civ. Code § 3426.1(a) .............................................................................................17

Cal. Civ. Code § 3426.1(b)(2)(A) ...................................................................................17

Cal. Civ. Code § 3426.7(b) .............................................................................................14

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................................17, 18, 19

Fed. R. Civ. P. 12(b)(6) ...................................................................................................1, 4

**Other Authorities**

https://coverager.com/corgi-introduces-ai-insurance-coverage/ ......................................2

Restatement (Third) of Unfair Competition § 39 (1995) .................................................5

6207609

## I.    NATURE AND STAGE OF PROCEEDINGS[1]

Plaintiffs Technology Risk Retention Group, Inc. (TRRG) and Corgi Insurance Services, Inc. (collectively, "Corgi") filed a complaint on April 14, 2026 alleging that Defendants Vouch, Inc., Vouch Specialty Insurance Services, LLC, Vouch US Insurance Services Holdings, LLC, Vouch Risk Management Services LLC (collectively, "Vouch Entity Defendants"), Kelly Wulff ("Ms. Wulff" and together with the Vouch Entity Defendants, the "Vouch Defendants"), and Augmenta Advisory, LLC ("Augmenta") misappropriated Corgi's trade secret information, committed various torts, and breached Corgi's Terms of Use.[2] Defendants now move to dismiss all but one of Corgi's claims under Federal Rule of Civil Procedure 12(b)(6). Concurrently, Defendants have also moved to compel arbitration. If arbitration is compelled (as it should be), the Court need not reach this motion. *See Lloyd v. HOVENESA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) (whenever suit is brought on an arbitrable claim, the Court "shall" stay the litigation pending conclusion of the arbitration).

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Corgi rushed to court on bad information. The story conjured in Corgi's complaint does not stand up to scrutiny, or square with common sense. Defendant Augmenta was not created as a charade to access Corgi's alleged trade secrets; it is the legitimate personal consulting business of Vouch's Chief Legal Officer, Kelly Wulff, who has operated it under various names since 2022 and recently re-incorporated it in Delaware. And neither Ms. Wulff nor Augmenta nor any of the Vouch Entity Defendants accessed, much less used, Corgi "trade secrets." At most, Corgi

---

[1] Unless otherwise noted, internal quotation marks, alterations, and citations have been omitted, and all emphases have been added.

[2] The complaint initially included, as a defendant, Vouch Insurance Services, LLC, but Corgi dismissed that entity on April 21, 2026. D.I. 13.

6207609

accuses Ms. Wulff and Augmenta of accessing its online insurance application (which is publicly available on Corgi's website), applying for insurance, and obtaining Corgi's "policy documents"—documents Corgi sends to literally every purchaser of Corgi insurance, without any confidentiality markings, and without any limitation on how the documents may be shared. These are not trade secrets at all. And Corgi's suggestion that Vouch was trying to "steal" its online insurance questionnaire is absurd, when Vouch has had its own online intake flow in place for over 7 years.

In fact, the evidence will ultimately show that it was Corgi (not Vouch) that unlawfully used competitive information to get a head start. Shortly after Corgi incorporated in 2024, its co-founder and COO Emily Yuan twice navigated through *Vouch's* online insurance application flow (using two different email addresses). Once in Vouch's flow, Ms. Yuan toggled various coverages and obtained a half-dozen unique price quotes. At least one other Corgi senior employee, using his Corgi email address, did the same thing. It is little surprise then that industry insiders recently pointed out that Corgi's new insurance application flow and offerings looked nearly identical to Vouch's.[3] To put it simply: Corgi's co-founder Ms. Yuan engaged in precisely the conduct that Corgi falsely accuses Defendants of carrying out. This will be the subject of discovery and proof at the appropriate time and place.

Defendants have concurrently moved to compel arbitration based on Corgi's own applicable Terms of Use, which Corgi disregarded in its rush to file this lawsuit and smear Vouch and its executives. If the motion to compel is granted, the Court need not reach this

---

[3] *See, e.g.*, https://coverager.com/corgi-introduces-ai-insurance-coverage/.

6207609

motion. If that motion is ultimately denied, however, the Court should dismiss all but one of Corgi's claims straightaway.[4] Specifically:

1.      The Court should dismiss Corgi's federal trade secret claim because Corgi does not allege protectable trade secrets or that the information Defendants purportedly accessed or obtained was subject to reasonable efforts to maintain its secrecy.

2.      The Court should dismiss Corgi's Delaware trade secret claim because the Delaware Uniform Trade Secrets Act ("DUTSA") does not apply extraterritorially, and Corgi does not allege that any relevant acts supporting the claim occurred in Delaware. Corgi's Delaware trade secret claim also fails for the same reasons as its federal claim.

3.      The Court should dismiss Corgi's civil conspiracy, unjust enrichment, and fraud claims because they are preempted by state trade secret statutes. Corgi also failed to adequately plead a fraud claim against any of the Defendants.

4.      The Court should dismiss Corgi's request for declaratory relief as moot because the Policy was cancelled and there is no live controversy between the parties on that issue.

## III.    STATEMENT OF FACTS

Corgi alleges that on February 10, 2026, Augmenta submitted an insurance application through Corgi's underwriting platform. D.I. 1 ("Compl.") ¶¶ 15, 27. The application identified Ms. Wulff as the applicant and Augmenta's sole director. *Id.* ¶ 27. Ms. Wulff also serves as the Chief Legal & Administrative Officer at Vouch, Inc., a brokerage entity that helps businesses obtain commercial insurance policies but does not underwrite or financially back those policies. *Id.* ¶ 8, 13. Corgi alleges that, based on the application, Corgi issued Augmenta a Commercial General Liability Policy and related materials for the period of February 10, 2026 through

---

[4]  Defendants deny that they breached any contract and will also defeat that claim in due course.

6207609

February 10, 2027. *Id.* ¶ 31. Corgi alleges, upon information and belief, that Augmenta's insurance application was a pretextual plot, directed by the Vouch Entity Defendants, to obtain Corgi's confidential information. *Id.* ¶¶ 35–39. Corgi alleges that by accessing Vouch's application platform and obtaining policy documents, the Defendants obtained Corgi's proprietary information. *Id.* ¶¶ 35, 38.

## IV.    ARGUMENT

Every one of Corgi's claims, except the breach of contract claim, should be dismissed under Rule 12(b)(6). Courts in the Third Circuit utilize a three-step process in analyzing a Rule 12(b)(6) motion: First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). Second, a court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Finally, "where there are well-pleaded allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* In evaluating a Rule 12(b)(6) motion, a court may consider matters which may be judicially noticed without converting the motion to dismiss into a motion for summary judgment. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

### A.    Corgi's federal trade secret claim should be dismissed.

Corgi's federal Defend Trade Secrets Act ("DTSA") claim should be dismissed because Corgi fails to allege protectable trade secret information or that Defendants wrongfully obtained information maintained in secrecy. To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plead: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' 18 U.S.C. § 1836(b)(1); and (3) the

4

6207609

misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, 18 U.S.C. § 1839(5)." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021) (cleaned up). Corgi's claim fails on the first and third elements.

### 1.    **Corgi fails to allege protectable trade secrets.**

Corgi's DTSA claim fails at the threshold. To proceed on a trade-secrets claim, the plaintiff must sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such. *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380–82 (3d Cir. 2021). This requires that the plaintiff identify the purported trade secrets with sufficient specificity to put the defendant on notice of the claims, *see Oakwood*, 999 F.3d at 906, and with enough particularity to distinguish the alleged trade secret from general industry knowledge or the specialized knowledge of those skilled in the field. *See Dow Chem. Canada, Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012). Plaintiffs may not merely point to "broad areas of technology and assert that something there must have been secret and misappropriated." *Mallet*, 16 F.4th at 384 n.24. Rather, the plaintiff must identify "concrete secrets," *see id.*, "with sufficient definiteness to permit a court to apply the criteria for protection." Restatement (Third) of Unfair Competition § 39 cmt. d (1995); *see also 1nteger LLC v. Almeida*, 2025 WL 3691887, at *3 (C.D. Cal. Dec. 11, 2025) (holding that plaintiffs' description of its alleged trade secrets in "broad categories" is insufficient because "such catchall language . . . does not separate the alleged secrets from matters of general knowledge or permit [defendants] to ascertain the boundaries of the claim").

