## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TECHNOLOGY RISK RETENTION GROUP, INC.**,**
an Arizona corporation, CORGI INSURANCE
SERVICES, INC.**,** a Delaware corporation,

       *Plaintiffs,*

      *v.*

VOUCH, INC., a Delaware corporation, VOUCH
SPECIALTY INSURANCE SERVICES, LLC**,** a
Delaware limited liability company, VOUCH  US
INSURANCE  SERVICES  HOLDINGS,  LLC**,**  a
Delaware  limited  liability  company, VOUCH RISK
MANAGEMENT SERVICES, LLC**,** a Delaware
limited liability company, KELLY  WULFF**,**  an
individual,  AUGMENTA ADVISORY, LLC, a
Delaware limited liability company,

      *Defendants.*

C.A. No. 1:26-cv-00426-RGA

### OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION
### TO DISMISS FIRST AMENDED COMPLAINT

July 10, 2026

OF COUNSEL:

KEKER, VAN NEST & PETERS LLP
Warren A. Braunig
Cody Gray
Jacqueline Concilla
Michaela Firmage
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
wbraunig@keker.com
cgray@keker.com
jconcilla@keker.com
mfirmage@keker.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Robert M. Vrana (No. 5666)
Parks L. Kingery (No. 7416)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
rvrana@ycst.com
pkingery@ycst.com

*Attorneys for Defendants Vouch, Inc., Vouch
Specialty Insurance Services, LLC, Vouch US
Insurance Services Holdings, LLC, Vouch Risk
Management Services, LLC, Kelly Wulff, and
Augmenta Advisory, LLC*

6240800

**TABLE OF CONTENTS**

**Page(s)**

I.   NATURE AND STAGE OF PROCEEDINGS ...................................................1

II.  INTRODUCTION AND SUMMARY OF ARGUMENT ..................................1

III. STATEMENT OF FACTS ...............................................................................3

IV.  ARGUMENT ..................................................................................................4

   A.   Corgi's federal trade secret claim should be dismissed. ........................5

      1.   Corgi fails to allege protectable trade secrets. .............................5

      2.   Corgi fails to allege that Defendants obtained any information that was the subject of reasonable measures to protect its secrecy.....................8

   B.   Corgi's Delaware trade secret claim must be dismissed because it lacks sufficient connection to Delaware. ..........................................12

   C.   Corgi's civil conspiracy, unjust enrichment, and fraud claims are preempted by California and Delaware trade secret law. ......................13

   D.   Even if not preempted, Corgi cannot sustain its fraud claim. ...............17

      1.   Corgi fails to meet the heightened pleading standard for fraud................17

      2.   Ms. Wulff cannot be liable for fraud because she had no legal obligation to disclose the supposedly omitted facts...................18

   E.   Corgi's declaratory relief claim is unnecessary and moot. ...................19

   F.   Corgi's three deceptive trade practices claims fail (Counts VII-IX). ....................19

      1.   The single statement that forms the basis for Corgi's claims is non-actionable puffery. ...............................................19

      2.   The Lanham Act claim (Count VII) further fails because the accused statement is not "commercial advertising."................21

      3.   The DTPA claim (Count VIII) further fails because the alleged conduct did not take place in Delaware and Corgi fails to allege a reasonable apprehension of future wrong.................22

      4.   The Trade Libel claim (Count IX) further fails because Corgi does not plead pecuniary loss or actual malice. ...............................23

   G.   Corgi's tortious interference claim (Count X) fails. ............................24

6240800

V.    CONCLUSION........................................................................................................25

6240800

**Federal Cases**

*1nteger, LLC v. Almeida,*
    2025 WL 3691887 (C.D. Cal. Dec. 11, 2025) ...............................................................5, 6, 15

*Agency Solutions.Com, LLC, v. TriZetto Group, Inc.,*
    819 F. Supp. 2d 1001 (E.D. Cal. 2011)...............................................................7, 8

*Almatar v. Reyes,*
    2026 WL 719161 (C.D. Cal. Mar. 12, 2026)...............................................................17, 18

*Battaglia Mgmt., Inc. v. Abramowicz,*
    2024 WL 3183063 (D. Del. June 26, 2024)...............................................................15

*Benihana of Tokyo, Inc. v. Benihana, Inc.,*
    828 F. Supp. 2d 720 (D. Del. 2011)...............................................................14

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.,*
    627 F. Supp. 2d 384 (D. N.J. 2009) ...............................................................21

*Briggs v. United States,*
    564 F. Supp. 2d 1087. (N.D. Cal. 2008) ...............................................................19

*Buck v. Hampton Twp. Sch. Dist.,*
    452 F.3d 256 (3d Cir. 2006)...............................................................4

*Burtch v. Milberg Factors, Inc.,*
    662 F.3d 212 (3d Cir. 2011)...............................................................4, 9, 12

*Carr v. AutoNation, Inc.,*
    798 Fed. Appx. 129 (9th Cir. 2020)...............................................................9

*Castrol Inc. v. Pennzoil Co.,*
    987 F. 2d 939 (3d Cir. 1993)...............................................................20

*Clear Blue Spec'y Ins. Co. v. Ozy Media, Inc.,*
    669 F. Supp. 3d 907 (N.D. Cal. 2023) ...............................................................19

*Dac v. Booking Holdings Inc.,*
    2023 WL 2867476 (D. Del. Apr. 7, 2023)...............................................................23

*Destfino v. Reiswig,*
    630 F.3d 952 (9th Cir. 2011) ...............................................................18

*Dow Chem. Canada, Inc. v. HRD Corp.,*
    909 F. Supp. 2d 340 (D. Del. 2012)...............................................................5

*Elias Indus., Inc. v. Kissler & Co. Inc.,*
    2021 WL 2141509 (W.D. Pa. May 26, 2021)...............................................................11

iv

*Ethypharm S.A. Fr. v. Bentley Pharm., Inc.*,
  388 F. Supp. 2d 426 (D. Del. 2005)............................................................................15, 17

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48 (2002)......................................................................................................22

*Genasys Inc. v. Vector Acoustics, LLC*,
  638 F. Supp. 3d 1135 (S.D. Cal. 2022).......................................................................16

*Greenmount LLC v. Cleanline Mgmt. LLC*,
  2024 WL 5505735 (C.D. Cal. Sept. 18, 2024) ...........................................................25

*Huber v. Taylor*,
  469 F.3d 67 (3d Cir. 2006)......................................................................................13, 14

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
  2020 WL 4584354 (D. Del. Aug. 10, 2020) ...............................................................14

*Intervert, Inc. v. Mileutis, Ltd.*,
  2016 WL 740267 (D. N.J. Feb. 24, 2016) ..................................................................23

*James v. Global TelLink Corp.*,
  852 F.3d 262 (3d Cir. 2017)........................................................................................10

*Lloyd v. HOVENESA, LLC*,
  369 F.3d 263 (3d Cir. 2004)..........................................................................................1

*Mallet & Co. Inc. v. Lacayo*,
  16 F.4th 364 (3d Cir. 2021) ..............................................................................5, 7, 11

*Maxim Inc. and Maxim Licensing Inc. v. Playboy, Inc.*,
  2026 WL 1361773 (S.D.N.Y. May 15, 2026) .............................................................11

*MBIA Ins. Corp. v. Royal Indem. Co.*,
  221 F.R.D. 419 (D. Del. 2004) ...................................................................................17

*Montway LLC v. Navi Transp. Servs. LLC*,
  809 F. Supp. 3d 200 (D. Del. 2025)......................................................................12, 13

*Nat'l Risk Mgmt., Inc. v. Bramwell*,
  819 F. Supp. 417 (E.D. Pa. 1993) ..............................................................................11

*Nautilus Ins. Co. v. Day to Day Fashion, Inc.*,
  2017 WL 5643182 (C.D. Cal. Aug. 8, 2017)..............................................................19

*Nova Chems., Inc. v. Sekisui Plastics Co., Ltd.*,
  579 F.3d 319 (3d Cir. 2009)...........................................................................................8

*Oakwood Lab'ys LLC v. Thanoo*,
  999 F.3d 892 (3d Cir. 2021)...........................................................................................5

v

*Optimum Techs, Inc. v. Home Depot USA, Inc.*,
  2005 WL 3307508 (N.D. Ga. Dec. 5, 2005)................................................................22

*Peloton Interactive*, *Inc. v. ICON Heath & Fitness, Inc.*,
  2021 WL 2188219 (D. Del. May 28, 2021)...............................................................20

*Pitney Bowes*, *Inc. v. ITS Mailing Sys., Inc.*,
  2010 WL 1005146 (E.D. Pa. Mar. 17, 2010)............................................................21

*Pizza Hut, Inc. v. Papa John's Int'l*,
  227 F.3d 489 (5th Cir. 2000) ....................................................................................20

*Profit Point Tax Tech., Inc. v. DPAD Group, LLP*,
  2020 WL 759952 (W.D. Pa. Jan. 29, 2020)..............................................................12

*Prostar Wireless Group, LLC v. Domino's Pizza, Inc.*,
  360 F. Supp. 3d 994 (N.D. Cal. 2018) .....................................................................15

*Quanzhou New Hunter Bags & Luggages (Light Industry) Co., Ltd. v. Spray
  Moret, LLC*,
  2026 WL 538578 (S.D.N.Y. Feb. 26, 2026)...............................................................7

*Registered Agent Sols., Inc. v. Corp. Servs Co.*,
  2022 WL 911253 (D. Del. Mar. 28, 2022) ...........................................................22, 23

*Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*,
  2001 WL 856946 (E.D. Pa. July 26, 2001)...............................................................21

*Sciore v. Phung*,
  2022 WL 950261 (D. N.J. Mar. 30, 2022).........................................................23, 24, 25

*SI Handling Sys., Inc. v. Heisley*,
  753 F.2d 1244 (3d Cir. 1985)...................................................................................9, 11

*Snapkeys, Ltd. v. Google LLC*,
  442 F. Supp. 3d 1196 (N.D. Cal. 2020) ...............................................................15, 17

*Swartz v. KPMG LLP*,
  476 F.3d 756 (9th Cir. 2007) ...................................................................................18

*Tortilla Factory, LLC v. Trader Joe's Co.*,
  2018 WL 8367468 (C.D. Cal. Oct. 11, 2018)...........................................................17

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
  679 F. Supp. 2d 1120  (C.D. Cal. 2009). ..............................................................20, 21

*United States Healthcare, Inc. v. Blue Cross of Greater Philadelphia*,
  898 F.2d 914 (3d Cir. 1990)..................................................................................20, 21

vi

Vertical Bridge REIT, LLC v. Everest Infrastructure Partners, Inc.
   2024 WL 2392896 (W.D. Pa. May 23, 2024)..................................................................8, 9

**State Cases**

*250ok, Inc. v. Message Sys.*, *Inc.*,
   2021 WL 225874 (Del. Ch. Jan. 22, 2021)......................................................................14, 16

*AlixPartners, LLP v. Mori*,
   2022 WL 1111404 (Del. Ch. Apr. 14, 2022).........................................................................13

*Beard Rsch., Inc., v. Kates*,
   8 A.3d 573 (Del. Ch. 2010)......................................................................................14, 15

*Blue Beach Bungalows DE, LLC v. State of Del.*,
   351 A.3d 1007 (Del. 2025) ........................................................................................18

*Curcini v. Cnty of Alameda*,
   164 Cal. App. 4th 629 (2008) ....................................................................................23

*Focus Fin. Partners, LLC v. Holsopple*,
   250 A.3d 939 (Del. Ch. 2020)....................................................................................12

*Incyte Corp. v. Flexus Biosciences, Inc.*,
   2017 WL 7803923 (Del. Super. Ct. Nov. 1, 2017)................................................................15

*J-M Mfg. Co., Inc. v. Phillips & Cohen LLP*,
   247 Cal. App. 4th 87 (2016) ......................................................................................23

*K.C. Multimedia, Inc. v. Bank of America Tech. & Ops., Inc.*,
   171 Cal. App. 4th 939 (2009) ................................................................................14, 15

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ...........................................................................................25

*Opus Bank v. First Found. Bank*,
   2016 Cal. Super. LEXIS 25433 (Cal. Super. Ct. Oct. 4, 2016) ...............................................14