Corgi's allegations fall well short of the "reasonable specificity" standard. Instead of identifying concrete, protectable trade secrets, Corgi offers six high-level categories of business and technical information: (1) "Underwriting Questionnaire and Risk Assessment Logic"; (2) "Custom Policy Forms"; (3) "Pricing Methodology and Structures"; (4) "Platform Workflow

6207609

Architecture"; (5) "Coverage Architecture and Product Design"; and (6) "Issuance Documentation Package". Compl. ¶ 25. Corgi's explanation of what these categories include is just more nondescript business jargon. *See e.g.*, *id.* (defining the "Underwriting Questionnaire" as "[t]he specific questions asked. . . branching logic, [and . . . ] weighting methodology"; the "Custom Policy Forms" as the "agreement terms, retention mechanisms, and definitional provisions"; the "Pricing Methodology and Structures" as the "algorithms, formulas, and methodologies by which Plaintiffs calculate premiums"; and the "Coverage Architecture and Product Design" as the "specific combination of coverage lines offered" for insurance).

These broad categories cannot function as trade secrets for two reasons. First, they do nothing to "separate the alleged secrets from matters of general knowledge" or define the bounds of the claim. *Integer*, 2025 WL 3691887, at *3.  And second, their breadth makes it impossible to determine whether the plaintiff took adequate secrecy measures with respect to the alleged secrets. *Mallet*, 16 F. 4th at 381.

Corgi's supposed "trade secrets" are ill-defined and impossible to differentiate from standard business practices for an online insurer. For example, Corgi asserts that its trade secret categories include elements like its "branching logic," "combinations of coverage lines," "technology, user interface design, and information architecture," and pricing "methodologies." But the complaint fails to explain what those entail, what aspects are proprietary, or how they are different from what every online insurance company would possess. The result is a trade-secrets list that attempts to declare virtually everything on Corgi's platform a trade secret.

Courts routinely reject such generic catch-all "trade-secret" lists, because they fail to separate the trade secrets from general industry knowledge. In *Mallet*, for instance, the Third Circuit vacated a lower court's injunction because the supposed trade secrets were "better characterized as a list of general categories of business and technical information." 16 F.4th at

6

382. The asserted trade secrets in *Mallet* were "formulas; customer purchase orders demonstrating Mallet's pricing; . . . Mallet's internal manuals and procedures …; pricing and volume data; . . . and a compilation of Mallet's product specification sheets." *Id.* at 382. Mindful of those categories, the court concluded that "Mallet fail[ed] to explain how we or anyone else is to distinguish between what is generally known or available information and what it contends to be protectable trade secrets." *Id.* at 383. So too here. Corgi similarly claims that policy documents, "algorithms," and an online "platform" (apparently, its entire website) are trade secrets. Compl. ¶ 25(b), (c), (d), (f). But those descriptions do not differentiate the alleged "secret" information in those categories from general industry knowledge or the specialized knowledge of those skilled in the field.

Trade secret plaintiffs, in short, may not rely on "general categories of business and technical information," *Mallet*, 16 F.4th at 382, or "gesture[] at methods, techniques, and processes" without "explain[ing] how [those] techniques operate, what makes them valuable, or how easily they might be acquired by others," *Quanzhou New Hunter Bags & Luggages (Light Industry) Co., Ltd. v. Spray Moret, LLC*, 2026 WL 538578, at *3 (S.D.N.Y. Feb. 26, 2026). Because Corgi does exactly that—and nothing more—its DTSA claim fails. *Agency Solutions.Com, LLC, v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001 (E.D. Cal. 2011) is instructive. There, the court rejected trade secrets described as an online insurance company's "rates," "rating process," "rating workflow," and "rating rules." *Id.* at 1021–23. Those broad categories didn't describe trade secrets because, as here, they are just broad categories of information and/or processes common to every company that provides online insurance. *Id.*

In addition, Corgi's failure to describe its purported trade secrets with particularity renders it impossible to evaluate the adequacy of Corgi's asserted secrecy measures. How is Vouch, or the Court, to determine whether Corgi's supposedly "unique coverage language," or

7

6207609

"risk factors assessed," or "manner in which multiple lines are packaged and cross sold" is readily ascertainable or has been the subject of reasonable measures to maintain secrecy— without a clearer delineation of what exactly those things entail?  Compl. ¶ 25. In *Vertical Bridge REIT, LLC v. Everest Infrastructure Partners, Inc.*, 2024 WL 2392896 (W.D. Pa. May 23, 2024), the district court granted a motion to dismiss in part because plaintiff's description of its trade secrets was so broad that it was "difficult . . . to determine" whether the information had been disclosed in "contracts that lacked any confidentiality provision" or "offer letters . . . without any non-disclosure agreement in place." *Id.* at *9–10, *9 n.14. Unless Corgi defines its trade secrets with greater specificity, the Court should do the same here and dismiss Corgi's DTSA claim.

### 2. Corgi fails to allege that Defendants obtained any information that was the subject of reasonable measures to protect its secrecy.

Corgi's DTSA claim fails for a second, independent reason. Corgi does not allege that the webpages or documents any Defendant *actually accessed* were maintained in secrecy or that Corgi took reasonable measures to protect them. This precludes a claim for misappropriation. *See Nova Chemicals, Inc. v. Sekisui Plastics Co.,* 579 F.3d 319, 327–28 (3d Cir. 2009) ("[T]he most important characteristic of a trade secret is that it is in fact secret.").

Stripped of its posturing, Corgi's complaint actually alleges that Defendants "misappropriated" only two items of information: (1) some undefined content from Corgi's public website; and (2) two custom policy forms. Corgi specifically avers that Ms. Wulff accessed the "risk-assessment questions" in its "underwriting flow," selected "coverage lines," and "requested specific limits and retentions across all four lines." Compl. ¶¶ 2, 27–31. Then, after completing the online application, Corgi alleges that Ms. Wulff was issued "custom policy form[s]." *Id.* ¶ 31. Corgi alleges, in other words, that Ms. Wulff applied for insurance through Corgi's website like any other customer and received a copy of the same forms that any customer receives when they buy insurance from Corgi. *Id.* In the Preliminary Statement, Corgi

8

6207609

misleadingly asserts that Ms. Wulff accessed and obtained "proprietary underwriting *logic*, pricing *architecture*, and coverage *structures*." *Id.* ¶ 2. But there is no non-conclusory allegation in the complaint that Ms. Wulff obtained access to Corgi's back-end system or software code, where its "algorithms," "architecture," "logic," and "weighting methodology" would presumably be located. The Court may disregard Corgi's conclusory allegations to that effect. *See Burtch*, 662 F.3d at 221.[5]

As a matter of law, Corgi did not take "reasonable measures to [maintain] the secrecy" of the information Corgi *does* allege Ms. Wulff accessed: its website (sometimes referred to as its "underwriting platform") or its insurance policy forms. *See* Compl. ¶ 26. Reasonable measures may include physically marking information as confidential, obtaining written confidentiality agreements, or otherwise taking measures that put a recipient on notice that the materials must be kept secret. *See SI Handling Sys. Inc. v. Heisley*, 753 F.2d 1244, 1250 (3d Cir. 1985); *Carr v. AutoNation, Inc.*, 798 Fed. Appx. 129, 130 (9th Cir. 2020) (reasonable measures not taken when plaintiff "failed to label the business plan as confidential," never informed defendant it was confidential, and the supposed trade secret was a "fairly standard" business document that "on its face does not appear to be something that a reader would reasonably expect to be treated as confidential").

Corgi's allegations fall far short of establishing "reasonable measures." As to the website, Corgi does not allege that the insurance questionnaire is password-protected; that the website

---

[5] In *Vertical Bridge,* the district court granted a motion to dismiss where, like here, the plaintiff alleged that certain "formulae, models, and market analyses used to develop their pricing terms" were confidential but did not credibly allege that defendants actually had access to such information. 2024 WL 2392896, at *9 & n.13. If, in fact, Corgi's algorithms, logic, and weighting methodologies could be discerned by any person who scrolls through their public website, Corgi obviously is not protecting those adequately. Either way, Vouch contends that Corgi has no information that qualifies as a trade secret at all. But the Court need not decide that for this present motion.