*Organovo Holdings v. Dimitrov*,
   162 A.3d 102 (Del. Ch. 2017).....................................................................................24

*Preston Hollow Capital LLC v. Nuveen LLC*,
   2020 WL 1814756 (Del. Ch. Apr. 9, 2020)....................................................................24, 25

*Renovaro Inc. v. Gumrukcu*,
   2025 WL 3134533 (Del. Ch. Nov. 7, 2025) ..................................................................17, 18

*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.*,
   2 Cal. 5th 505 (2017) ..............................................................................................24

6240800

*Salma v. Capon*,
   161 Cal. App. 4th 1275 (2008) ...................................................................................25

*Schuster v. DeRocili*,
   2000 WL 1211504 (Del. Super. June 15, 2000) .......................................................23

*Spread Your Wings, LLC v. Tran*,
   2025 Cal. Super. LEXIS 80395 (Cal. Super. Ct. Dec. 15, 2025)..............................15

*Stoltz Mgmt. of Del., Inc. v. Entrata, Inc.*,
   2026 Del. Super. LEXIS 51 (Del. Super. Ct. Jan. 30, 2026) ....................................22

*Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*,
   245 Cal. App. 4th 821 (2016) ...................................................................................18

*Tygon Peak Capital Mgmt., LLC v. Mobile Invs. Investco, LLC*,
   2022 WL 34688 (Del. Ch. Jan. 4, 2022)...................................................................23

*Winner Acceptance Corp. v. Return on Capital*,
   2008 WL 5352063 (Del. Ch. Dec. 23, 2008)............................................................21

*Wright v. SLWM, LLC*,
   2025 Del. Ch. LEXIS 335 (Del. Ch. Apr. 23, 2025) ................................................22

*Zync, Inc. v. Porsche Invs. Mgmt.*,
   S.A., 2026 Del. Ch. LEXIS 239 (Del. Ch. May 29, 2026) ......................................25

**Federal Statutes**

18 U.S.C. § 1836(b)(1); and (3)................................................................................................5

18 U.S.C. § 1839(3) ..................................................................................................................5

18 U.S.C. § 1839(5) ..................................................................................................................5

**State Statutes**

6 Del. C. § 2001 ......................................................................................................................17

Cal. Civ. Code § 3426.1(a), (b)(2)(A) ...................................................................................17

Delaware Deceptive Trade Practices Act ........................................................................ *passim*

Delaware Uniform Trade Secrets Act................................................................................ *passim*

**Rules**

Fed. R. Civ. P. 9......................................................................................................................17

Fed. R. Civ. P. 12......................................................................................................................1

viii

6240800

Rule 12(b)(6)..........................................................................................................................4

**Other Authorities**

Restatement (Third) of Unfair Competition § 39 Comment d (1995)...........................................5

6240800

## I.    NATURE AND STAGE OF PROCEEDINGS[1]

Plaintiffs Technology Risk Retention Group, Inc. ("TRRG") and Corgi Insurance Services, Inc. (collectively, "Corgi") filed a First Amended Complaint on June 18, 2026 alleging that Defendants Vouch, Inc., Vouch Specialty Insurance Services, LLC, Vouch US Insurance Services Holdings, LLC, Vouch Risk Management Services LLC (collectively, "Vouch Entity Defendants"), Kelly Wulff ("Ms. Wulff" and together with the Vouch Entity Defendants, the "Vouch Defendants"), and Augmenta Advisory, LLC ("Augmenta") misappropriated Corgi's trade secret information, committed various torts, and engaged in deceptive advertising practices (D.I. 24). Defendants now move to dismiss Corgi's claims in their entirety under Federal Rule of Civil Procedure 12(b)(6).[2] Defendants have also moved to compel arbitration. If arbitration is compelled (as it should be), the Court need not reach this motion. *See Lloyd v. HOVENESA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) (whenever suit is brought on an arbitrable claim, the Court "shall" stay the litigation pending conclusion of the arbitration).

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Corgi rushed to court on bad information. The story conjured in Corgi's First Amended Complaint does not stand up to scrutiny, or square with common sense. Defendant Augmenta was not created as a charade to access Corgi's alleged trade secrets; it is the legitimate personal consulting business of Vouch's Chief Legal Officer, Kelly Wulff, who has operated it under various names since 2022 and recently re-incorporated it in Delaware. And neither Ms. Wulff

---

[1] Unless otherwise noted, internal quotation marks, alterations, and citations have been omitted, and all emphases have been added.

[2] Defendants previously moved to dismiss Corgi's original complaint. D.I. 21–23. Despite being made aware of the deficiencies in its claims, Corgi withdrew only the claim on which Defendants had ***not moved*** to dismiss (breach of contract), in a misguided effort by Corgi to avoid its own arbitration provision. Instead, Corgi's FAC just maintained its deficient claims, while adding four more that are equally deficient. Per D.I. 26, Defendants now move again to dismiss.

1

6240800

nor Augmenta nor any of the Vouch Entity Defendants accessed, much less used, Corgi "trade secrets." At most, Corgi accuses Ms. Wulff and Augmenta of accessing its online insurance application (which is publicly available on Corgi's website), applying for insurance, and obtaining Corgi's "policy documents"—documents Corgi routinely sends to every purchaser of Corgi insurance, without any confidentiality markings, and without any limitation on how the documents may be shared. These are not trade secrets at all. And Corgi's suggestion that Vouch was trying to "steal" its online insurance questionnaire is absurd, when Vouch has had its own online intake flow in place for over 7 years.

In fact, the evidence will ultimately show that it was Corgi (not Vouch) that unlawfully used competitive information to get a head start. Shortly after Corgi incorporated in 2024, its co-founder and COO Emily Yuan twice navigated through *Vouch's* online insurance application flow (using two different email addresses). Once in Vouch's flow, Ms. Yuan toggled various coverages and obtained a half-dozen unique price quotes. At least one other Corgi senior employee, using his Corgi email address, did the same thing. It is little surprise then that industry insiders recently pointed out that Corgi's new insurance application flow and offerings looked nearly identical to Vouch's.[3] To put it simply: Corgi's co-founder Ms. Yuan engaged in precisely the conduct that Corgi falsely accuses Defendants of carrying out. This will be the subject of discovery and proof at the appropriate time and place.

Defendants previously moved to compel arbitration based on Corgi's own applicable Terms of Use ("Terms"), which Corgi disregarded in its rush to file this lawsuit and smear Vouch and its executives. If the motion to compel is granted, the Court need not reach this

---

[3] *See, e.g.*, https://coverager.com/corgi-introduces-ai-insurance-coverage/.

2

6240800

motion. If that motion is denied, however, the Court should dismiss all of Corgi's claims. Specifically:

1.    The Court should dismiss Corgi's federal trade secret claim because Corgi does not allege protectable trade secrets or that the information Defendants purportedly accessed or obtained was subject to reasonable efforts to maintain its secrecy.

2.    The Court should dismiss Corgi's Delaware Uniform Trade Secrets Act ("DUTSA") claim because DUTSA does not apply extraterritorially, and Corgi does not allege that any relevant acts supporting the claim occurred in Delaware. Corgi's DUTSA claim also fails for the same reasons as its federal claim.

3.    The Court should dismiss Corgi's civil conspiracy, unjust enrichment, and fraud claims because they are preempted by state trade secret statutes. Corgi also failed to adequately plead a fraud claim against any of the Defendants.

4.    The Court should dismiss Corgi's request for declaratory relief as moot because the Policy was cancelled and there is no live controversy between the parties on that issue.

5.    The Court should dismiss Corgi's deceptive and false advertising claims because the accused statements, allegedly made by one employee in a sales solicitation, are mere "puffery" not actionable as a matter of law. Those claims are also deficient on other grounds.

6.    The Court should dismiss Corgi's intentional interference claim because Corgi does not allege a concrete business opportunity, damages, or an independent wrongful act.

## III.    STATEMENT OF FACTS

Corgi alleges that on February 10, 2026, Augmenta submitted an insurance application through Corgi's underwriting platform. D.I. 24 ("FAC") ¶¶ 15, 28. The application identified Ms. Wulff as the applicant and Augmenta's sole director. *Id.* ¶ 28. Ms. Wulff also serves as the Chief Legal & Administrative Officer at Vouch, Inc., a brokerage entity that helps businesses

3

6240800

obtain commercial insurance policies but does not underwrite or financially back those policies. *Id.* ¶¶ 9, 13. Corgi alleges that, based on the application, Corgi issued Augmenta a Commercial General Liability Policy and related materials for the period of February 10, 2026 through February 10, 2027. *Id.* ¶ 32. Corgi alleges, upon information and belief, that Augmenta's insurance application was a pretextual plot, directed by the Vouch Entity Defendants, to obtain Corgi's confidential information. *Id.* ¶¶ 36–40. Corgi alleges that by accessing Corgi's application platform and obtaining policy documents, the Defendants obtained Corgi's proprietary information. *Id.* ¶¶ 36, 39.

Corgi further alleges that the Vouch Entity Defendants engaged in deceptive advertising and interfered with a prospective business opportunity when one Vouch sales representative made a statement to an unidentified business prospect that "the difference between the parties' products is 'the difference between insurance that checks a box and insurance that actually pays.'" FAC ¶¶ 40–42.

IV.    ARGUMENT

Every one of Corgi's claims should be dismissed under Rule 12(b)(6). Courts in the Third Circuit utilize a three-step process in analyzing a Rule 12(b)(6) motion: First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). Second, a court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Finally, "where there are well-pleaded [] allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* In evaluating a Rule 12(b)(6) motion, a court may consider matters which may be judicially noticed without converting the motion to dismiss into a motion for summary judgment. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006).

4

6240800

### A.    Corgi's federal trade secret claim should be dismissed.

Corgi's federal Defend Trade Secrets Act ("DTSA") claim should be dismissed because Corgi fails to allege protectable trade secret information or that Defendants wrongfully obtained information maintained in secrecy. To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plead: "(1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret, 18 U.S.C. § 1839(3); (2) that 'is related to a product or service used in, or intended for use in, interstate or foreign commerce[,]' [18 U.S.C.] § 1836(b)(1); and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret, [18 U.S.C.] § 1839(5)." *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). Corgi's claim fails on the first and third elements.

### 1.    Corgi fails to allege protectable trade secrets.

Corgi's DTSA claim fails at the threshold. To proceed on a trade-secrets claim, the plaintiff must sufficiently identify the information it claims as a trade secret and allege facts supporting the assertion that the information is indeed protectable as such. *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 380–82 (3d Cir. 2021). This requires that the plaintiff identify the purported trade secrets with sufficient specificity to put the defendant on notice of the claims, *see Oakwood*, 999 F.3d at 906, and with enough particularity to distinguish the alleged trade secret from general industry knowledge or the specialized knowledge of those skilled in the field. *See Dow Chem. Canada, Inc. v. HRD Corp.*, 909 F. Supp. 2d 340, 346 (D. Del. 2012). Plaintiffs may not merely point to "broad areas of technology and assert that something there must have been secret and misappropriated." *Mallet*, 16 F.4th at 384 n.24. Rather, the plaintiff must identify "concrete secrets," *see id.*, "with sufficient definiteness to permit a court to apply the criteria for protection." Restatement (Third) of Unfair Competition § 39 cmt. d (1995); *see also 1Integer,*

5

*LLC v. Almeida*, 2025 WL 3691887, at \*3 (C.D. Cal. Dec. 11, 2025) (describing alleged trade secrets in "broad categories" is insufficient because "such catchall language . . . does not separate the alleged secrets from matters of general knowledge or permit [defendants] to ascertain the boundaries of the claim").

Corgi's allegations fall well short of the "reasonable specificity" standard. Instead of identifying concrete, protectable trade secrets, Corgi offers six high-level categories of business and technical information: (1) "Underwriting Questionnaire and Risk Assessment Logic"; (2) "Custom Policy Forms"; (3) "Pricing Methodology and Structures"; (4) "Platform Workflow Architecture"; (5) "Coverage Architecture and Product Design"; and (6) "Issuance Documentation Package." FAC ¶ 25. Corgi's explanation of what these categories include is just more nondescript business jargon. *See e.g.*, *id.* (defining the "Underwriting Questionnaire" as "[t]he specific questions asked. . . branching logic, [and . . . ] weighting methodology"; the "Custom Policy Forms" as the "agreement terms, retention mechani[sms], and definitional provisions"; the "Pricing Methodology and Structures" as the "algorithms, formulas, and methodologies by which Plaintiffs calculate premiums"; and the "Coverage Architecture and Product Design" as the "specific combination of coverage lines offered" for insurance).