6207609

pages were labeled "confidential"; or that the application flow is made available only to a discrete number of recipients. Nor could it: the Corgi website and insurance application are public and available to anyone. *See* Compl. ¶ 19. Instead, Corgi attempts to bootstrap reasonable measures by asserting that "access to Corgi's underwriting platform" (*i.e.*, website) is restricted "through acceptance of binding Terms of Use." *Id.* ¶ 26.

But Corgi's Terms of Use alone cannot constitute "reasonable measures." The Complaint does not assert that potential applicants must assent to, or even view, the Terms of Use **before** accessing the insurance application where the trade secrets apparently can be found in plain sight. Indeed, Corgi does not allege that a visitor or insurance applicant **ever** must click "I Accept" or otherwise assent to Corgi's Terms. As such, the Terms appear to operate as a "browsewrap" agreement.[6] But even assuming, as Corgi alleges, that this browsewrap contract is valid,[7] the Terms do not inform a website visitor *what content* on the site is purported to be a trade secret. The Terms merely recite boilerplate language that "all the intellectual property rights, including copyrights, patents, trade marks, and trade secrets, in the Site and its content are owned by Company or Company's suppliers." Ex. A § 2.5. That is insufficient. Courts confronting similar allegations have held that just posting terms of service, even those that say a user "shall not use, copy, distribute, or exploit any of the Website Content," are not "equivalent to a nondisclosure agreement" and do not constitute reasonable measures. *See, e.g.*, *Maxim Inc.*

---

[6] "Unlike online agreements where users must click on an acceptance after being presented with terms and conditions (known as "clickwrap" agreements), browsewrap agreements do not require users to expressly manifest assent." *James v. GlobalTelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017). "In browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen." *Id.* That is how Corgi's work. They state: "By accessing or using the site, you are accepting these terms." *See* Ex. A at 1.

[7] The Third Circuit has noted the uncertainty around enforcing browsewrap agreements. *See, e.g.*, *James*, 852 F.3d at 267.

6207609

*and Maxim Licensing Inc. v. Playboy, Inc.*, 2026 WL 1361773, at *4 (S.D.N.Y. May 15, 2026) (denying preliminary injunction).[8]

Corgi's "Policy Forms" are not the subject of reasonable measures to protect secrecy either. By Corgi's admission, they are provided to every customer who buys Corgi insurance. Compl. ¶ 19. Corgi does not allege—because it could not—that the obtained policy documents were marked confidential or accompanied by any restriction on disclosure or sharing with third parties. If every customer gets a copy of these documents, they are not marked "confidential," and the customer is allowed to do with them as they please (including sharing them with other insurance companies to compare coverage or seek out a better deal), the policy forms cannot be trade secrets. *See SI Handling Sys. Inc.*, 753 F.2d at 1257 (where information is provided to "third parties . . . who have every incentive, and [] right [] to disclose it," the information loses its status as a trade secret); *Mallet*, 16 F. 4th at 370 (observing that "product data sheets" cannot be claimed as a trade secret "since those specification sheets are 'produced and provided to consumers of its products'"); *National Risk Management, Inc. v. Bramwell*, 819 F. Supp. 417, 432 (E.D. Pa. 1993) ("pricing" is not a trade secret where it "is freely given out to prospective clients"); *Elias Indus., Inc. v. Kissler & Co. Inc.*, 2021 WL 2141509, at *6 (W.D. Pa. May 26, 2021) (plaintiff claimed customer-specific pricing was "closely guarded" but did not take steps to prohibit customers from sharing it).

Nor can Corgi satisfy the "reasonable measures" requirement by simply asserting, as it does, that Corgi "maintain[s] *proprietary* policy forms as *confidential* documents disclosed only to applicants and policy holders." Compl. ¶ 26(c). The conclusory assertion that the policy

---

[8] The complaint also notes that the Terms of Use bar "using the platform for competitive purposes (Section 2.2(c))." Compl. ¶ 26(b). But while competitive use might theoretically be the basis for a contract claim, it does not turn the otherwise non-confidential contents of Corgi's website into trade secrets.

6207609

documents are "proprietary" and "confidential" is backed up by nothing; the Court may disregard it. *See Burtch*, 662 F.3d at 221; *Profit Point Tax Tech., Inc. v. DPAD Group, LLP*, 2020 WL 759952, at *6 (W.D. Pa. Jan. 29, 2020) (dismissing trade-secret claims where allegation of secrecy was supported by nothing "beyond conclusory statements"). And what difference does it make if the policy forms are "disclosed only to applicants and policyholders" if those individuals have no restriction on their use of the provided forms? Compl. ¶ 26.

Because Corgi has failed to allege the misappropriation of any information that could qualify as a trade secret, the Court should dismiss its DTSA claim.

### B.    Corgi's Delaware trade secret claim must be dismissed because it lacks sufficient connection to Delaware.

Corgi's DUTSA claim should be dismissed because Corgi does not allege any relevant conduct occurred in Delaware and the DUTSA does not apply extraterritorially. *See Focus Financial Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020). The DUTSA does not apply where a plaintiff "has not cited any conduct that took place in Delaware." *Id.*; *see also Montway LLC v. Navi Transp. Servs. LLC*, 809 F. Supp. 3d 200, 213 (D. Del. 2025) ("If the misappropriation happened in another state or country, the DUTSA does not apply.").

There are no Delaware-specific allegations in the complaint. Corgi does not allege that any purported misappropriation occurred in Delaware, that any of the trade secrets were developed in Delaware, that any documents or servers were maintained in Delaware, or that any supposed impacts were felt in Delaware. In fact, the location of any conduct related to development or misappropriation of the alleged trade secrets is conspicuously absent from the Complaint. *See* Compl. ¶¶ 24–34.

Corgi's failure to allege any Delaware-based conduct in connection with its trade-secret claim comes as no surprise given that all of the parties live or are based outside of Delaware. Corgi does not allege that any of the parties' principal places of business (or any physical place

12

of business, for that matter) are in Delaware. Instead, Corgi alleges that its principal place of business is in California; Ms. Wulff resides in California; and TRRG's principal place of business is in Arizona. *See* Compl. ¶¶ 5, 6,13. The Court can take judicial notice of the Vouch entities' principal place of business (also in California).[9]

The **only** connection that this action has to Delaware is that some of the parties are incorporated in Delaware—but that is insufficient under the DUTSA. In determining whether the DUTSA applies, place of incorporation "is not dispositive, maybe not even relevant." *Montway LLC*, 809 F. Supp. 3d at 213. Instead, courts conclude that the place where "the vast majority of the conduct ... relevant to the misappropriation occurred guides the analysis." *Id.*; *see also AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *18 (Del. Ch. 2022) ("The fact that two of the Plaintiffs are Delaware entities and [defendant] was a partner in a Delaware limited liability partnership does not overcome the presumption against DUTSA's extraterritoriality."). Because some of the parties' state of incorporation is the only connection this action has to Delaware, the DUTSA plainly does not apply.[10]

### C.    Corgi's common law claims are preempted by California or Delaware trade secret law.

Corgi's civil conspiracy, unjust enrichment, and fraud claims are preempted by California or Delaware state trade secret law. To determine which law to apply to Corgi's state law claims, this Court "must apply the choice of law rules of the forum state to determine what substantive law will govern." *Huber v. Taylor*, 469 F.3d 67, 73 (3d Cir. 2006). Under Delaware's choice of

---

[9] This Court may take judicial notice of Vouch's official filings with the California Secretary of State. *See* Defendants' Request for Judicial Notice and Exhibits 1–3 filed herewith.

[10] Even if DUTSA did apply, Corgi's state trade secret claim would fail as a matter of law for the same reasons as the DTSA claim. *See Montway LLC*, 809 F. Supp. 3d at 213 (holding that DUTSA trade secret analysis is "substantively identical" such that "the viability of a DUTSA claim rises and falls with a DTSA claim").