Corgi's supposed "trade secrets" are ill-defined and impossible to differentiate from standard business practices for an online insurer. For example, Corgi asserts that its trade secret categories include elements like its "branching logic," "combinations of coverage lines," "technology, user interface design, and information architecture," and pricing "methodologies." *Id*. But the FAC fails to explain what those entail, what aspects are proprietary, or how they are different from what every online insurance company would possess. The result is a trade-secrets list that attempts to declare virtually everything on Corgi's platform a trade secret.

6

6240800

Courts routinely reject such generic catch-all "trade-secret" lists, because they fail to separate the trade secrets from general industry knowledge. In *Mallet*, for instance, the Third Circuit vacated a lower court's injunction because the supposed trade secrets were "better characterized as a list of general categories of business and technical information." 16 F.4th at 382. The asserted trade secrets in *Mallet* were "formulas; customer purchase orders demonstrating Mallet's pricing; . . . Mallet's internal manuals and procedures …; pricing and volume data; . . . and a compilation of Mallet's product specification sheets." *Id.* Mindful of those categories, the court concluded that "Mallet fail[ed] to explain how we or anyone else is to distinguish between what is generally known or available information and what it contends to be protectable trade secrets." *Id.* at 383. So too here. Corgi similarly claims that policy documents, "algorithms," and an online "platform" (apparently, its entire website) are trade secrets. FAC ¶ 25(b), (c), (d), (f). But those descriptions do not differentiate the alleged "secret" information in those categories from general industry knowledge or the specialized knowledge of those skilled in the field.

Trade secret plaintiffs, in short, may not rely on "general categories of business and technical information," *Mallet*, 16 F.4th at 382, or "gesture[] at methods, techniques, and processes" without "explain[ing] how [those] techniques operate, what makes them valuable, or how easily they might be acquired by others," *Quanzhou New Hunter Bags & Luggages (Light Industry) Co., Ltd. v. Spray Moret, LLC*, 2026 WL 538578, at *3 (S.D.N.Y. Feb. 26, 2026). Because Corgi does exactly that—and nothing more—its DTSA claim fails. *Agency Solutions.Com, LLC, v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001 (E.D. Cal. 2011) is also instructive. There, the court rejected trade secrets described as an online insurance company's "rates," "rating process," "rating workflow," and "rating rules." *Id.* at 1021–23. Those broad

categories didn't describe trade secrets because, as here, they are just broad categories of information and/or processes common to every company that provides online insurance. *Id.*

In addition, Corgi's failure to describe its purported trade secrets with particularity renders it impossible to evaluate the adequacy of Corgi's asserted secrecy measures. How is Vouch, or the Court, to determine whether Corgi's supposedly "unique coverage language," or "risk factors assessed," or "manner in which multiple lines are packaged and cross sold" is readily ascertainable or has been the subject of reasonable measures to maintain secrecy— without a clearer delineation of what those things entail?  FAC ¶ 25 (a), (b), (e). In *Vertical Bridge REIT, LLC v. Everest Infrastructure Partners, Inc.*, the district court granted a motion to dismiss because plaintiff's description of its trade secrets was so broad that it was "difficult . . . to determine" whether the information had been disclosed in "contracts that lacked any confidentiality provision" or "offer letters . . . without any non-disclosure agreement in place." Unless Corgi defines its trade secrets with greater specificity, the Court should do the same and dismiss Corgi's DTSA claim.

### 2.     Corgi fails to allege that Defendants obtained any information that was the subject of reasonable measures to protect its secrecy.

Corgi's DTSA claim fails for a second, independent reason. Corgi does not allege that the webpages or documents any Defendant *actually accessed* were maintained in secrecy or that Corgi took reasonable measures to protect them. This precludes a claim for misappropriation. *See Nova Chems., Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 327–28 (3d Cir. 2009) ("[T]he most important characteristic of a trade secret is that it is in fact secret.").

Stripped of its posturing, Corgi's complaint alleges that Defendants "misappropriated" only two items of information: (1) some undefined content from Corgi's public website; and (2) two custom policy forms. Corgi specifically avers that Ms. Wulff accessed the "risk-assessment questions" in its "underwriting flow," selected "coverage lines," and "requested specific limits

8

6240800

and retentions across all four lines." FAC ¶¶ 2, 28–32. Then, after completing the online application, Corgi alleges that Ms. Wulff was issued "custom policy form[s]." *Id.* ¶ 32. Corgi alleges, in other words, that Ms. Wulff applied for insurance through Corgi's website like any other customer and received a copy of the same forms that any customer receives when they buy insurance from Corgi. *Id.* In the Preliminary Statement, Corgi misleadingly asserts that Ms. Wulff accessed and obtained "proprietary underwriting *logic*, pricing *architecture*, and coverage *structures*." *Id.* ¶ 2. But there is no non-conclusory allegation in the complaint that Ms. Wulff obtained access to Corgi's back-end system or software code, where its "algorithms," "architecture," "logic," and "weighting methodology" would presumably be located. The Court may disregard Corgi's conclusory allegations to that effect. *See Burtch*, 662 F.3d at 221.[4]

As a matter of law, Corgi did not take "reasonable measures to [maintain] the secrecy" of the information Corgi *does* allege Ms. Wulff accessed: its website (sometimes referred to as its "underwriting platform") and its insurance policy forms. *See* FAC ¶ 27. Reasonable measures may include physically marking information as confidential, obtaining written confidentiality agreements, or otherwise taking measures that put a recipient on notice of the materials' secrecy. *See SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1250 (3d Cir. 1985); *Carr v. AutoNation, Inc.*, 798 Fed. Appx. 129, 130 (9th Cir. 2020) (reasonable measures not taken when plaintiff "failed to label the business plan as confidential," never informed defendant it was confidential, and the supposed trade secret was a "fairly standard" business document that "on its face does not appear to be something that a reader would reasonably expect to be treated as confidential").

---

[4] In *Vertical Bridge*, the district court granted a motion to dismiss where, like here, the plaintiff alleged that certain "formulae, models, and market analyses used to develop their pricing terms" were confidential but did not credibly allege that defendants actually had access to such information. 2024 WL 2392896, at *9 & n.13. If, in fact, Corgi's algorithms, logic, and weighting methodologies could be discerned by any person who scrolls through their public website, Corgi obviously is not protecting those adequately.

9

Corgi's allegations fall far short of establishing "reasonable measures." As to the website, Corgi does not allege that the insurance questionnaire is password-protected; that the website pages were labeled "confidential"; or that the application flow is made available only to a discrete number of recipients. Nor could it: the Corgi website and insurance application are public and available to anyone. *See* FAC ¶ 19. Instead, Corgi attempts to bootstrap reasonable measures by asserting that "access to Corgi's underwriting platform" (*i.e.*, website) is restricted "through acceptance of binding Terms of Use." *Id.* ¶ 27.

But Corgi's Terms of Use alone cannot constitute "reasonable measures." The Complaint does not assert that potential applicants must assent to, or even view, the Terms of Use ***before*** accessing the insurance application where the trade secrets apparently can be found in plain sight. Indeed, Corgi does not allege that a visitor or insurance applicant ***ever*** must click "I Accept" or otherwise assent to Corgi's Terms. As such, the Terms appear to operate as a "browsewrap" agreement.[5] But even assuming, as Corgi alleges, that this browsewrap contract is valid,[6] the Terms do not inform a website visitor *what content* on the site is purported to be a trade secret. The Terms merely recite boilerplate language that "all the intellectual property rights, including copyrights, patents, trade marks, and trade secrets, in the Site and its content are owned by Company or Company's suppliers." Ex. A § 2.5. Courts confronting similar allegations have held that even terms of service that say a user "shall not use, copy, distribute, or

---

[5] "Unlike online agreements where users must click on an acceptance after being presented with terms and conditions (known as 'clickwrap' agreements), browsewrap agreements do not require users to expressly manifest assent." *James v. Global TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017). "In browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen." *Id.* That is how Corgi's work. They state: "By accessing or using the site, you are accepting these terms." *See* Ex. A at 1.

[6] The Third Circuit has noted the uncertainty around enforcing browsewrap agreements. *See, e.g., Global TelLink*, 852 F.3d at 267.

6240800

exploit any of the Website Content," are not "equivalent to a nondisclosure agreement" and do not constitute reasonable measures. *See, e.g.*, *Maxim Inc. and Maxim Licensing Inc. v. Playboy, Inc.*, 2026 WL 1361773, at *4 (S.D.N.Y. May 15, 2026) (denying preliminary injunction).[7]

Corgi's "Policy Forms" are not the subject of reasonable measures to protect secrecy either. By Corgi's admission, they are provided to every customer who buys Corgi insurance. FAC ¶ 19. Corgi does not allege—because it could not—that the obtained policy documents were marked "confidential" or accompanied by any restriction on disclosure or sharing with third parties. If every customer gets a copy of these documents, they are not marked "confidential," and the customer is allowed to do with them as they please (including sharing them with other insurance companies to compare coverage or seek out a better deal), the policy forms cannot be trade secrets. *See SI Handling Sys., Inc.*, 753 F.2d at 1257 (where information is provided to "third parties . . . who have every incentive, and [] right [] to disclose it," the information loses its status as a trade secret); *Mallet*, 16 F. 4th at 370 (observing that "product data sheets" cannot be claimed as a trade secret "since those specification sheets are 'produced and provided to consumers of its products[]'"); *Nat'l Risk Mgmt., Inc. v. Bramwell*, 819 F. Supp. 417, 432 (E.D. Pa. 1993) ("pricing" is not a trade secret where it "is freely given out to prospective clients"); *Elias Indus., Inc. v. Kissler & Co. Inc.*, 2021 WL 2141509, at *6 (W.D. Pa. May 26, 2021) (plaintiff claimed customer-specific pricing was "closely guarded" but did not take steps to prohibit customers from sharing it).

Nor can Corgi satisfy the "reasonable measures" requirement by simply asserting, as it does, that Corgi "maintain[s] *proprietary* policy forms as *confidential* documents disclosed only

---

[7] The FAC also notes that the Terms bar "using the platform for competitive purposes." FAC ¶ 27(b). But while competitive use might theoretically be the basis for a brecach-of-contract claim, it does not turn the otherwise non-confidential contents of Corgi's website into trade secrets.

6240800

to applicants and policy[] holders." FAC ¶ 27(c). The conclusory assertion that the policy documents are "proprietary" and "confidential" is backed up by nothing; the Court may disregard it. *See Burtch*, 662 F.3d at 221; *Profit Point Tax Tech., Inc. v. DPAD Group, LLP*, 2020 WL 759952, at *6 (W.D. Pa. Jan. 29, 2020) (dismissing trade-secret claims where allegation of secrecy was supported by nothing "beyond conclusory statements"). And what difference does it make if the policy forms are "disclosed only to applicants and policyholders" if those individuals have no restriction on their use of the provided forms? FAC ¶ 27.

Because Corgi has failed to allege the misappropriation of any information that could qualify as a trade secret, the Court should dismiss its DTSA claim.

### B.    Corgi's Delaware trade secret claim must be dismissed because it lacks sufficient connection to Delaware.

Corgi's DUTSA claim should be dismissed because Corgi does not allege that any relevant conduct occurred in Delaware and the DUTSA does not apply extraterritorially. *See Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020) (dismissing claim where plaintiff had "not cited any conduct that took place in Delaware"); *see also Montway LLC v. Navi Transp. Servs. LLC*, 809 F. Supp. 3d 200, 213 (D. Del. 2025) ("If the misappropriation happened in another state or country, the DUTSA does not apply.").