6207609

law rules, where the laws of two potentially applicable jurisdictions are the same, a choice of law analysis is unnecessary and the court may refer "interchangeably" to the laws of the states whose laws potentially apply. *Id.* at 74. Because there are no relevant conflicts between California and Delaware laws with respect to trade-secret preemption, the Court may apply both state laws interchangeably. *Id.*[11]

Under both California and Delaware law, common law claims arising from the same facts as a trade secret claim are preempted by state trade secret statutes. *See* Cal. Civ. Code § 3426.7(b); 6 Del. C. § 2007(a). In California, the CUTSA "preempts common law claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.'" *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations., Inc.*, 171 Cal. App. 4th 939, 958 (2009). Likewise, the DUTSA preempts state law claims that are "grounded in the same facts which purportedly support the misappropriation of trade secrets claims." *Beard Rsch., Inc., v. Kates,* 8 A.3d 573, 602 (Del. Ch. 2010). Both California and Delaware courts almost uniformly adopt the "majority view" that preemption can be determined at the pleading stage before a court determines whether protectable trade secrets exist. *See 250ok, Inc. v. Message Sys., Inc.,* 2021 WL 225874, at *4 & n.41 (Del. Ch. Jan. 22, 2021) (collecting cases); *Opus Bank*

---

[11] If a conflict existed, the Court would apply the "most significant relationship" test, and California law would apply. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 725 (D. Del. 2011). That test looks at four factors: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* "[T]he applicable law will usually be the local law of the state where the injury occurred." *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2020 WL 4584354, at *8 (D. Del. Aug. 10, 2020). Here, while the third factor is neutral (the corporate parties are incorporated in Delaware or Arizona, and their principal places of business are California or Arizona), the alleged injury would be felt in California, where Corgi is based; the conduct allegedly causing injury took place in California; and the parties' relationship is centered in California, where the Terms of Use were executed.

14

*v. First Found. Bank*, 2016 LEXIS 25433, at *2 (Cal. Super. Ct. Oct. 4, 2016) ("The question of preemption of such claims may be determined at the pleading stage.").

To determine whether a plaintiff's claims are grounded in the same set of facts as a trade secret claim, the Court must ask "whether, stripped of facts supporting trade secret misappropriation, the remaining factual allegations can be reassembled to independently support other causes of action." *Snapkeys, Ltd. v. Google LLC*, 442 F. Supp. 3d 1196, 1205 (N.D. Cal. 2020); *see also Ethypharm S.A. Fr. v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (A common law claim is "grounded in the same facts" as a trade secret claim if "the failure of the misappropriation claim would doom the common law claim."). In other words, "[t]o survive preemption, [a claim] must allege wrongdoing that is materially distinct from the wrongdoing alleged" in the trade secret claim. *Prostar Wireless Group, LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1006 (N.D. Cal. 2018). Corgi's claims do not come near satisfying that test.

*Civil Conspiracy*: Corgi's civil conspiracy claim is preempted under either California or Delaware state trade secret law because it is "based on" and "grounded in" the same facts as the misappropriation claims. *K.C. Multimedia,* 171 Cal.App.4th at 958; *Beard,* 8 A.3d at 602. Corgi's civil conspiracy claim alleges that "Defendants agreed to misappropriate the Trade Secret Information"; "Augmenta and Wulff did indeed misappropriate the Trade Secret Information"; and Wulff (on information and belief) "deliver[ed]" the "Trade Secret Information" to Vouch. *See* Compl. at ¶¶ 54–58. The supposed conspiracy is entirely grounded in the facts of the trade-secrets claim. Courts in both California and Delaware have frequently found similar conspiracy claims preempted. *See, e.g., 1nteger LLC*, 2025 WL 3691887, at *4 (finding preemption where the "state law [civil conspiracy] claim expressly relies on the allegations that [defendants] misappropriated Plaintiff's trade secrets"); *Spread Your Wings, LLC*

15

*v. Tran*, 2025 LEXIS 80395, at *3 (Cal. Super. Ct. Dec. 15, 2025) (same); *Battaglia Mgmt., Inc. v. Abramowicz*, 2024 WL 3183063, at *5 (D. Del. June 26, 2024) (dismissing claim where the "only underlying wrongful act alleged against Defendants is misappropriation of [plaintiff's] trade secrets"); *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *3 (Del. Super. Ct. Nov. 1, 2017) (granting motion for judgment on the pleadings "[b]ecause the 'factual predicate of' Incyte's . . . civil conspiracy claims 'mirror the facts alleged to have constituted a misappropriation of trade secrets'").

*Unjust Enrichment.* Corgi's unjust enrichment claim is likewise preempted under the CUTSA or DUTSA. Corgi's assertion that it is "entitled to restitution for Defendants['] ill-gotten gains," is premised on the allegation that "Defendants obtained Plaintiffs' proprietary and commercially sensitive business information through a pretextual scheme that circumvented normal market mechanisms." *See* Compl. ¶¶ 65–69. In other words, the unjust enrichment claim sounds in trade secret. Both Delaware and California courts have seen through this gambit. In *250ok*, the Chancery Court held that while plaintiff "avoids the term 'trade secret' in its Count III, it is clear the claim for unjust enrichment pled in that count rests on the same alleged misappropriation of 'confidential information and proprietary data' that animates the misappropriation of trade secrets claim in Count II." 2021 WL 225874, at *5. The court held that DUTSA unambiguously dictates that "claims in service of a 'restitutionary' remedy are displaced by the statute." *Id.*; *see also Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1154 (S.D. Cal. 2022) (CUTSA preempts "common law tort claims when they 'do not genuinely allege alternative legal theories but are a transparent attempt to evade the strictures of CUTSA by restating a trade secrets claim as something else.'"). In pleading its unjust enrichment claim as a restitutionary measure "[in the] alternative" to Counts I and II, Corgi acknowledges its claim is

16

6207609

premised on the same facts as the trade-secret claims. *See Genasys*, 638 F.Supp.3d at 1154. Despite Corgi's attempt at artful pleading, its unjust enrichment claim is preempted.

**Fraud.** Corgi's claim for fraud fares no better; it too is preempted. Corgi accuses Defendants of filing an insurance application as "a pretext to obtain Plaintiffs' proprietary materials." Compl. ¶ 71. Corgi asserts it relied on Defendants' "misrepresentation[] and concealment to . . . disclose the Trade Secret Information." Compl. ¶ 72. This is once again conduct that "falls squarely into the statutory definition of trade secret misappropriation" under the CUTSA and the DUTSA. *Snapkeys Ltd.*, 442 F. Supp. 3d at 1206; Cal. Civ. Code § 3426.1(a), (b)(2)(A) (defining trade secret misappropriation to include the use of "misrepresentation . . . to acquire knowledge of the trade secret"); *Ethypharm*, 388 F. Supp. 2d at 434 ("The DUTSA specifically identifies misrepresentation as an improper means of obtaining trade secrets." (citing 6 Del. C. § 2001)). Not surprisingly then, courts in both California and Delaware have held that fraud claims based on making misrepresentations or omitting information to obtain alleged trade-secret information are preempted. *See Snapkeys*, 442 F. Supp. 3d at 1205; *Ethypharm*, 388 F. Supp. 2d at 434. The same should be true here.

### D.    Even if not preempted, Corgi could not sustain its fraud claim.

#### 1.    Corgi fails to meet the heightened pleading standard for fraud.

Corgi's fraud allegations do not satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff is required "to separately plead the fraudulent acts of each defendant." *MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004). In evaluating claims against multiple defendants, the Court "must disregard conclusory allegations unsubstantiated by specific factual details that would support a rational inference that a particular defendant

17

6207609

committed common law fraud." *Renovaro Inc. v. Gumrukcu*, 2025 WL 3134533, at *7 (Del. Ch. Nov. 7, 2025). Furthermore, "[a]llegations made upon 'information and belief' do not satisfy Rule 9(b)'s heightened pleading standard." *Id.* at 8; *see also Tortilla Factory LLC v. Trader Joe's Co.*, 2018 WL 8367468, at *4 (C.D. Cal. Oct. 11, 2018) (same).

Corgi fails to plead the fraudulent acts of each defendant with particularity. Other than the allegations that Ms. Wulff submitted a "false" insurance application through Corgi's website (an allegation that is baseless), Corgi makes no specific, substantive allegations concerning the conduct of any other defendant. *See* Compl. ¶¶ 38, 72. Instead, Corgi impermissibly rests its fraud claim on conclusory "everyone did everything" allegations. *See Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (affirming dismissal of fraud claim where plaintiff made "everyone did everything" allegations). Conclusory allegations of fraud against a group of defendants, such as those pleaded by Corgi, do not satisfy Rule 9(b). *See Almatar v. Reyes*, 2026 WL 719161, at *4 (C.D. Cal. Mar. 12, 2026); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together[.]"). And alleging mere control over a co-defendant is insufficient to satisfy Rule 9(b)'s heightened requirements. *See Almatar*, 2026 WL 719161, at *4–5.