There are no Delaware-specific allegations in the FAC. Even after Defendants noted this deficiency in their original motion, Corgi still does not allege that any purported misappropriation occurred in Delaware; that any of the trade secrets were developed in Delaware; that any documents or servers were maintained in Delaware; or that any supposed impacts were felt in Delaware. *See* FAC ¶¶ 24–35.

Corgi's failure to allege any Delaware-based conduct in connection with its trade-secret claim comes as no surprise given that all of the parties live or are based outside of Delaware. Corgi does not allege that any of the parties' principal places of business (or any physical place

12

of business, for that matter) are in Delaware. Instead, Corgi alleges that its principal place of business is in California; Ms. Wulff resides in California; and TRRG's principal place of business is in Arizona. *See* FAC ¶¶ 6, 7, 13. The Court can take judicial notice of the Vouch entities' principal place of business (also in California). *See* Defendants' Request for Judicial Notice and Exhibits 1–3 filed herewith.

The **only** connection that this action has to Delaware is that some of the parties are incorporated in Delaware—but that is insufficient under the DUTSA. In determining whether the DUTSA applies, place of incorporation "is not dispositive, maybe not even relevant." *Montway LLC*, 809 F. Supp. 3d at 213. Instead, the place where "the vast majority of the conduct ... relevant to the misappropriation occurred guides the analysis." *Id.*; *see also AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *18 (Del. Ch. Apr. 14, 2022) ("The fact that two of the Plaintiffs are Delaware entities and [defendant] was a partner in a Delaware limited liability partnership does not overcome the presumption against DUTSA's extraterritoriality."). Because some of the parties' state of incorporation is the only connection this action has to Delaware, the DUTSA plainly does not apply.[8]

### C.    Corgi's civil conspiracy, unjust enrichment, and fraud claims are preempted by California and Delaware trade secret law.

Corgi's civil conspiracy, unjust enrichment, and fraud claims are preempted by California and Delaware state trade secret law. To determine which law to apply to Corgi's state law claims, this Court "must apply the choice of law rules of the forum state to determine what substantive law will govern." *Huber v. Taylor*, 469 F.3d 67, 73 (3d Cir. 2006). Under Delaware's choice of law rules, where the laws of two potentially applicable jurisdictions are the same, a

---

[8] Even if DUTSA did apply, Corgi's state trade secret claim would fail as a matter of law for the same reasons as the federal DTSA claim. *See Montway LLC*, 809 F. Supp. 3d at 213 ("[T]he viability of a DUTSA claim rises and falls with a DTSA claim").

choice of law analysis is unnecessary and the court may refer "interchangeably" to those states' laws. *Id.* at 74. Because there are no relevant conflicts between California and Delaware laws with respect to trade-secret preemption, the Court may apply both state laws interchangeably. *Id.*[9]

Under both California and Delaware law, common law claims arising from the same facts as a trade secret claim are preempted by state trade secret statutes. *See K.C. Multimedia, Inc. v. Bank of America Tech. & Ops., Inc.*, 171 Cal. App. 4th 939, 958 (2009) (CUTSA "preempts common law claims that are based on the same nucleus of facts as the misappropriation of trade secrets claim for relief"); *Beard Rsch., Inc., v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010) (DUTSA preempts state law claims that are "grounded in the same facts which purportedly support the misappropriation of trade secrets claims"). Both California and Delaware courts almost uniformly adopt the "majority view" that preemption can be determined at the pleading stage before a court determines whether protectable trade secrets exist. *See 250ok, Inc. v. Message Sys., Inc.,* 2021 WL 225874, at *4 & n.41 (Del. Ch. Jan. 22, 2021) (collecting cases); *Opus Bank v. First Found. Bank*, 2016 Cal. Super. LEXIS 25433, at *2 (Cal. Super. Ct. Oct. 4, 2016) ("The question of preemption of such claims may be determined at the pleading stage.").

---

[9] If a conflict existed, the Court would apply the "most significant relationship" test, and California law would apply. *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 725 (D. Del. 2011). That test looks at four factors: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* "[T]he applicable law will usually be the local law of the state where the injury occurred." *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2020 WL 4584354, at *8 (D. Del. Aug. 10, 2020). Here, while the third factor is neutral (the corporate parties are incorporated in Delaware or Arizona, and their principal places of business are California or Arizona), the alleged injury would be felt in California, where Corgi is based; the conduct allegedly causing injury took place in California; and the parties' relationship is centered in California, where the Terms of Use were executed.

14

To determine whether a plaintiff's claims are grounded in the same set of facts as a trade secret claim, the Court must ask "whether, stripped of facts supporting trade secret misappropriation, the remaining factual allegations can be reassembled to independently support other causes of action." *Snapkeys, Ltd. v. Google LLC*, 442 F. Supp. 3d 1196, 1205 (N.D. Cal. 2020); *see also Ethypharm S.A. Fr. v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (same). In other words, "[t]o survive preemption, [a claim] must allege wrongdoing that is materially distinct from the wrongdoing alleged" in the trade secret claim. *Prostar Wireless Group, LLC v. Domino's Pizza, Inc.*, 360 F. Supp. 3d 994, 1006 (N.D. Cal. 2018). Corgi's claims do not come near satisfying that test.

*Civil Conspiracy*: Corgi's civil conspiracy claim is preempted under either California or Delaware state trade secret law because it is "based on" and "grounded in" the same facts as the misappropriation claims. *K.C. Multimedia*, 171 Cal. App. 4th at 958; *Beard*, 8 A.3d at 602. Corgi's civil conspiracy claim alleges that "Defendants agreed to misappropriate the Trade Secret Information"; "Augmenta and Wulff did indeed misappropriate the Trade Secret Information"; and Wulff (on information and belief) "deliver[ed]" the "Trade Secret Information" to Vouch. *See* FAC ¶¶ 56–58. The supposed conspiracy is entirely grounded in the facts of the trade-secrets claim. Courts in both California and Delaware have frequently found similar conspiracy claims preempted. *See, e.g.*, *Integer LLC*, 2025 WL 3691887, at *4 (finding preemption where the "state law [civil conspiracy] claim expressly relies on the allegations that [defendants] misappropriated Plaintiff's trade secrets"); *Spread Your Wings, LLC v. Tran*, 2025 Cal. Super. LEXIS 80395, at *3 (Cal. Super. Ct. Dec. 15, 2025) (same); *Battaglia Mgmt., Inc. v. Abramowicz*, 2024 WL 3183063, at *5 (D. Del. June 26, 2024) (dismissing claim where the "only underlying wrongful act alleged against Defendants is misappropriation of [plaintiff's] trade secrets"); *Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *3 (Del. Super.

15

Ct. Nov. 1, 2017) (granting motion for judgment on the pleadings "[b]ecause the 'factual predicate of' Incyte's . . . civil conspiracy claims 'mirror the facts alleged to have constituted a misappropriation of trade secrets'").

*Unjust Enrichment.* Corgi's unjust enrichment claim is likewise preempted under the CUTSA and DUTSA. Although Corgi's recitation of this cause of action studiously avoids the word "trade secrets," the unjust enrichment claim obviously sounds in trade secret. *See* FAC ¶¶ 60–64 (premising claim for restitution on allegation that "Defendants obtained Plaintiffs' proprietary and commercially sensitive business information through a pretextual scheme that circumvented normal market . . . mechanisms"). Both Delaware and California courts have seen through this gambit in other cases. In *250ok*, the Chancery Court held that while plaintiff "avoids the term 'trade secret' in its Count III, it is clear the claim for unjust enrichment pled in that count rests on the same alleged misappropriation of 'confidential information and proprietary data' that animates the misappropriation of trade secrets claim in Count II." 2021 WL 225874, at *5. The court held that DUTSA unambiguously dictates that "claims in service of a 'restitutionary' remedy are displaced by the statute." *Id.*; *see also Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1154 (S.D. Cal. 2022) (CUTSA preempts "common law tort claims when they 'do not genuinely allege alternative legal theories but are a transparent attempt to evade the strictures of CUTSA by restating a trade secrets claim as something else'"). Despite Corgi's attempt at artful pleading, its unjust enrichment claim is preempted.

*Fraud.* Corgi's claim for fraud fares no better; it too is preempted. Corgi accuses Defendants of filing an insurance application as "a pretext to obtain Plaintiffs' proprietary materials." FAC ¶ 66. Corgi asserts it relied on Defendants' "misrepresentation[] and concealment to . . . disclose the Trade Secret Information." FAC ¶ 67. This is once again conduct that "falls squarely into the statutory definition of trade secret misappropriation" under the

16

6240800

CUTSA and the DUTSA. *Snapkeys Ltd.*, 442 F. Supp. 3d at 1206; Cal. Civ. Code §

3426.1(a), (b)(2)(A) (defining trade secret misappropriation to include the use of

"misrepresentation . . . to acquire knowledge of the trade secret"); *Ethypharm*, 388 F. Supp. 2d at

434 ("The DUTSA specifically identifies misrepresentation as an improper means of obtaining

trade secrets." (citing 6 Del. C. § 2001)). Not surprisingly then, courts in both California and

Delaware have held that fraud claims based on making misrepresentations or omitting

information to obtain alleged trade-secret information are preempted. *See Snapkeys*, 442 F. Supp.

3d at 1205; *Ethypharm*, 388 F. Supp. 2d at 434. The same should be true here.

> **D.**     **Even if not preempted, Corgi cannot sustain its fraud claim.**

> **1.**     **Corgi fails to meet the heightened pleading standard for fraud.**

Federal Rule of Civil Procedure 9(b) provides that "in alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P.

9(b). A plaintiff is required "to separately plead the fraudulent acts of each defendant." *MBIA*

*Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004). In evaluating claims against

multiple defendants, the Court "must disregard conclusory allegations unsubstantiated by

specific factual details that would support a rational inference that a particular defendant

committed common law fraud." *Renovaro Inc. v. Gumrukcu*, 2025 WL 3134533, at *7 (Del. Ch.

Nov. 7, 2025). Furthermore, "[a]llegations made upon 'information and belief' do not satisfy

Rule 9(b)'s heightened pleading standard." *Id.* at *8; *see also Tortilla Factory, LLC v. Trader*

*Joe's Co.*, 2018 WL 8367468, at *4 (C.D. Cal. Oct. 11, 2018) (same).

Corgi fails to plead the fraudulent acts of each defendant with particularity. Other than

the allegations that Ms. Wulff submitted a "false" insurance application through Corgi's website

(an allegation that is baseless), Corgi makes no specific, substantive allegations concerning the

conduct of any other defendant. *See* FAC ¶¶ 39, 67. That does not satisfy Rule 9(b). *See Almatar*

17

6240800

*v. Reyes*, 2026 WL 719161, at *4 (C.D. Cal. Mar. 12, 2026); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together[.]"); *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (affirming dismissal of fraud claim where plaintiff made "everyone did everything" allegations). Nor can a plaintiff satisfy Rule 9(b) by alleging one defendant's control over a co-defendant. *See Almatar*, 2026 WL 719161, at *3–5. Thus, Corgi fails to satisfy the heightened standard for fraud and its claim should be dismissed. *See Renovaro*, 2025 WL 3134533, at *9–10 (finding allegations that defendants "conspired to perpetuate this fraudulent concealment . . . do no work because they rely on improper and conclusory group pleading").

### 2.     Ms. Wulff cannot be liable for fraud because she had no legal obligation to disclose the supposedly omitted facts.

Even as to Ms. Wulff, the only defendant about whom Corgi pleads (incorrect) facts with particularity, Corgi's fraud claim fails as a matter of law—because Corgi does not, and cannot, allege that Ms. Wulff had a legal obligation to disclose the allegedly concealed information. To establish an omission-based fraud claim, Corgi must allege that Ms. Wulff had a legal duty to disclose the supposedly omitted facts. *See Blue Beach Bungalows DE, LLC v. State of Del.*, 351 A.3d 1007, 1043 (Del. 2025). ("[F]raud . . . requires: (1) the defendant falsely represented or omitted facts that the defendant ***had a duty to disclose***."); *Tenet Healthsystem Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 844 (2016) ("[T]he plaintiff [must] allege that the defendant concealed or suppressed a material fact in a situation in which the defendant was under a duty to disclose that material fact."). Corgi does not allege that its insurance application solicited an applicant's entire employment status, *i.e.*, whether the applicant works for entities beyond the company for whom insurance is sought, or whether they work for a competitor; and the complaint does not establish that Ms. Wulff was legally required to disclose her additional employment at Vouch. The lack of such an allegation defeats the fraud

18

claim. *See Nautilus Ins. Co. v. Day to Day Fashion, Inc.*, 2017 WL 5643182, at *3 (C.D. Cal. Aug. 8, 2017) (dismissing fraud claim based on defendants' omissions ***in an insurance application*** because the plaintiff "does not specify particular questions on the application form that required answers by the applicant concerning" omitted matters).