The Delaware Chancery Court's decision in *Renovaro* is particularly on point. In *Renovaro*, the plaintiff alleged that three defendants "actively and deliberately concealed" information to close a merger deal with the plaintiff. 2025 WL 3134533, at *9. In support of its fraud claim, the plaintiff alleged that defendants "intentionally concealed the truth . . . to induce [plaintiff] to enter into the Merger Agreement" and that defendants "conspired to perpetuate this fraudulent concealment." *Id.* at *9–10. The court concluded that these allegations "do no work because they rely on improper and conclusory group pleading." *Id.* at *9. Because the court was required to "disregard conclusory allegations unsubstantiated by specific factual details that

18

6207609

would support a rational inference that a particular defendant committed common law fraud," the complaint failed to satisfy Rule 9(b). *Id.* at *7. The same defect is present here.

> ### 2.  **Ms. Wulff cannot be liable for fraud because she had no legal obligation to disclose the supposedly omitted facts.**

Even as to Ms. Wulff, the only defendant about whom Corgi pleads (incorrect) facts with particularity, Corgi's fraud claim fails as a matter of law because Corgi does not, and cannot, allege that she had a legal obligation to disclose the allegedly concealed information. To establish an omission-based fraud claim, Corgi must allege that Ms. Wulff had a legal duty to disclose the supposedly omitted facts. *See Blue Beach Bungalows DE, LLC v. State of Del.*, 351 A.3d 1007, 1043 (Del. 2025). ("[F]raud . . . requires: (1) the defendant falsely represented or omitted facts that the defendant **had a duty to disclose**."); *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 844 (2016) ("[T]he plaintiff [must] allege that the defendant concealed or suppressed a material fact in a situation in which the defendant was under a duty to disclose that material fact."). Corgi does not allege that its insurance application solicited an applicant's entire employment status, *i.e.*, whether the applicant works for entities beyond the company for whom insurance is sought, or whether they work for a competitor; and the complaint does not establish that Ms. Wulff was legally required to disclose her additional employment at Vouch.

The lack of such an allegation defeats the fraud claim. In *Nautilus Ins. Co. v. Day to Day Fashion, Inc.*, a California district court held that a plaintiff could not sustain its fraud claim based on defendants' omissions **in an insurance application** because the plaintiff did not allege that the application included any questions relating to the allegedly omitted information. 2017 WL 5643182, at *3 (C.D. Cal. Aug. 8, 2017) While the plaintiff alleged the defendant omitted information about his personal history and legal claims against his company's owner, the court observed that the complaint "does not specify particular questions on the application form that

19

required answers by the applicant concerning" such matters. *Id.* Thus, the court concluded that "Plaintiff has not made allegations that state a plausible claim for fraud in the insurance application based on defendant's statements in the application." *Id.* Because Corgi does not allege that Ms. Wulff was required to share information about her employment at Vouch, there was no fraudulent omission and Corgi's fraud claim against her fails as a matter of law.

### E. Corgi's declaratory relief claim is unnecessary and moot.

Corgi's request for declaratory relief to declare Augmenta's insurance policy *void ab initio* is moot because that policy has already been cancelled, *see* Compl. ¶¶ 1, 2, 33, 68, and there is no live controversy between the parties on this issue. "In determining whether a request for declaratory relief ha[s] become moot," courts examine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests." *Briggs v. United States*, 564 F. Supp. 2d 1087, 1094–95. (N.D. Cal. 2008). Accordingly, declaratory relief that a previously cancelled policy is *void ab initio* is only appropriate where the parties possess a legally cognizable interest in the outcome; for example, when a party seeks relief from outstanding contractual obligations or expenses incurred prior to cancellation of the policy. *See Clear Blue Specialty Ins. Co. v. Ozy Media, Inc.*, 669 F. Supp. 3d 907, 921 (N.D. Cal. 2023) (declaring an insurance policy *void ab initio* "will avoid liability even on pending claims"). Here, Corgi does not allege that there are any pending claims, outstanding contractual obligations, or debts owed, such that a declaration that the Policy is *void ab initio* implicates a live controversy. Thus, Plaintiffs' claim for relief is unnecessary and moot.

## V. CONCLUSION

Defendants respectfully request that this Court dismiss Corgi's federal and state trade secrets claims, civil conspiracy claim, unjust enrichment claim, fraud claim, and claim for declaratory relief.

6207609

Respectfully submitted,

June 4, 2026                                    YOUNG CONAWAY STARGATT
                                               & TAYLOR, LLP

OF COUNSEL:
                                               */s/ Robert M. Vrana*
KEKER, VAN NEST & PETERS LLP                   Robert M. Vrana (No. 5666)
Warren A. Braunig                              Parks L. Kingery (No. 7416)
Cody Gray                                      Rodney Square
Jacqueline Concilla                            1000 North King Street
Michaela Firmage                               Wilmington, DE 19801
633 Battery Street                             (302) 571-6600
San Francisco, CA 94111                        rvrana@ycst.com
(415) 391-5400                                 pkingery@ycst.com
wbraunig@keker.com
cgray@keker.com                                *Attorneys for Defendants Vouch, Inc., Vouch*
jconcilla@keker.com                            *Specialty Insurance Services, LLC, Vouch US*
mfirmage@keker.com                             *Insurance Services Holdings, LLC, Vouch Risk*
                                               *Management Services, LLC, Kelly Wulff, and*
                                               *Augmenta Advisory, LLC*

21

6207609

# Exhibit A

WEBSITE TERMS OF USE
VERSION 1.0
LAST REVISED ON: JANUARY 7, 2026

The website located at www.corgi.insure (the "**Site**") is a copyrighted work belonging to Corgi Insurance Services, Inc. ("**Company**", "**us**", "**our**", and "**we**"). Certain features of the Site may be subject to additional guidelines, terms, or rules, which will be posted on the Site in connection with such features. All such additional terms, guidelines, and rules are incorporated by reference into these Terms.

THESE TERMS OF USE (THESE "**TERMS**") SET FORTH THE LEGALLY BINDING TERMS AND CONDITIONS THAT GOVERN YOUR USE OF THE SITE. BY ACCESSING OR USING THE SITE, YOU ARE ACCEPTING THESE TERMS (ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT), AND YOU REPRESENT AND WARRANT THAT YOU HAVE THE RIGHT, AUTHORITY, AND CAPACITY TO ENTER INTO THESE TERMS (ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT). YOU MAY NOT ACCESS OR USE THE SITE OR ACCEPT THE TERMS IF YOU ARE NOT AT LEAST 18 YEARS OLD. IF YOU DO NOT AGREE WITH ALL OF THE PROVISIONS OF THESE TERMS, DO NOT ACCESS AND/OR USE THE SITE.

**PLEASE BE AWARE THAT SECTION 10.2 CONTAINS PROVISIONS GOVERNING HOW TO RESOLVE DISPUTES BETWEEN YOU AND COMPANY. AMONG OTHER THINGS, SECTION 10.2 INCLUDES AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US SHALL BE RESOLVED BY BINDING AND FINAL ARBITRATION. SECTION 10.2 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. PLEASE READ SECTION 10.2 CAREFULLY.**

**UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS: (1) YOU WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST US ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) YOU ARE WAIVING YOUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.**

1.      ACCOUNTS

        **1.1      Account Creation.**  In order to use certain features of the Site, you must register for an account ("**Account**") and provide certain information about yourself as prompted by the account registration form. You represent and warrant that: (a) all required registration information you submit is truthful and accurate; (b) you will maintain the accuracy of such information. You may delete your Account at any time, for any reason, by following the instructions on the Site. Company may suspend or terminate your Account in accordance with Section 8.

        **1.2      Account Responsibilities.**  You are responsible for maintaining the confidentiality of your Account login information and are fully responsible for all activities that occur under your Account. You agree to immediately notify Company of any unauthorized use, or suspected unauthorized use of your Account or any other breach of security. Company cannot and will not be liable for any loss or damage arising from your failure to comply with the above requirements.

2.      ACCESS TO THE SITE

        **2.1      License.**  Subject to these Terms, Company grants you a non-transferable, non-exclusive, revocable, limited license to use and access the Site solely for your own personal, noncommercial use.