### E.    Corgi's declaratory relief claim is unnecessary and moot.

Corgi's request for declaratory relief to declare Augmenta's insurance policy *void ab initio* is moot because that policy has already been cancelled, *see* FAC ¶¶ 1, 2, 34, 63, and there is no live controversy between the parties on this issue. "In determining whether a request for declaratory relief ha[s] become moot," courts examine "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests[.]" *Briggs v. United States*, 564 F. Supp. 2d 1087, 1094–95. (N.D. Cal. 2008). Thus, declaratory relief that a previously cancelled insurance policy is *void ab initio* is appropriate only where the parties possess a legally cognizable interest in the outcome; for example, when a party seeks relief from outstanding contractual obligations or expenses incurred prior to cancellation of the policy. *See Clear Blue Spec'y Ins. Co. v. Ozy Media, Inc.*, 669 F. Supp. 3d 907, 921 (N.D. Cal. 2023) (declaring an insurance policy *void ab initio* "will avoid liability even on pending claims"). Here, Corgi does not allege that there are any pending claims, outstanding contractual obligations, or debts owed, such that a declaration that the policy is *void ab initio* implicates a live controversy. Accordingly, Plaintiffs' claim for declaratory relief is unnecessary and moot.

### F.    Corgi's three deceptive trade practices claims fail (Counts VII-IX).

#### 1.    The single statement that forms the basis for Corgi's claims is non-actionable puffery.

Corgi's Lanham Act, Deceptive Trade Practices Act ("DTPA"), and trade libel claims all fail because they are premised on a single, non-actionable statement of puffery: the claim that a Vouch sales representative described "the difference between the parties' products [as] 'the

19

difference between insurance that checks a box and insurance that actually pays.'" FAC ¶ 42.

Puffery cannot form the basis of a false advertising, DTPA, or trade libel claim because it is not a

"specific and measurable claim, capable of being proved false or of being reasonably interpreted

as a statement of objective fact." *See Pizza Hut, Inc. v. Papa John's Int'l*, 227 F.3d 489, 496 (5th

Cir. 2000) (collecting cases); *Castrol Inc. v. Pennzoil Co.*, 987 F. 2d 939, 945 (3d Cir. 1993)

("Puffery is distinguishable from misdescriptions or false representations of specific

characteristics of a product. As such, it is not actionable."). Statements touting a company's

benefits relative to those of a competitor are quintessential puffery. *See, e.g.*, *Peloton Interactive,

Inc. v. ICON Heath & Fitness, Inc.*, 2021 WL 2188219, at *6, 8 (D. Del. May 28, 2021)

(dismissing Lanham Act and DTPA claims because "Peloton's statements concerning its status

as an 'innovator' and 'hardcore technology company' are non-actionable puffery"); *Pizza Hut*,

227 F.3d at 495–96 ("Bald assertions of superiority or general statements of opinion cannot form

the basis of Lanham Act liability."); *United States Healthcare, Inc. v. Blue Cross of Greater

Philadelphia*, 898 F.2d 914, 926 (3d Cir. 1990) (holding that the defendant's claim that it was the

better health care plan was an innocuous kind of puffery).

For example, in *TYR Sport Inc. v. Warnaco Swimwear Inc.*, the district court dismissed

plaintiffs' Lanham Act and trade libel claims based on a competitor's statements that customers

using other brands "had backed the wrong horse" and were "contracted to an inferior product."

679 F. Supp. 2d 1120, 1137, 1140 (C.D. Cal. 2009). The court concluded that these statements

were puffery because they were "classic opinions" comparable to calling a company a "sinking

ship," which other courts have deemed non-actionable. *Id.* at 1137.

The statement alleged in Corgi's complaint—"the difference between insurance that

checks a box and insurance that actually pays"—is precisely the sort of wordplay and general

assertion of superiority that courts routinely dismiss as non-actionable puffery. FAC ¶ 42. As in

20

6240800

*TYR Sport*, this statement is unverifiable, nonspecific and "no different from 'better than' statements" that courts consider the "most innocuous" form of puffery. 679 F. Supp. 2d at 1137. The colloquial, quippy phrases "checks a box" and "insurance that actually pays" do not provide specific facts that can be deemed true or false. *Winner Acceptance Corp. v. Return on Capital*, 2008 WL 5352063, at *8 (Del. Ch. Dec. 23, 2008) (finding defendant's statement that other business was just a "postage stamp of [what] I can orchestrate this mail business to be" was "mere pun and puffery"). They are not false or misleading because no reasonable customer would interpret them as a specific factual assertion about Corgi's claims-paying ability. *See U.S. Healthcare*, 898 F.2d at 922 ("Mere puffing, advertising [] is not deceptive for no one would rely on its exaggerated claims."). Accordingly, Corgi's Lanham Act, DTPA, and trade libel claims should be dismissed for failure to allege a false or misleading statement.

2.    **The Lanham Act claim (Count VII) further fails because the accused statement is not "commercial advertising."**

Corgi's Lanham Act claim fails for an additional independent reason: the single statement attributed to a Vouch salesperson is not "commercial advertising." "[I]t is well-settled" that, in a false advertising case, the challenged statements "must be widely disseminated and part of an organized campaign to penetrate the relevant market." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 460–61 (D. N.J. 2009) (collecting cases). By contrast, "isolated statements to potential customers generally do not constitute sufficient dissemination to be defined as advertising within the meaning of the Lanham Act." *Pitney Bowes, Inc. v. ITS Mailing Sys., Inc.*, 2010 WL 1005146, at *5 (E.D. Pa. Mar. 17, 2010). Courts routinely recognize that a single sales communication to one prospective customer is not "sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." *Id.*; *see also Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc.*, 2001 WL 856946, at *11 (E.D. Pa. July 26, 2001) ("Generally, isolated private statements are not sufficiently

21

6240800

disseminated to constitute advertising."); *Optimum Techs, Inc. v. Home Depot USA, Inc.*, 2005 WL 3307508, at *5 (N.D. Ga. Dec. 5, 2005) ("[I]solated statements by sales personnel to individual customers do not satisfy the requirement of sufficient dissemination."). Courts have declined to find commercial advertising where Defendants have made as many as "twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 58 (2002).

Corgi's Lanham Act theory, like those rejected above by other courts, is premised on one alleged statement of a single Vouch employee (in a single written communication) stating that the difference between Corgi's and Vouch's product is the "difference between insurance that checks a box and insurance that actually pays." FAC ¶ 42. Corgi does not allege that the statement was made in a formal advertisement or widely disseminated. *See id.* And Corgi fails to allege any facts to support its allegation, made only "[on] information and belief," that the claim was made to anyone else. *Id.* ¶ 47. *See Registered Agent Sols., Inc. v. Corp. Servs Co.*, 2022 WL 911253, at *3 (D. Del. Mar. 28, 2022) (dismissing false advertising claim because the plaintiff failed to allege "enough facts to raise a reasonable expectation that discovery will reveal evidence of [dissemination]"). The Lanham Act claim should be dismissed.

3. **The DTPA claim (Count VIII) further fails because the alleged conduct did not take place in Delaware and Corgi fails to allege a reasonable apprehension of future wrong.**

In addition to being premised on non-actionable puffery, Corgi's DTPA claim must also be dismissed because Corgi does not allege that the conduct underpinning the claim took place in Delaware. "[T[he Delaware Deceptive Trade Practices Act does not have extraterritorial effect." *Wright v. SLWM, LLC*, 2025 Del. Ch. LEXIS 335, *2 (Del. Ch. Apr. 23, 2025) (dismissing claim where complaint did not allege conduct in Delaware); *Stoltz Mgmt. of Del., Inc. v. Entrata, Inc.*, 2026 Del. Super. LEXIS 51, at *27 (Del. Super. Ct. Jan. 30, 2026) (same). Corgi does not allege

22

6240800

that any statements were made in Delaware, were received in Delaware, or were transmitted through Delaware. There is no Delaware connection, and the DTPA does not apply.

Corgi's threadbare pleading also fails to allege a reasonable apprehension of future harm. The DTPA is primarily an injunctive statute, "designed to prevent patterns of deceptive conduct, not isolated incidents." *Tygon Peak Capital Mgmt., LLC v. Mobile Invs. Investco, LLC*, 2022 WL 34688, at *28 (Del. Ch. Jan. 4, 2022). A claim must therefore be "supported by the allegation of facts that create a reasonable apprehension of a future wrong." *Id.* Where, as here, a complaint merely "references an isolated incident" and fails to "allege[] other facts about the defendant's sales strategy supporting an inference that the defendant's trash talking . . . may have been frequent[,]" the complaint should be dismissed. *Id.*; *see also Reg. Agent Sols.,* 2022 WL 911253, at *6 (injunctive relief not warranted where allegations pertain entirely to past wrongdoing).

### 4. The Trade Libel claim (Count IX) further fails because Corgi does not plead pecuniary loss or actual malice.

A claim for commercial disparagement/trade libel requires the plaintiff to plead special damages and actual malice. *See Dac v. Booking Holdings Inc.*, 2023 WL 2867476, at *8 (D. Del. Apr. 7, 2023); *J-M Mfg. Co., Inc. v. Phillips & Cohen LLP*, 247 Cal. App. 4th 87, 97 (2016). Generalized allegations of reputational harm or conclusory recitals of reckless disregard are insufficient. *See Schuster v. DeRocili*, 2000 WL 1211504, at *5 (Del. Super. June 15, 2000) ("A bare assertion that an allegedly defamatory statement was made maliciously cannot survive."); *Curcini v. Cnty of Alameda*, 164 Cal. App. 4th 629, 650 (2008) ("Conclusory allegations [of actual malice] are insufficient to survive a demurrer."); *Sciore v. Phung*, 2022 WL 950261, at *13 & n.9 (D. N.J. Mar. 30, 2022) (dismissing trade libel claim premised on "bald assertions" of harm and malice). For example, in *Sciore*, the court held that "Plaintiffs have not pled special damages with the requisite level of particularity by merely alleging generally that Ardiente lost customers, prospective customers, and vendors." 2022 WL 950261, at *13; *see also Intervert,*

23

*Inc. v. Mileutis, Ltd.*, 2016 WL 740267, at *6 (D. N.J. Feb. 24, 2016) (dismissing claim where the defendant "merely avers generally that [a]s a direct and proximate results of the trade libel of [Plaintiff], [Defendant] has incurred and will continue to suffer damages'"). That is the same deficiency in Corgi's complaint. *See* FAC ¶ 93. Likewise, Corgi's boilerplate allegations of actual malice—that Vouch made the alleged statement "with knowledge of its falsity or with reckless disregard for its truth or falsity" (FAC ¶ 92)—do not suffice. *See Sciore*, 2022 WL 950261, at *13 n.9 (granting motion to dismiss where plaintiffs merely alleged that defendants' "statements were made maliciously and willfully"). The trade libel claim should be dismissed.

### G.    Corgi's tortious interference claim (Count X) fails.

Corgi does not adequately plead a claim for tortious interference with prospective economic advantage. *First*, under both California and Delaware law, tortious interference requires the plaintiff to allege a specific, concrete business relationship that was the subject of interference. *See Roy Allan Slurry Seal, Inc. v. American Asphalt S., Inc.*, 2 Cal. 5th 505, 512 (2017) (plaintiff must identify "(1) an existing economic relationship that (2) contains the probability of an economic benefit to the plaintiff"); *Organovo Holdings v. Dimitrov*, 162 A.3d 102, 122 (Del. Ch. 2017) (plaintiff "must identify a specific party who was prepared to enter[] into a business relationship"). The tort "traditionally has not protected speculative expectancies . . . because 'there is no sufficient degree of certainty that the plaintiff ever would have received the anticipated benefits.'" *Roy Allan*, 2 Cal. 5th at 518; *see also Preston Hollow Capital LLC v. Nuveen LLC*, 2020 WL 1814756, at *12 (Del. Ch. Apr. 9, 2020) ("[Plaintiff] must show a 'bona fide expectancy' of opportunity."). Corgi has not done so. Corgi pleads that "Plaintiffs had existing and prospective economic relationships with customers . . . with a reasonable probability of resulting business." FAC ¶ 96. And Corgi notes that the statement in question was made to a "customer or prospective customer . . . who was then evaluating and comparing" insurance plans.