        **2.2      Certain Restrictions.**  The rights granted to you in these Terms are subject to the following restrictions: (a) you shall not license, sell, rent, lease, transfer, assign, distribute, host, or otherwise commercially

exploit the Site, whether in whole or in part, or any content displayed on the Site; (b) you shall not modify, make derivative works of, disassemble, reverse compile or reverse engineer any part of the Site; (c) you shall not access the Site in order to build a similar or competitive website, product, or service; and (d) except as expressly stated herein, no part of the Site may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means. Unless otherwise indicated, any future release, update, or other addition to functionality of the Site shall be subject to these Terms. All copyright and other proprietary notices on the Site (or on any content displayed on the Site) must be retained on all copies thereof.

**2.3    Modification.**  Company reserves the right, at any time, to modify, suspend, or discontinue the Site (in whole or in part) with or without notice to you. You agree that Company will not be liable to you or to any third party for any modification, suspension, or discontinuation of the Site or any part thereof.

**2.4    No Support or Maintenance.**  You acknowledge and agree that Company will have no obligation to provide you with any support or maintenance in connection with the Site.

**2.5    Ownership.**  Excluding any User Content that you may provide (defined below), you acknowledge that all the intellectual property rights, including copyrights, patents, trade marks, and trade secrets, in the Site and its content are owned by Company or Company's suppliers. Neither these Terms (nor your access to the Site) transfers to you or any third party any rights, title or interest in or to such intellectual property rights, except for the limited access rights expressly set forth in Section 2.1. Company and its suppliers reserve all rights not granted in these Terms. There are no implied licenses granted under these Terms.

**2.6    Feedback.**  If you provide Company with any feedback or suggestions regarding the Site ("**Feedback**"), you hereby assign to Company all rights in such Feedback and agree that Company shall have the right to use and fully exploit such Feedback and related information in any manner it deems appropriate. Company will treat any Feedback you provide to Company as non-confidential and non-proprietary. You agree that you will not submit to Company any information or ideas that you consider to be confidential or proprietary.

**3.    USER CONTENT**

**3.1    User Content.**  "**User Content**" means any and all information and content that a user submits to, or uses with, the Site (e.g., content in the user's profile or postings). You are solely responsible for your User Content. You assume all risks associated with use of your User Content, including any reliance on its accuracy, completeness or usefulness by others, or any disclosure of your User Content that personally identifies you or any third party. You hereby represent and warrant that your User Content does not violate our Acceptable Use Policy (defined in Section 3.3). You may not represent or imply to others that your User Content is in any way provided, sponsored or endorsed by Company. Since you alone are responsible for your User Content, you may expose yourself to liability if, for example, your User Content violates the Acceptable Use Policy. Company is not obligated to backup any User Content, and your User Content may be deleted at any time without prior notice. You are solely responsible for creating and maintaining your own backup copies of your User Content if you desire.

**3.2    License.**  You hereby grant (and you represent and warrant that you have the right to grant) to Company an irrevocable, nonexclusive, royalty-free and fully paid, worldwide license to reproduce, distribute, publicly display and perform, prepare derivative works of, incorporate into other works, and otherwise use and exploit your User Content, and to grant sublicenses of the foregoing rights, solely for the purposes of including your User Content in the Site. You hereby irrevocably waive (and agree to cause to be waived) any claims and assertions of moral rights or attribution with respect to your User Content.

**3.3    Acceptable Use Policy.**  The following terms constitute our "**Acceptable Use Policy**":

**(a)**    You agree not to use the Site to collect, upload, transmit, display, or distribute any User Content (i) that violates any third-party right, including any copyright, trademark, patent, trade secret, moral right, privacy right, right of publicity, or any other intellectual property or proprietary right, (ii) that is unlawful, harassing, abusive, tortious, threatening, harmful, invasive of another's privacy, vulgar, defamatory, false, intentionally misleading, trade libelous, pornographic, obscene, patently offensive, promotes racism, bigotry, hatred, or physical

harm of any kind against any group or individual or is otherwise objectionable, (iii) that is harmful to minors in any way, or (iv) that is in violation of any law, regulation, or obligations or restrictions imposed by any third party.

(b)      In addition, you agree not to: (i) upload, transmit, or distribute to or through the Site any computer viruses, worms, or any software intended to damage or alter a computer system or data; (ii) send through the Site unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, or any other form of duplicative or unsolicited messages, whether commercial or otherwise; (iii) use the Site to harvest, collect, gather or assemble information or data regarding other users, including e-mail addresses, without their consent; (iv) interfere with, disrupt, or create an undue burden on servers or networks connected to the Site, or violate the regulations, policies or procedures of such networks; (v) attempt to gain unauthorized access to the Site (or to other computer systems or networks connected to or used together with the Site), whether through password mining or any other means; (vi) harass or interfere with any other user's use and enjoyment of the Site; or (vii) use software or automated agents or scripts to produce multiple accounts on the Site, or to generate automated searches, requests, or queries to (or to strip, scrape, or mine data from) the Site (provided, however, that we conditionally grant to the operators of public search engines revocable permission to use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials, subject to the parameters set forth in our robots.txt file).

**3.4      Enforcement.**  We reserve the right (but have no obligation) to review, refuse and/or remove any User Content in our sole discretion, and to investigate and/or take appropriate action against you in our sole discretion if you violate the Acceptable Use Policy or any other provision of these Terms or otherwise create liability for us or any other person. Such action may include removing or modifying your User Content, terminating your Account in accordance with Section 8, and/or reporting you to law enforcement authorities.

**4.      INDEMNIFICATION.**  You agree to indemnify and hold Company (and its officers, employees, and agents) harmless, including costs and attorneys' fees, from any claim or demand made by any third party due to or arising out of (a) your use of the Site, (b) your violation of these Terms, (c) your violation of applicable laws or regulations or (d) your User Content. Company reserves the right, at your expense, to assume the exclusive defense and control of any matter for which you are required to indemnify us, and you agree to cooperate with our defense of these claims. You agree not to settle any matter without the prior written consent of Company. Company will use reasonable efforts to notify you of any such claim, action or proceeding upon becoming aware of it.

**5.      THIRD-PARTY LINKS & ADS; OTHER USERS**

**5.1      Third-Party Links & Ads.**  The Site may contain links to third-party websites and services, and/or display advertisements for third parties (collectively, "**Third-Party Links & Ads**"). Such Third-Party Links & Ads are not under the control of Company, and Company is not responsible for any Third-Party Links & Ads. Company provides access to these Third-Party Links & Ads only as a convenience to you, and does not review, approve, monitor, endorse, warrant, or make any representations with respect to Third-Party Links & Ads. You use all Third-Party Links & Ads at your own risk, and should apply a suitable level of caution and discretion in doing so. When you click on any of the Third-Party Links & Ads, the applicable third party's terms and policies apply, including the third party's privacy and data gathering practices. You should make whatever investigation you feel necessary or appropriate before proceeding with any transaction in connection with such Third-Party Links & Ads.

**5.2      Other Users.**  Each Site user is solely responsible for any and all of its own User Content. Since we do not control User Content, you acknowledge and agree that we are not responsible for any User Content, whether provided by you or by others. We make no guarantees regarding the accuracy, currency, suitability, appropriateness, or quality of any User Content. Your interactions with other Site users are solely between you and such users. You agree that Company will not be responsible for any loss or damage incurred as the result of any such interactions. If there is a dispute between you and any Site user, we are under no obligation to become involved.