24

6240800

*Id.* ¶ 40. But these allegations do not rise to the level of a concrete and specific business opportunity. *See Preston*, 2020 WL 1814756, at *12 ("Our courts reject 'vague statements about unknown customers,' allegations of 'a nebulous, unascertainable class of business relationships,' or speculative prospects."). Corgi fails to even allege that the prospective customer ultimately elected not to do business with Corgi. *See* FAC ¶¶ 95–102. Corgi's claim thus fails.

*Second*, California law requires that plaintiffs plead an independently wrongful act "apart from the interference itself," *Salma v. Capon*, 161 Cal. App. 4th 1275, 1290 (2008),[10] and Corgi has not done so. An act is independently wrongful "if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). Corgi cannot rely on the allegations of trade secret misappropriation or else its claim would be preempted. *See Greenmount LLC v. Cleanline Mgmt. LLC*, 2024 WL 5505735, at *13 (C.D. Cal. Sept. 18, 2024). Instead, Corgi appears to hang its hat on its flawed "false advertising, deceptive trade practices, and commercial disparagement" claims. FAC ¶ 99. But because those claims all fail for the reasons discussed above, *see supra* Section IV.F, Corgi's tortious interference claim also fails. *See Sciore*, 2022 WL 950261, at *15 ("[W]hen a tortious interference claim is based on allegedly defamatory statements and the defamation cause of action fails for lack of evidentiary support, the tortious interference claim necessarily fails as well.").

## V.   CONCLUSION

Defendants respectfully request that this Court dismiss the FAC in its entirety.

---

[10] Delaware law has the same requirement by recognizing a defendant's privilege to compete in a lawful manner. *See Zync, Inc. v. Porsche Invs. Mgmt.*, S.A., 2026 Del. Ch. LEXIS 239, at *38–39 (Del. Ch. May 29, 2026). To the extent there is any conflict between California and Delaware tortious-interference law, however, California law should control. *See supra* n.9.

6240800

Respectfully submitted,

July 10, 2026

OF COUNSEL:

KEKER, VAN NEST & PETERS LLP
Warren A. Braunig
Cody Gray
Jacqueline Concilla
Michaela Firmage
633 Battery Street
San Francisco, CA 94111
(415) 391-5400
wbraunig@keker.com
cgray@keker.com
jconcilla@keker.com
mfirmage@keker.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Robert M. Vrana*
Robert M. Vrana (No. 5666)
Parks L. Kingery (No. 7416)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
rvrana@ycst.com
pkingery@ycst.com

*Attorneys for Defendants Vouch, Inc., Vouch
Specialty Insurance Services, LLC, Vouch US
Insurance Services Holdings, LLC, Vouch Risk
Management Services, LLC, Kelly Wulff, and
Augmenta Advisory, LLC*

26

6240800

# Exhibit A

**WEBSITE TERMS OF USE**
**VERSION 1.0**
**LAST REVISED ON: JANUARY 7, 2026**

The website located at www.corgi.insure (the "**Site**") is a copyrighted work belonging to Corgi Insurance Services, Inc. ("**Company**", "**us**", "**our**", and "**we**"). Certain features of the Site may be subject to additional guidelines, terms, or rules, which will be posted on the Site in connection with such features. All such additional terms, guidelines, and rules are incorporated by reference into these Terms.

THESE TERMS OF USE (THESE "**TERMS**") SET FORTH THE LEGALLY BINDING TERMS AND CONDITIONS THAT GOVERN YOUR USE OF THE SITE. BY ACCESSING OR USING THE SITE, YOU ARE ACCEPTING THESE TERMS (ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT), AND YOU REPRESENT AND WARRANT THAT YOU HAVE THE RIGHT, AUTHORITY, AND CAPACITY TO ENTER INTO THESE TERMS (ON BEHALF OF YOURSELF OR THE ENTITY THAT YOU REPRESENT). YOU MAY NOT ACCESS OR USE THE SITE OR ACCEPT THE TERMS IF YOU ARE NOT AT LEAST 18 YEARS OLD. IF YOU DO NOT AGREE WITH ALL OF THE PROVISIONS OF THESE TERMS, DO NOT ACCESS AND/OR USE THE SITE.

**PLEASE BE AWARE THAT SECTION 10.2 CONTAINS PROVISIONS GOVERNING HOW TO RESOLVE DISPUTES BETWEEN YOU AND COMPANY. AMONG OTHER THINGS, SECTION 10.2 INCLUDES AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND US SHALL BE RESOLVED BY BINDING AND FINAL ARBITRATION. SECTION 10.2 ALSO CONTAINS A CLASS ACTION AND JURY TRIAL WAIVER. PLEASE READ SECTION 10.2 CAREFULLY.**

**UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS: (1) YOU WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST US ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) YOU ARE WAIVING YOUR RIGHT TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.**

1.    **ACCOUNTS**

    **1.1    Account Creation.**  In order to use certain features of the Site, you must register for an account ("**Account**") and provide certain information about yourself as prompted by the account registration form. You represent and warrant that: (a) all required registration information you submit is truthful and accurate; (b) you will maintain the accuracy of such information. You may delete your Account at any time, for any reason, by following the instructions on the Site. Company may suspend or terminate your Account in accordance with Section 8.

    **1.2    Account Responsibilities.**  You are responsible for maintaining the confidentiality of your Account login information and are fully responsible for all activities that occur under your Account. You agree to immediately notify Company of any unauthorized use, or suspected unauthorized use of your Account or any other breach of security. Company cannot and will not be liable for any loss or damage arising from your failure to comply with the above requirements.

2.    **ACCESS TO THE SITE**

    **2.1    License.**  Subject to these Terms, Company grants you a non-transferable, non-exclusive, revocable, limited license to use and access the Site solely for your own personal, noncommercial use.

    **2.2    Certain Restrictions.**  The rights granted to you in these Terms are subject to the following restrictions: (a) you shall not license, sell, rent, lease, transfer, assign, distribute, host, or otherwise commercially

exploit the Site, whether in whole or in part, or any content displayed on the Site; (b) you shall not modify, make derivative works of, disassemble, reverse compile or reverse engineer any part of the Site; (c) you shall not access the Site in order to build a similar or competitive website, product, or service; and (d) except as expressly stated herein, no part of the Site may be copied, reproduced, distributed, republished, downloaded, displayed, posted or transmitted in any form or by any means. Unless otherwise indicated, any future release, update, or other addition to functionality of the Site shall be subject to these Terms. All copyright and other proprietary notices on the Site (or on any content displayed on the Site) must be retained on all copies thereof.

**2.3    Modification.**  Company reserves the right, at any time, to modify, suspend, or discontinue the Site (in whole or in part) with or without notice to you. You agree that Company will not be liable to you or to any third party for any modification, suspension, or discontinuation of the Site or any part thereof.

**2.4    No Support or Maintenance.**  You acknowledge and agree that Company will have no obligation to provide you with any support or maintenance in connection with the Site.

**2.5    Ownership.**  Excluding any User Content that you may provide (defined below), you acknowledge that all the intellectual property rights, including copyrights, patents, trade marks, and trade secrets, in the Site and its content are owned by Company or Company's suppliers. Neither these Terms (nor your access to the Site) transfers to you or any third party any rights, title or interest in or to such intellectual property rights, except for the limited access rights expressly set forth in Section 2.1. Company and its suppliers reserve all rights not granted in these Terms. There are no implied licenses granted under these Terms.

**2.6    Feedback.**  If you provide Company with any feedback or suggestions regarding the Site ("**Feedback**"), you hereby assign to Company all rights in such Feedback and agree that Company shall have the right to use and fully exploit such Feedback and related information in any manner it deems appropriate. Company will treat any Feedback you provide to Company as non-confidential and non-proprietary. You agree that you will not submit to Company any information or ideas that you consider to be confidential or proprietary.

**3.    USER CONTENT**

**3.1    User Content.**  "**User Content**" means any and all information and content that a user submits to, or uses with, the Site (e.g., content in the user's profile or postings). You are solely responsible for your User Content. You assume all risks associated with use of your User Content, including any reliance on its accuracy, completeness or usefulness by others, or any disclosure of your User Content that personally identifies you or any third party. You hereby represent and warrant that your User Content does not violate our Acceptable Use Policy (defined in Section 3.3). You may not represent or imply to others that your User Content is in any way provided, sponsored or endorsed by Company. Since you alone are responsible for your User Content, you may expose yourself to liability if, for example, your User Content violates the Acceptable Use Policy. Company is not obligated to backup any User Content, and your User Content may be deleted at any time without prior notice. You are solely responsible for creating and maintaining your own backup copies of your User Content if you desire.

**3.2    License.**  You hereby grant (and you represent and warrant that you have the right to grant) to Company an irrevocable, nonexclusive, royalty-free and fully paid, worldwide license to reproduce, distribute, publicly display and perform, prepare derivative works of, incorporate into other works, and otherwise use and exploit your User Content, and to grant sublicenses of the foregoing rights, solely for the purposes of including your User Content in the Site. You hereby irrevocably waive (and agree to cause to be waived) any claims and assertions of moral rights or attribution with respect to your User Content.

**3.3    Acceptable Use Policy.**  The following terms constitute our "**Acceptable Use Policy**":

**(a)**    You agree not to use the Site to collect, upload, transmit, display, or distribute any User Content (i) that violates any third-party right, including any copyright, trademark, patent, trade secret, moral right, privacy right, right of publicity, or any other intellectual property or proprietary right, (ii) that is unlawful, harassing, abusive, tortious, threatening, harmful, invasive of another's privacy, vulgar, defamatory, false, intentionally misleading, trade libelous, pornographic, obscene, patently offensive, promotes racism, bigotry, hatred, or physical

harm of any kind against any group or individual or is otherwise objectionable, (iii) that is harmful to minors in any way, or (iv) that is in violation of any law, regulation, or obligations or restrictions imposed by any third party.

        **(b)**      In addition, you agree not to: (i) upload, transmit, or distribute to or through the Site any computer viruses, worms, or any software intended to damage or alter a computer system or data; (ii) send through the Site unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, or any other form of duplicative or unsolicited messages, whether commercial or otherwise; (iii) use the Site to harvest, collect, gather or assemble information or data regarding other users, including e-mail addresses, without their consent; (iv) interfere with, disrupt, or create an undue burden on servers or networks connected to the Site, or violate the regulations, policies or procedures of such networks; (v) attempt to gain unauthorized access to the Site (or to other computer systems or networks connected to or used together with the Site), whether through password mining or any other means; (vi) harass or interfere with any other user's use and enjoyment of the Site; or (vii) use software or automated agents or scripts to produce multiple accounts on the Site, or to generate automated searches, requests, or queries to (or to strip, scrape, or mine data from) the Site (provided, however, that we conditionally grant to the operators of public search engines revocable permission to use spiders to copy materials from the Site for the sole purpose of and solely to the extent necessary for creating publicly available searchable indices of the materials, but not caches or archives of such materials, subject to the parameters set forth in our robots.txt file).

        **3.4**      **Enforcement.**  We reserve the right (but have no obligation) to review, refuse and/or remove any User Content in our sole discretion, and to investigate and/or take appropriate action against you in our sole discretion if you violate the Acceptable Use Policy or any other provision of these Terms or otherwise create liability for us or any other person. Such action may include removing or modifying your User Content, terminating your Account in accordance with Section 8, and/or reporting you to law enforcement authorities.