**5.3      Release.**  You hereby release and forever discharge Company (and our officers, employees, agents, successors, and assigns) from, and hereby waive and relinquish, each and every past, present and future dispute, claim, controversy, demand, right, obligation, liability, action and cause of action of every kind and nature (including personal injuries, death, and property damage), that has arisen or arises directly or indirectly out of, or that relates

directly or indirectly to, the Site (including any interactions with, or act or omission of, other Site users or any Third-Party Links & Ads). IF YOU ARE A CALIFORNIA RESIDENT, YOU HEREBY WAIVE CALIFORNIA CIVIL CODE SECTION 1542 IN CONNECTION WITH THE FOREGOING, WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

**6.    DISCLAIMERS**

THE SITE IS PROVIDED ON AN "AS-IS" AND "AS AVAILABLE" BASIS, AND COMPANY (AND OUR SUPPLIERS) EXPRESSLY DISCLAIM ANY AND ALL WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ALL WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, QUIET ENJOYMENT, ACCURACY, OR NON-INFRINGEMENT. WE (AND OUR SUPPLIERS) MAKE NO WARRANTY THAT THE SITE WILL MEET YOUR REQUIREMENTS, WILL BE AVAILABLE ON AN UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE BASIS, OR WILL BE ACCURATE, RELIABLE, FREE OF VIRUSES OR OTHER HARMFUL CODE, COMPLETE, LEGAL, OR SAFE. IF APPLICABLE LAW REQUIRES ANY WARRANTIES WITH RESPECT TO THE SITE, ALL SUCH WARRANTIES ARE LIMITED IN DURATION TO 90 DAYS FROM THE DATE OF FIRST USE.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

**7.    LIMITATION ON LIABILITY**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL COMPANY (OR OUR SUPPLIERS) BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY LOST PROFITS, LOST DATA, COSTS OF PROCUREMENT OF SUBSTITUTE PRODUCTS, OR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES ARISING FROM OR RELATING TO THESE TERMS OR YOUR USE OF, OR INABILITY TO USE, THE SITE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ACCESS TO, AND USE OF, THE SITE IS AT YOUR OWN DISCRETION AND RISK, AND YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR DEVICE OR COMPUTER SYSTEM, OR LOSS OF DATA RESULTING THEREFROM.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, OUR LIABILITY TO YOU FOR ANY DAMAGES ARISING FROM OR RELATED TO THESE TERMS (FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF THE ACTION), WILL AT ALL TIMES BE LIMITED TO A MAXIMUM OF FIFTY US DOLLARS. THE EXISTENCE OF MORE THAN ONE CLAIM WILL NOT ENLARGE THIS LIMIT. YOU AGREE THAT OUR SUPPLIERS WILL HAVE NO LIABILITY OF ANY KIND ARISING FROM OR RELATING TO THESE TERMS.

SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

**8.    TERM AND TERMINATION.** Subject to this Section, these Terms will remain in full force and effect while you use the Site. We may suspend or terminate your rights to use the Site (including your Account) at any time for any reason at our sole discretion, including for any use of the Site in violation of these Terms. Upon termination of your rights under these Terms, your Account and right to access and use the Site will terminate immediately. You understand that any termination of your Account may involve deletion of your User Content associated with your Account from our live databases. Company will not have any liability whatsoever to you for any termination of your rights under these Terms, including for termination of your Account or deletion of your User Content. Even after your rights under these Terms are terminated, the following provisions of these Terms will remain in effect: Sections 2.2 through 2.6, Section 3 and Sections 4 through 10.

9.    COPYRIGHT POLICY.

Company respects the intellectual property of others and asks that users of our Site do the same. In connection with our Site, we have adopted and implemented a policy respecting copyright law that provides for the removal of any infringing materials and for the termination, in appropriate circumstances, of users of our online Site who are repeat infringers of intellectual property rights, including copyrights. If you believe that one of our users is, through the use of our Site, unlawfully infringing the copyright(s) in a work, and wish to have the allegedly infringing material removed, the following information in the form of a written notification (pursuant to 17 U.S.C. § 512(c)) must be provided to our designated Copyright Agent:

1.    your physical or electronic signature;
2.    identification of the copyrighted work(s) that you claim to have been infringed;
3.    identification of the material on our services that you claim is infringing and that you request us to remove;
4.    sufficient information to permit us to locate such material;
5.    your address, telephone number, and e-mail address;
6.    a statement that you have a good faith belief that use of the objectionable material is not authorized by the copyright owner, its agent, or under the law; and
7.    a statement that the information in the notification is accurate, and under penalty of perjury, that you are either the owner of the copyright that has allegedly been infringed or that you are authorized to act on behalf of the copyright owner.

Please note that, pursuant to 17 U.S.C. § 512(f), any misrepresentation of material fact (falsities) in a written notification automatically subjects the complaining party to liability for any damages, costs and attorney's fees incurred by us in connection with the written notification and allegation of copyright infringement.

10.    GENERAL

10.1    Changes.  These Terms are subject to occasional revision, and if we make any substantial changes, we may notify you by sending you an e-mail to the last e-mail address you provided to us (if any), and/or by prominently posting notice of the changes on our Site. You are responsible for providing us with your most current e-mail address. In the event that the last e-mail address that you have provided us is not valid, or for any reason is not capable of delivering to you the notice described above, our dispatch of the e-mail containing such notice will nonetheless constitute effective notice of the changes described in the notice. Continued use of our Site following notice of such changes shall indicate your acknowledgement of such changes and agreement to be bound by the terms and conditions of such changes.

10.2    Dispute Resolution.    Please read the following arbitration agreement in this Section (the "Arbitration Agreement") carefully. It requires you to arbitrate disputes with Company, its parent companies, subsidiaries, affiliates, successors and assigns and all of their respective officers, directors, employees, agents, and representatives (collectively, the "Company Parties") and limits the manner in which you can seek relief from the Company Parties.

(a)    Applicability of Arbitration Agreement.    You agree that any dispute between you and any of the Company Parties relating in any way to the Site, the services offered on the Site (the "Services") or these Terms will be resolved by binding arbitration, rather than in court, except that (1) you and the Company Parties may assert individualized claims in small claims court if the claims qualify, remain in such court and advance solely on an individual, non-class basis; and (2) you or the Company Parties may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). **This Arbitration Agreement shall survive the expiration or termination of these Terms and shall apply, without limitation, to all claims that arose or were asserted before you agreed to these Terms (in accordance with the preamble) or any prior version of these Terms.** This Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state or local agencies. Such agencies can, if the law allows, seek relief against the Company Parties on your behalf. For purposes of this Arbitration Agreement,

"**Dispute**" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the Agreement as well as claims that may arise after the termination of these Terms.

(b)      **Informal Dispute Resolution.**  There might be instances when a Dispute arises between you and Company. If that occurs, Company is committed to working with you to reach a reasonable resolution. You and Company agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and Company therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("**Informal Dispute Resolution Conference**"). If you are represented by counsel, your counsel may participate in the conference, but you will also participate in the conference.

The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("**Notice**"), which shall occur within 45 days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties. Notice to Company that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to: legal@corgi.insure, or by regular mail to 425 Bush St, San Francisco, California 94104. The Notice must include: (1) your name, telephone number, mailing address, e-mail address associated with your account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

The Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases, unless all parties agree; multiple individuals initiating a Dispute cannot participate in the same Informal Dispute Resolution Conference unless all parties agree. In the time between a party receiving the Notice and the Informal Dispute Resolution Conference, nothing in this Arbitration Agreement shall prohibit the parties from engaging in informal communications to resolve the initiating party's Dispute. Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

(c)      **Arbitration Rules and Forum.**  These Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings. If the Informal Dispute Resolution Process described above does not resolve satisfactorily within 60 days after receipt of your Notice, you and Company agree that either party shall have the right to finally resolve the Dispute through binding arbitration. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement. The arbitration will be conducted by JAMS, an established alternative dispute resolution provider. Disputes involving claims and counterclaims with an amount in controversy under $250,000, not inclusive of attorneys' fees and interest, shall be subject to JAMS' most current version of the Streamlined Arbitration Rules and procedures available at http://www.jamsadr.com/rules-streamlined-arbitration/; all other claims shall be subject to JAMS's most current version of the Comprehensive Arbitration Rules and Procedures, available at http://www.jamsadr.com/rules-comprehensive-arbitration/. JAMS's rules are also available at www.jamsadr.com or by calling JAMS at 800-352-5267. A party who wishes to initiate arbitration must provide the other party with a request for arbitration (the "**Request**"). The Request must include: (1) the name, telephone number, mailing address, e-mail address of the party seeking arbitration and the account username (if applicable) as well as the email address associated with any applicable account; (2) a statement of the legal claims being asserted and the factual bases of those claims; (3) a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy in United States Dollars; (4) a statement certifying completion of the Informal Dispute Resolution process as described above; and (5) evidence that the requesting party has paid any necessary filing fees in connection with such arbitration.