**4.**      **INDEMNIFICATION.**  You agree to indemnify and hold Company (and its officers, employees, and agents) harmless, including costs and attorneys' fees, from any claim or demand made by any third party due to or arising out of (a) your use of the Site, (b) your violation of these Terms, (c) your violation of applicable laws or regulations or (d) your User Content. Company reserves the right, at your expense, to assume the exclusive defense and control of any matter for which you are required to indemnify us, and you agree to cooperate with our defense of these claims. You agree not to settle any matter without the prior written consent of Company. Company will use reasonable efforts to notify you of any such claim, action or proceeding upon becoming aware of it.

**5.**      **THIRD-PARTY LINKS & ADS; OTHER USERS**

        **5.1**      **Third-Party Links & Ads.**  The Site may contain links to third-party websites and services, and/or display advertisements for third parties (collectively, "**Third-Party Links & Ads**"). Such Third-Party Links & Ads are not under the control of Company, and Company is not responsible for any Third-Party Links & Ads. Company provides access to these Third-Party Links & Ads only as a convenience to you, and does not review, approve, monitor, endorse, warrant, or make any representations with respect to Third-Party Links & Ads. You use all Third-Party Links & Ads at your own risk, and should apply a suitable level of caution and discretion in doing so. When you click on any of the Third-Party Links & Ads, the applicable third party's terms and policies apply, including the third party's privacy and data gathering practices. You should make whatever investigation you feel necessary or appropriate before proceeding with any transaction in connection with such Third-Party Links & Ads.

        **5.2**      **Other Users.**  Each Site user is solely responsible for any and all of its own User Content. Since we do not control User Content, you acknowledge and agree that we are not responsible for any User Content, whether provided by you or by others. We make no guarantees regarding the accuracy, currency, suitability, appropriateness, or quality of any User Content. Your interactions with other Site users are solely between you and such users. You agree that Company will not be responsible for any loss or damage incurred as the result of any such interactions. If there is a dispute between you and any Site user, we are under no obligation to become involved.

        **5.3**      **Release.**  You hereby release and forever discharge Company (and our officers, employees, agents, successors, and assigns) from, and hereby waive and relinquish, each and every past, present and future dispute, claim, controversy, demand, right, obligation, liability, action and cause of action of every kind and nature (including personal injuries, death, and property damage), that has arisen or arises directly or indirectly out of, or that relates

directly or indirectly to, the Site (including any interactions with, or act or omission of, other Site users or any Third-Party Links & Ads). IF YOU ARE A CALIFORNIA RESIDENT, YOU HEREBY WAIVE CALIFORNIA CIVIL CODE SECTION 1542 IN CONNECTION WITH THE FOREGOING, WHICH STATES: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

**6.     DISCLAIMERS**

THE SITE IS PROVIDED ON AN "AS-IS" AND "AS AVAILABLE" BASIS, AND COMPANY (AND OUR SUPPLIERS) EXPRESSLY DISCLAIM ANY AND ALL WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING ALL WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, QUIET ENJOYMENT, ACCURACY, OR NON-INFRINGEMENT. WE (AND OUR SUPPLIERS) MAKE NO WARRANTY THAT THE SITE WILL MEET YOUR REQUIREMENTS, WILL BE AVAILABLE ON AN UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE BASIS, OR WILL BE ACCURATE, RELIABLE, FREE OF VIRUSES OR OTHER HARMFUL CODE, COMPLETE, LEGAL, OR SAFE. IF APPLICABLE LAW REQUIRES ANY WARRANTIES WITH RESPECT TO THE SITE, ALL SUCH WARRANTIES ARE LIMITED IN DURATION TO 90 DAYS FROM THE DATE OF FIRST USE.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSION MAY NOT APPLY TO YOU. SOME JURISDICTIONS DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.

**7.     LIMITATION ON LIABILITY**

TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL COMPANY (OR OUR SUPPLIERS) BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY LOST PROFITS, LOST DATA, COSTS OF PROCUREMENT OF SUBSTITUTE PRODUCTS, OR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES ARISING FROM OR RELATING TO THESE TERMS OR YOUR USE OF, OR INABILITY TO USE, THE SITE, EVEN IF COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ACCESS TO, AND USE OF, THE SITE IS AT YOUR OWN DISCRETION AND RISK, AND YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR DEVICE OR COMPUTER SYSTEM, OR LOSS OF DATA RESULTING THEREFROM.

TO THE MAXIMUM EXTENT PERMITTED BY LAW, NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, OUR LIABILITY TO YOU FOR ANY DAMAGES ARISING FROM OR RELATED TO THESE TERMS (FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF THE ACTION), WILL AT ALL TIMES BE LIMITED TO A MAXIMUM OF FIFTY US DOLLARS. THE EXISTENCE OF MORE THAN ONE CLAIM WILL NOT ENLARGE THIS LIMIT. YOU AGREE THAT OUR SUPPLIERS WILL HAVE NO LIABILITY OF ANY KIND ARISING FROM OR RELATING TO THESE TERMS.

SOME JURISDICTIONS DO NOT ALLOW THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

**8.     TERM AND TERMINATION.**  Subject to this Section, these Terms will remain in full force and effect while you use the Site. We may suspend or terminate your rights to use the Site (including your Account) at any time for any reason at our sole discretion, including for any use of the Site in violation of these Terms. Upon termination of your rights under these Terms, your Account and right to access and use the Site will terminate immediately. You understand that any termination of your Account may involve deletion of your User Content associated with your Account from our live databases. Company will not have any liability whatsoever to you for any termination of your rights under these Terms, including for termination of your Account or deletion of your User Content. Even after your rights under these Terms are terminated, the following provisions of these Terms will remain in effect: Sections 2.2 through 2.6, Section 3 and Sections 4 through 10.

9.    **COPYRIGHT POLICY.**

Company respects the intellectual property of others and asks that users of our Site do the same. In connection with our Site, we have adopted and implemented a policy respecting copyright law that provides for the removal of any infringing materials and for the termination, in appropriate circumstances, of users of our online Site who are repeat infringers of intellectual property rights, including copyrights. If you believe that one of our users is, through the use of our Site, unlawfully infringing the copyright(s) in a work, and wish to have the allegedly infringing material removed, the following information in the form of a written notification (pursuant to 17 U.S.C. § 512(c)) must be provided to our designated Copyright Agent:

1.  your physical or electronic signature;
2.  identification of the copyrighted work(s) that you claim to have been infringed;
3.  identification of the material on our services that you claim is infringing and that you request us to remove;
4.  sufficient information to permit us to locate such material;
5.  your address, telephone number, and e-mail address;
6.  a statement that you have a good faith belief that use of the objectionable material is not authorized by the copyright owner, its agent, or under the law; and
7.  a statement that the information in the notification is accurate, and under penalty of perjury, that you are either the owner of the copyright that has allegedly been infringed or that you are authorized to act on behalf of the copyright owner.

Please note that, pursuant to 17 U.S.C. § 512(f), any misrepresentation of material fact (falsities) in a written notification automatically subjects the complaining party to liability for any damages, costs and attorney's fees incurred by us in connection with the written notification and allegation of copyright infringement.

10.    **GENERAL**

**10.1    Changes.**    These Terms are subject to occasional revision, and if we make any substantial changes, we may notify you by sending you an e-mail to the last e-mail address you provided to us (if any), and/or by prominently posting notice of the changes on our Site. You are responsible for providing us with your most current e-mail address. In the event that the last e-mail address that you have provided us is not valid, or for any reason is not capable of delivering to you the notice described above, our dispatch of the e-mail containing such notice will nonetheless constitute effective notice of the changes described in the notice. Continued use of our Site following notice of such changes shall indicate your acknowledgement of such changes and agreement to be bound by the terms and conditions of such changes.

**10.2    Dispute Resolution.**    Please read the following arbitration agreement in this Section (the "**Arbitration Agreement**") carefully. It requires you to arbitrate disputes with Company, its parent companies, subsidiaries, affiliates, successors and assigns and all of their respective officers, directors, employees, agents, and representatives (collectively, the "**Company Parties**") and limits the manner in which you can seek relief from the Company Parties.

**(a)    Applicability of Arbitration Agreement.**    You agree that any dispute between you and any of the Company Parties relating in any way to the Site, the services offered on the Site (the "**Services**") or these Terms will be resolved by binding arbitration, rather than in court, except that (1) you and the Company Parties may assert individualized claims in small claims court if the claims qualify, remain in such court and advance solely on an individual, non-class basis; and (2) you or the Company Parties may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents). **This Arbitration Agreement shall survive the expiration or termination of these Terms and shall apply, without limitation, to all claims that arose or were asserted before you agreed to these Terms (in accordance with the preamble) or any prior version of these Terms.** This Arbitration Agreement does not preclude you from bringing issues to the attention of federal, state or local agencies. Such agencies can, if the law allows, seek relief against the Company Parties on your behalf. For purposes of this Arbitration Agreement,

"**Dispute**" will also include disputes that arose or involve facts occurring before the existence of this or any prior versions of the Agreement as well as claims that may arise after the termination of these Terms.

　　　　**(b)　　Informal Dispute Resolution.**  There might be instances when a Dispute arises between you and Company. If that occurs, Company is committed to working with you to reach a reasonable resolution. You and Company agree that good faith informal efforts to resolve Disputes can result in a prompt, low-cost and mutually beneficial outcome. You and Company therefore agree that before either party commences arbitration against the other (or initiates an action in small claims court if a party so elects), we will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ("**Informal Dispute Resolution Conference**"). If you are represented by counsel, your counsel may participate in the conference, but you will also participate in the conference.

The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ("**Notice**"), which shall occur within 45 days after the other party receives such Notice, unless an extension is mutually agreed upon by the parties. Notice to Company that you intend to initiate an Informal Dispute Resolution Conference should be sent by email to: legal@corgi.insure, or by regular mail to 425 Bush St, San Francisco, California 94104. The Notice must include: (1) your name, telephone number, mailing address, e-mail address associated with your account (if you have one); (2) the name, telephone number, mailing address and e-mail address of your counsel, if any; and (3) a description of your Dispute.

The Informal Dispute Resolution Conference shall be individualized such that a separate conference must be held each time either party initiates a Dispute, even if the same law firm or group of law firms represents multiple users in similar cases, unless all parties agree; multiple individuals initiating a Dispute cannot participate in the same Informal Dispute Resolution Conference unless all parties agree. In the time between a party receiving the Notice and the Informal Dispute Resolution Conference, nothing in this Arbitration Agreement shall prohibit the parties from engaging in informal communications to resolve the initiating party's Dispute. Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section.

　　　　**(c)　　Arbitration Rules and Forum.**  These Terms evidence a transaction involving interstate commerce; and notwithstanding any other provision herein with respect to the applicable substantive law, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., will govern the interpretation and enforcement of this Arbitration Agreement and any arbitration proceedings. If the Informal Dispute Resolution Process described above does not resolve satisfactorily within 60 days after receipt of your Notice, you and Company agree that either party shall have the right to finally resolve the Dispute through binding arbitration. The Federal Arbitration Act governs the interpretation and enforcement of this Arbitration Agreement. The arbitration will be conducted by JAMS, an established alternative dispute resolution provider. Disputes involving claims and counterclaims with an amount in controversy under $250,000, not inclusive of attorneys' fees and interest, shall be subject to JAMS' most current version of the Streamlined Arbitration Rules and procedures available at http://www.jamsadr.com/rules-streamlined-arbitration/; all other claims shall be subject to JAMS's most current version of the Comprehensive Arbitration Rules and Procedures, available at http://www.jamsadr.com/rules-comprehensive-arbitration/. JAMS's rules are also available at www.jamsadr.com or by calling JAMS at 800-352-5267. A party who wishes to initiate arbitration must provide the other party with a request for arbitration (the "**Request**"). The Request must include: (1) the name, telephone number, mailing address, e-mail address of the party seeking arbitration and the account username (if applicable) as well as the email address associated with any applicable account; (2) a statement of the legal claims being asserted and the factual bases of those claims; (3) a description of the remedy sought and an accurate, good-faith calculation of the amount in controversy in United States Dollars; (4) a statement certifying completion of the Informal Dispute Resolution process as described above; and (5) evidence that the requesting party has paid any necessary filing fees in connection with such arbitration.