If the party requesting arbitration is represented by counsel, the Request shall also include counsel's name, telephone number, mailing address, and email address. Such counsel must also sign the Request. By signing the Request, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (1) the Request is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (2) the claims, defenses and other legal

contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual and damages contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Unless you and Company otherwise agree, or the Batch Arbitration process discussed in Subsection 10.2(h) is triggered, the arbitration will be conducted in the county where you reside. Subject to the JAMS Rules, the arbitrator may direct a limited and reasonable exchange of information between the parties, consistent with the expedited nature of the arbitration. If the JAMS is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any JAMS fees and costs will be solely as set forth in the applicable JAMS Rules.

You and Company agree that all materials and documents exchanged during the arbitration proceedings shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors, and then subject to the condition that they agree to keep all materials and documents exchanged during the arbitration proceedings confidential.

**(d)** **Authority of Arbitrator.** The arbitrator shall have exclusive authority to resolve all disputes subject to arbitration hereunder including, without limitation, any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: (1) all Disputes arising out of or relating to the subsection entitled "Waiver of Class or Other Non-Individualized Relief," including any claim that all or part of the subsection entitled "Waiver of Class or Other Non-Individualized Relief" is unenforceable, illegal, void or voidable, or that such subsection entitled "Waiver of Class or Other Non-Individualized Relief" has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in the subsection entitled "Batch Arbitration," all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties, except as expressly provided in the subsection entitled "Batch Arbitration." The arbitrator shall have the authority to grant motions dispositive of all or part of any claim or dispute. The arbitrator shall have the authority to award monetary damages and to grant any non-monetary remedy or relief available to an individual party under applicable law, the arbitral forum's rules, and these Terms (including the Arbitration Agreement). The arbitrator shall issue a written award and statement of decision describing the essential findings and conclusions on which any award (or decision not to render an award) is based, including the calculation of any damages awarded. The arbitrator shall follow the applicable law. The award of the arbitrator is final and binding upon you and us. Judgment on the arbitration award may be entered in any court having jurisdiction.

**(e)** **Waiver of Jury Trial.** EXCEPT AS SPECIFIED IN SECTION 10.2(A) YOU AND THE COMPANY PARTIES HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY. You and the Company Parties are instead electing that all covered claims and disputes shall be resolved exclusively by arbitration under this Arbitration Agreement, except as specified in Section 10.2(a) above. An arbitrator can award on an individual basis the same damages and relief as a court and must follow these Terms as a court would. However, there is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.

**(f)** **Waiver of Class or Other Non-Individualized Relief.** YOU AND COMPANY AGREE THAT, EXCEPT AS SPECIFIED IN SUBSECTION 10.2(H) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER. Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim. Nothing in this paragraph is intended to, nor

shall it, affect the terms and conditions under the Subsection 10.2(h) entitled "Batch Arbitration." Notwithstanding anything to the contrary in this Arbitration Agreement, if a court decides by means of a final decision, not subject to any further appeal or recourse, that the limitations of this subsection, "Waiver of Class or Other Non-Individualized Relief," are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief), you and Company agree that that particular claim or request for relief (and only that particular claim or request for relief) shall be severed from the arbitration and may be litigated in the state or federal courts located in the State of California. All other Disputes shall be arbitrated or litigated in small claims court. This subsection does not prevent you or Company from participating in a class-wide settlement of claims.

**(g)** **Attorneys' Fees and Costs.**  The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you or Company need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration. The prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Informal Dispute Resolution Process, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs.

**(h)** **Batch Arbitration.**  To increase the efficiency of administration and resolution of arbitrations, you and Company agree that in the event that there are 100 or more individual Requests of a substantially similar nature filed against Company by or with the assistance of the same law firm, group of law firms, or organizations, within a 30 day period (or as soon as possible thereafter), the JAMS shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("**Batch Arbitration**").

All parties agree that Requests are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise the JAMS, and the JAMS shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process ("**Administrative Arbitrator**"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by Company.

You and Company agree to cooperate in good faith with the JAMS to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches of Requests, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings.

This Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances, except as expressly set forth in this provision.

**(i)** **30-Day Right to Opt Out.**  You have the right to opt out of the provisions of this Arbitration Agreement by sending a timely written notice of your decision to opt out to the following address: 425 Bush St, San Francisco, California 94104, or email to legal@corgi.insure, within 30 days after first becoming subject to this Arbitration Agreement. Your notice must include your name and address and a clear statement that you want to opt out of this Arbitration Agreement. If you opt out of this Arbitration Agreement, all other parts of these Terms will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may currently have with us, or may enter into in the future with us.

**(j)** **Invalidity, Expiration.** Except as provided in the subsection entitled "Waiver of Class or Other Non-Individualized Relief", if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect. You further agree that any Dispute that you have with Company as detailed in this Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred. Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the applicable court of competent jurisdiction.

**(k)** **Modification.** Notwithstanding any provision in these Terms to the contrary, we agree that if Company makes any future material change to this Arbitration Agreement, you may reject that change within 30 days of such change becoming effective by writing Company at the following address: 425 Bush St, San Francisco, California 94104, or email to legal@corgi.insure. Unless you reject the change within 30 days of such change becoming effective by writing to Company in accordance with the foregoing, your continued use of the Site and/or Services, including the acceptance of products and services offered on the Site following the posting of changes to this Arbitration Agreement constitutes your acceptance of any such changes. Changes to this Arbitration Agreement do not provide you with a new opportunity to opt out of the Arbitration Agreement if you have previously agreed to a version of these Terms and did not validly opt out of arbitration. If you reject any change or update to this Arbitration Agreement, and you were bound by an existing agreement to arbitrate Disputes arising out of or relating in any way to your access to or use of the Services or of the Site, any communications you receive, any products sold or distributed through the Site, the Services, or these Terms, the provisions of this Arbitration Agreement as of the date you first accepted these Terms (or accepted any subsequent changes to these Terms) remain in full force and effect. Company will continue to honor any valid opt outs of the Arbitration Agreement that you made to a prior version of these Terms.

10.3    **Export.** The Site may be subject to U.S. export control laws and may be subject to export or import regulations in other countries. You agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company, or any products utilizing such data, in violation of the United States export laws or regulations.

10.4    **Disclosures.** Company is located at the address in Section 10.8. If you are a California resident, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Product of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

10.5    **Electronic Communications.** The communications between you and Company use electronic means, whether you use the Site or send us emails, or whether Company posts notices on the Site or communicates with you via email. For contractual purposes, you (a) consent to receive communications from Company in an electronic form; and (b) agree that all terms and conditions, agreements, notices, disclosures, and other communications that Company provides to you electronically satisfy any legal requirement that such communications would satisfy if it were be in a hardcopy writing. The foregoing does not affect your non-waivable rights.

10.6    **Entire Terms.** These Terms constitute the entire agreement between you and us regarding the use of the Site. Our failure to exercise or enforce any right or provision of these Terms shall not operate as a waiver of such right or provision. The section titles in these Terms are for convenience only and have no legal or contractual effect. The word "including" means "including without limitation". If any provision of these Terms is, for any reason, held to be invalid or unenforceable, the other provisions of these Terms will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law. Your relationship to Company is that of an independent contractor, and neither party is an agent or partner of the other. These Terms, and your rights and obligations herein, may not be assigned, subcontracted, delegated, or otherwise transferred by you without Company's prior written consent, and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void. Company may freely assign these Terms. The terms and conditions set forth in these Terms shall be binding upon assignees.

10.7    **Copyright/Trademark Information.** Copyright © 2026 Corgi Insurance Services, Inc. All rights reserved. All trademarks, logos and service marks ("**Marks**") displayed on the Site are our property or the property

of other third parties. You are not permitted to use these Marks without our prior written consent or the consent of such third party which may own the Marks.

**10.8    Contact Information:**

Corgi Legal
Address: 425 Bush Street
San Francisco, California 94104
Telephone: 301-693-2267
Email: legal@corgi.insure

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 4, 2026, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**BY EMAIL**
Travis J. Ferguson
Amy R. Harriman
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 North King St., 8th Floor
Wilmington, DE 19801
tferguson@mccarter.com
aharriman@mccarter.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Robert M. Vrana*
Robert M. Vrana (No. 5666)
Parks L. Kingery (No. 7416)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
rvrana@ycst.com
pkingery@ycst.com

*Attorneys for Defendants Vouch, Inc., Vouch
Specialty Insurance Services, LLC, Vouch US
Insurance Services Holdings, LLC, Vouch Risk
Management Services, LLC, Kelly Wulff, and
Augmenta Advisory, LLC*