If the party requesting arbitration is represented by counsel, the Request shall also include counsel's name, telephone number, mailing address, and email address. Such counsel must also sign the Request. By signing the Request, counsel certifies to the best of counsel's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that: (1) the Request is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of dispute resolution; (2) the claims, defenses and other legal

contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; and (3) the factual and damages contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Unless you and Company otherwise agree, or the Batch Arbitration process discussed in Subsection 10.2(h) is triggered, the arbitration will be conducted in the county where you reside. Subject to the JAMS Rules, the arbitrator may direct a limited and reasonable exchange of information between the parties, consistent with the expedited nature of the arbitration. If the JAMS is not available to arbitrate, the parties will select an alternative arbitral forum. Your responsibility to pay any JAMS fees and costs will be solely as set forth in the applicable JAMS Rules.

You and Company agree that all materials and documents exchanged during the arbitration proceedings shall be kept confidential and shall not be shared with anyone except the parties' attorneys, accountants, or business advisors, and then subject to the condition that they agree to keep all materials and documents exchanged during the arbitration proceedings confidential.

**(d)** **Authority of Arbitrator.** The arbitrator shall have exclusive authority to resolve all disputes subject to arbitration hereunder including, without limitation, any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement or any portion of the Arbitration Agreement, except for the following: (1) all Disputes arising out of or relating to the subsection entitled "Waiver of Class or Other Non-Individualized Relief," including any claim that all or part of the subsection entitled "Waiver of Class or Other Non-Individualized Relief" is unenforceable, illegal, void or voidable, or that such subsection entitled "Waiver of Class or Other Non-Individualized Relief" has been breached, shall be decided by a court of competent jurisdiction and not by an arbitrator; (2) except as expressly contemplated in the subsection entitled "Batch Arbitration," all Disputes about the payment of arbitration fees shall be decided only by a court of competent jurisdiction and not by an arbitrator; (3) all Disputes about whether either party has satisfied any condition precedent to arbitration shall be decided only by a court of competent jurisdiction and not by an arbitrator; and (4) all Disputes about which version of the Arbitration Agreement applies shall be decided only by a court of competent jurisdiction and not by an arbitrator. The arbitration proceeding will not be consolidated with any other matters or joined with any other cases or parties, except as expressly provided in the subsection entitled "Batch Arbitration." The arbitrator shall have the authority to grant motions dispositive of all or part of any claim or dispute. The arbitrator shall have the authority to award monetary damages and to grant any non-monetary remedy or relief available to an individual party under applicable law, the arbitral forum's rules, and these Terms (including the Arbitration Agreement). The arbitrator shall issue a written award and statement of decision describing the essential findings and conclusions on which any award (or decision not to render an award) is based, including the calculation of any damages awarded. The arbitrator shall follow the applicable law. The award of the arbitrator is final and binding upon you and us. Judgment on the arbitration award may be entered in any court having jurisdiction.

**(e)** **Waiver of Jury Trial.** EXCEPT AS SPECIFIED IN SECTION 10.2(A) YOU AND THE COMPANY PARTIES HEREBY WAIVE ANY CONSTITUTIONAL AND STATUTORY RIGHTS TO SUE IN COURT AND HAVE A TRIAL IN FRONT OF A JUDGE OR A JURY. You and the Company Parties are instead electing that all covered claims and disputes shall be resolved exclusively by arbitration under this Arbitration Agreement, except as specified in Section 10.2(a) above. An arbitrator can award on an individual basis the same damages and relief as a court and must follow these Terms as a court would. However, there is no judge or jury in arbitration, and court review of an arbitration award is subject to very limited review.

**(f)** **Waiver of Class or Other Non-Individualized Relief.** YOU AND COMPANY AGREE THAT, EXCEPT AS SPECIFIED IN SUBSECTION 10.2(H) EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT ON A CLASS, REPRESENTATIVE, OR COLLECTIVE BASIS, AND THE PARTIES HEREBY WAIVE ALL RIGHTS TO HAVE ANY DISPUTE BE BROUGHT, HEARD, ADMINISTERED, RESOLVED, OR ARBITRATED ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MASS ACTION BASIS. ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND DISPUTES OF MORE THAN ONE CUSTOMER OR USER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER OR USER. Subject to this Arbitration Agreement, the arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by the party's individual claim. Nothing in this paragraph is intended to, nor

shall it, affect the terms and conditions under the Subsection 10.2(h) entitled "Batch Arbitration." Notwithstanding anything to the contrary in this Arbitration Agreement, if a court decides by means of a final decision, not subject to any further appeal or recourse, that the limitations of this subsection, "Waiver of Class or Other Non-Individualized Relief," are invalid or unenforceable as to a particular claim or request for relief (such as a request for public injunctive relief), you and Company agree that that particular claim or request for relief (and only that particular claim or request for relief) shall be severed from the arbitration and may be litigated in the state or federal courts located in the State of California. All other Disputes shall be arbitrated or litigated in small claims court. This subsection does not prevent you or Company from participating in a class-wide settlement of claims.

**(g)** **Attorneys' Fees and Costs.**  The parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the Dispute or the relief sought in the Request was frivolous or was brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)). If you or Company need to invoke the authority of a court of competent jurisdiction to compel arbitration, then the party that obtains an order compelling arbitration in such action shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees incurred in securing an order compelling arbitration. The prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Informal Dispute Resolution Process, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs.

**(h)** **Batch Arbitration.**  To increase the efficiency of administration and resolution of arbitrations, you and Company agree that in the event that there are 100 or more individual Requests of a substantially similar nature filed against Company by or with the assistance of the same law firm, group of law firms, or organizations, within a 30 day period (or as soon as possible thereafter), the JAMS shall (1) administer the arbitration demands in batches of 100 Requests per batch (plus, to the extent there are less than 100 Requests left over after the batching described above, a final batch consisting of the remaining Requests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("**Batch Arbitration**").

All parties agree that Requests are of a "substantially similar nature" if they arise out of or relate to the same event or factual scenario and raise the same or similar legal issues and seek the same or similar relief. To the extent the parties disagree on the application of the Batch Arbitration process, the disagreeing party shall advise the JAMS, and the JAMS shall appoint a sole standing arbitrator to determine the applicability of the Batch Arbitration process ("**Administrative Arbitrator**"). In an effort to expedite resolution of any such dispute by the Administrative Arbitrator, the parties agree the Administrative Arbitrator may set forth such procedures as are necessary to resolve any disputes promptly. The Administrative Arbitrator's fees shall be paid by Company.

You and Company agree to cooperate in good faith with the JAMS to implement the Batch Arbitration process including the payment of single filing and administrative fees for batches of Requests, as well as any steps to minimize the time and costs of arbitration, which may include: (1) the appointment of a discovery special master to assist the arbitrator in the resolution of discovery disputes; and (2) the adoption of an expedited calendar of the arbitration proceedings.

This Batch Arbitration provision shall in no way be interpreted as authorizing a class, collective and/or mass arbitration or action of any kind, or arbitration involving joint or consolidated claims under any circumstances, except as expressly set forth in this provision.

**(i)** **30-Day Right to Opt Out.**  You have the right to opt out of the provisions of this Arbitration Agreement by sending a timely written notice of your decision to opt out to the following address: 425 Bush St, San Francisco, California 94104, or email to legal@corgi.insure, within 30 days after first becoming subject to this Arbitration Agreement. Your notice must include your name and address and a clear statement that you want to opt out of this Arbitration Agreement. If you opt out of this Arbitration Agreement, all other parts of these Terms will continue to apply to you. Opting out of this Arbitration Agreement has no effect on any other arbitration agreements that you may currently have with us, or may enter into in the future with us.

**(j)      Invalidity, Expiration.**  Except as provided in the subsection entitled "Waiver of Class or Other Non-Individualized Relief", if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect. You further agree that any Dispute that you have with Company as detailed in this Arbitration Agreement must be initiated via arbitration within the applicable statute of limitation for that claim or controversy, or it will be forever time barred. Likewise, you agree that all applicable statutes of limitation will apply to such arbitration in the same manner as those statutes of limitation would apply in the applicable court of competent jurisdiction.

**(k)      Modification.**  Notwithstanding any provision in these Terms to the contrary, we agree that if Company makes any future material change to this Arbitration Agreement, you may reject that change within 30 days of such change becoming effective by writing Company at the following address: 425 Bush St, San Francisco, California 94104, or email to legal@corgi.insure. Unless you reject the change within 30 days of such change becoming effective by writing to Company in accordance with the foregoing, your continued use of the Site and/or Services, including the acceptance of products and services offered on the Site following the posting of changes to this Arbitration Agreement constitutes your acceptance of any such changes. Changes to this Arbitration Agreement do not provide you with a new opportunity to opt out of the Arbitration Agreement if you have previously agreed to a version of these Terms and did not validly opt out of arbitration. If you reject any change or update to this Arbitration Agreement, and you were bound by an existing agreement to arbitrate Disputes arising out of or relating in any way to your access to or use of the Services or of the Site, any communications you receive, any products sold or distributed through the Site, the Services, or these Terms, the provisions of this Arbitration Agreement as of the date you first accepted these Terms (or accepted any subsequent changes to these Terms) remain in full force and effect. Company will continue to honor any valid opt outs of the Arbitration Agreement that you made to a prior version of these Terms.

**10.3      Export.**  The Site may be subject to U.S. export control laws and may be subject to export or import regulations in other countries. You agree not to export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company, or any products utilizing such data, in violation of the United States export laws or regulations.

**10.4      Disclosures.**  Company is located at the address in Section 10.8. If you are a California resident, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Product of the California Department of Consumer Affairs by contacting them in writing at 400 R Street, Sacramento, CA 95814, or by telephone at (800) 952-5210.

**10.5      Electronic Communications.**  The communications between you and Company use electronic means, whether you use the Site or send us emails, or whether Company posts notices on the Site or communicates with you via email. For contractual purposes, you (a) consent to receive communications from Company in an electronic form; and (b) agree that all terms and conditions, agreements, notices, disclosures, and other communications that Company provides to you electronically satisfy any legal requirement that such communications would satisfy if it were be in a hardcopy writing. The foregoing does not affect your non-waivable rights.

**10.6      Entire Terms.**  These Terms constitute the entire agreement between you and us regarding the use of the Site. Our failure to exercise or enforce any right or provision of these Terms shall not operate as a waiver of such right or provision. The section titles in these Terms are for convenience only and have no legal or contractual effect. The word "including" means "including without limitation". If any provision of these Terms is, for any reason, held to be invalid or unenforceable, the other provisions of these Terms will be unimpaired and the invalid or unenforceable provision will be deemed modified so that it is valid and enforceable to the maximum extent permitted by law. Your relationship to Company is that of an independent contractor, and neither party is an agent or partner of the other. These Terms, and your rights and obligations herein, may not be assigned, subcontracted, delegated, or otherwise transferred by you without Company's prior written consent, and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void. Company may freely assign these Terms. The terms and conditions set forth in these Terms shall be binding upon assignees.

**10.7      Copyright/Trademark Information.**  Copyright © 2026 Corgi Insurance Services, Inc. All rights reserved. All trademarks, logos and service marks ("**Marks**") displayed on the Site are our property or the property

of other third parties. You are not permitted to use these Marks without our prior written consent or the consent of such third party which may own the Marks.

**10.8    Contact Information:**

Corgi Legal
Address: 425 Bush Street
San Francisco, California 94104
Telephone: 301-693-2267
Email: legal@corgi.insure

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on July 10, 2026, a copy of the foregoing document

was served on the counsel listed below in the manner indicated:

**<u>BY EMAIL</u>**
Travis J. Ferguson
Amy R. Harriman
MCCARTER & ENGLISH, LLP
Renaissance Centre
405 North King St., 8th Floor
Wilmington, DE 19801
tferguson@mccarter.com
aharriman@mccarter.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Robert M. Vrana*
Robert M. Vrana (No. 5666)
Parks L. Kingery (No. 7416)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
rvrana@ycst.com
pkingery@ycst.com

*Attorneys for Defendants Vouch, Inc., Vouch
Specialty Insurance Services, LLC, Vouch US
Insurance Services Holdings, LLC, Vouch Risk
Management Services, LLC, Kelly Wulff, and
Augmenta Advisory, LLC*