## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TECHNOLOGY RISK RETENTION GROUP, INC., an Arizona corporation, CORGI INSURANCE SERVICES, INC., a Delaware corporation,<br><br>*Plaintiffs,*<br><br>v.<br><br>VOUCH, INC., a Delaware corporation, VOUCH SPECIALTY INSURANCE SERVICES, LLC, a Delaware limited liability company, VOUCH US INSURANCE SERVICES HOLDINGS, LLC, a Delaware limited liability company, VOUCH RISK MANAGEMENT SERVICES, LLC, a Delaware limited liability company, KELLY WULFF, an individual, AUGMENTA ADVISORY, LLC, a Delaware limited liability company,<br><br>*Defendants.* | C.A. No. 26-426-RGA<br><br>JURY TRIAL DEMANDED |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Dated: July 31, 2026

McCARTER & ENGLISH, LLP

Travis J. Ferguson (No. 6029)
Amy R. Harriman (No. 7602)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300

*Counsel for Plaintiffs*

ME1\62276403.v1

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     SUMMARY OF ARGUMENT ................................................................................... 1

III.    STATEMENT OF FACTS ......................................................................................... 3

IV.     ARGUMENT ............................................................................................................... 5

      A.      Counts I and II State Valid Claims for Trade Secret Misappropriation. ...................... 5

            1.      Plaintiffs Identify Their Trade Secrets With Appropriate Specificity. ............... 6

            2.      The FAC Pleads Reasonable Secrecy Measures.................................................... 9

            3.      The FAC Pleads Acquisition By Improper Means. ........................................... 11

      B.      Count II Should Not Be Dismissed on Extraterritoriality Grounds. ........................... 12

      C.      Counts III, IV, and V Are Not Preempted By Counts I and II. ................................. 13

      D.      Count V's Fraud Claim Satisfied Rule 9(b)................................................................ 15

      E.      Count VI Presents a Live Controversy. ...................................................................... 17

      F.      Counts VII, VIII, and IX State Actionable Trade Practice Claims............................. 18

            4.      Counts VII, VIII, and IX Rest On A False Statement of Fact, Not Puffery. ..... 18

            5.      The FAC Adequately Pleads Facts Giving Rise to a Reasonable Inference of "Commercial Advertising or Promotion." ........................................................... 19

            6.      Count VIII Adequately Pleads a DTPA Claim. ................................................. 20

            7.      Count IX's Trade Libel Claim Should Proceed. ................................................ 20

      G.      Count X's Tortious Interference Claim is Adequately Pleaded.................................. 21

      H.      Any Dismissal Should Be Without Prejudice and With Leave to Amend. ................. 21

V.      CONCLUSION.......................................................................................................... 22

ME1\62276403.v1

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agency Solutions.Com, LLC v. TriZetto Group, Inc.*,
819 F. Supp. 2d 1001 (E.D. Cal. 2011)..................................................................................7

*AlixPartners, LLP v. Benichou*,
250 A.3d 775 (Del. Ch. 2019)..............................................................................................13

*Ameritas Life Ins. Corp. v. U.S. Bank Nat'l Assoc.*,
2026 WL 1078632 (D. Del. Apr. 21, 2026)..........................................................................17

*Angelica Textile Servs., Inc. v. Park*,
220 Cal. App. 4th 495 (2013) ..............................................................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................................5

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................5

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..................................................................................................5

*Burtch v. Milberg Factors, Inc.*,
662 F.3d 212 (3d Cir. 2011)....................................................................................................5

*Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*,
318 F. Supp. 2d. 205 (D. Del. 2004)......................................................................................8

*Carr v. AutoNation, Inc.*,
798 Fed. Appx. 129 (9th Cir. 2020)......................................................................................10

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993)..................................................................................................18

*Chatham Financial Corp. v. Milhaus, LLC*,
807 F. Supp. 3d. 373 (D. Del. Oct. 28, 2025) (Bibas, J., sitting by designation) ..............11, 14

*In re DaVita Inc. S'holder Derivative Litig.*,
2019 WL 1855445 (D. Del. Apr. 25, 2019)......................................................................13, 14

*Deloitte Consulting LLP v. Sagitec Sols. LLC*,
2023 WL 6039069 (D. Del. Sept. 15, 2023)...........................................................................8

ii

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
    314 F.3d 48 (2d Cir. 2002)...................................................................................19

*Foman v. Davis*,
    371 U.S. 178 (1962)...........................................................................................22

*I-Mab Biopharma v. Inhibrx, Inc.*,
    2024 WL 5335719 (D. Del. Nov. 6, 2024) ............................................................6

*Labyrinth, Inc. v. Urich*,
    2024 WL 395996 (Del. Ch. Jan. 26, 2024)..........................................................13

*Mallet & Co. Inc. v. Lacayo*,
    16 F.4th 364 (3d Cir. 2021) .................................................................................7

*Maxim, Inc. and Maxim Licensing Inc. v. Playboy, Inc.*,
    2026 WL 1361773 (S.D.N.Y. May 15, 2026) ......................................................10

*Montway LLC v. Navi Transp. Servs. LLC*,
    809 F. Supp. 3d 200 (D. Del. 2025)..............................................................6, 12

*U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
    812 F.3d 294 (3d Cir. 2016).........................................................................15, 16

*Oakwood Labs. LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021)..................................................................2, 6, 7, 8

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ..............................................................................18

*Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*,
    149 F.4th 1081 (9th Cir. 2025) ............................................................................6

*Stephenson v. Capano Dev., Inc.*,
    462 A.2d 1069 (Del. 1983) .................................................................................16

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*,
    898 F.2d 914 (3d Cir. 1990)...............................................................................19

*Uberether, Inc. v. Anitian, Inc.*,
    2023 WL 1471754 (D. Del. Feb, 2, 2023) ..........................................................19

*You Map, Inc. v. Snap Inc.*,
    2021 WL 106498 (D. Del. Jan. 12, 2021)...........................................................11

**Statutes**

6 Del. C. § 2001(4) ................................................................................................8

iii

18 U.S.C. § 1839(3) ................................................................................................................8, 11

18 U.S.C. § 1839(3)(A)................................................................................................................10

18 U.S.C. § 1839(6)(A)................................................................................................................11

California Uniform Trade Secret Act ...........................................................................................13

Delaware's Deceptive Trade Practices Act...................................................................................18

Delaware Uniform Trade Secret Act .............................................................................................6

**Other Authorities**

Fed. R. Civ. P. 8(d)(2)-(3)............................................................................................................15

Fed. R. Civ. P. 15(a)(2)................................................................................................................22

Fed. R. Cil. P. 8(d)(2)–(3)............................................................................................................15

Fed. R. Civ. P. 12(d) ......................................................................................................................5

Fed. R. Civ. P. 12(b)(6).......................................................................................................1, 2, 5, 14

iv

## I.  INTRODUCTION

This action arises from Defendants' calculated misappropriation of Plaintiffs' Technology Risk Retention Group, Inc. ("TRRG") and Corgi Insurance Services, Inc. ("Corgi" and together with TRRG, "Plaintiffs") trade secrets and proprietary information to gain an unlawful competitive advantage, followed by a campaign of false and disparaging statements to damage Corgi's insurance products and standing in the marketplace.  Defendants moved to dismiss Plaintiffs' First Amended Complaint, D.I. 24 ("FAC"), in its entirety.  D.I. 27 ("Mot.") and 28 ("Br.").  Plaintiffs submit this answering brief in opposition to Defendants' Motion to Dismiss.

Defendants' motion to dismiss requests several things that Fed. R. Civ. P. 12(b)(6) forbids. It asks the Court to disregard the pleaded facts—a same-day shell entity, a fabricated application, an extraction of specifically identified proprietary materials, and an immediate cancellation.  It asks the Court to credit Defendants' competing factual story—complete with extra-record accusations and an internet hyperlink—before an answer has been filed or a document produced. And it asks the Court to resolve—against the pleader and without discovery—quintessential questions of fact: whether Plaintiffs' secrecy measures were reasonable, whether a 100-plus-question underwriting compilation is generally known, how a purchasing customer would understand a targeted accusation that a competitor's insurance does not pay, and what Defendants knew and intended.

For the reasons set forth herein, Defendants' Motion to Dismiss should be denied.

## II.  SUMMARY OF ARGUMENT

1.      Plaintiffs identified their trade secrets by name and number (proprietary policy forms CORG-CGL-0001 and CORG-CGL-0100), by content (a 100-plus-question underwriting flow spanning four coverage lines, with its branching logic, risk weighting, pricing, retention, and

sublimit architecture), and by the precise transaction through which Defendants took them (Quote No. 79OM9KUJ; Policy No. CG-DE-26-000011-01). Under *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892 (3d Cir. 2021), a plaintiff "need not spell out the details of the trade secret" but rather allow the defendant "to ascertain at least the boundaries within which the secret lies." *Id.* at 906. The FAC does so. Defendants' authorities are preliminary-injunction and summary-judgment decisions applying evidentiary standards that have no place on a Rule 12(b)(6) motion.

2.      The FAC pleads reasonable secrecy measures. Defendants' refrain that Corgi's documents are "public" is refuted by their own scheme: if the documents were public, Defendants would not have needed to manufacture a fake applicant to get them. They did so because the CORG policy forms and underwriting outputs go only to bona fide applicants who complete underwriting and bind coverage. No member of the public receives policy documents for a policy they never applied for. At minimum, the reasonableness of Plaintiffs' secrecy measures is a quintessential fact question that cannot be decided against Plaintiffs at the pleading stage.

3.      DUTSA applies because the instrumentality of the scheme, Augmenta, was formed in Delaware for the purpose of the pretextual application and misappropriation.

4.      Defendants' preemption arguments against Counts III, IV, and V fail. The fraud claim is independent of any trade secret. It redresses the fraudulent procurement of an insurance policy and carries its own remedy—rescission—that trade secret law does not supply. And conspiracy and unjust enrichment are pleaded in the alternative for a reason Defendants themselves supply: Defendants deny the extracted information qualifies as a trade secret under DTSA and DUTSA. They cannot deny the predicate for preemption and claim its benefit in the same breath.

5.      Count V satisfies Rule 9(b) because it alleges: who (Wulff and Augmenta), what (an application that falsely presented Augmenta as an operating advisory business seeking

2

coverage), when (February 10, 2026), where (Corgi's platform), and how (responding to the questionnaire). Knowledge and intent "may be alleged generally." Fed. R. Civ. P. 9(b).

6.      Plaintiffs' request for a judicial declaration that the policy obtained by Augmenta is void *ab initio* is not moot.  Cancellation is forward-looking, while a void *ab initio* declaration applies retroactively to confirm that no valid insurance contract ever came into existence.

7.      Defendants' statement that the difference between Vouch's and Corgi's insurance products is "the difference between insurance that checks a box and insurance that actually pays" is not mere puffery.  In a named, side-by-side comparison to a purchasing customer, it makes a specific, verifiable, and false factual claim about a material attribute of insurance—whether it pays claims and honors its contractual commitments.  The remaining elements of Counts VII through X are adequately pleaded, and the facts about the scope of Vouch's sales campaign lie with Vouch.

## III.    STATEMENT OF FACTS

Corgi operates a technology-enabled commercial insurance platform through which applicants complete a proprietary underwriting questionnaire, receive a quote, bind coverage, and obtain policy documents.  D.I. 24 at ¶¶ 6, 19. TRRG underwrites the commercial general liability policies distributed through the platform and owns the proprietary CORG-designated policy forms. *Id.* ¶¶ 5, 20.  Plaintiffs' underwriting methodology, custom policy forms, pricing architecture, and platform workflow represent years of development and millions of dollars of investment, *id.* ¶¶ 20, 24, and give Plaintiffs a competitive advantage in a market where "underwriting precision, pricing accuracy, coverage design, and platform experience" are "the primary basis of competition." *Id.* ¶ 23;

On February 10, 2026, Augmenta Advisory, LLC ("Augmenta") was formed as a Delaware limited liability company.  D.I. 24 at ¶ 28.  That same day, a quote questionnaire—Quote No.

3

79OM9KUJ—was submitted through Corgi's platform in Augmenta's name, identifying Kelly Wulff as applicant and sole director. *Id.* ¶¶ 13, 28. The application presented Augmenta as an advisory business seeking coverage for its own operating risk, even though Augmenta had no EIN, no revenue, no clients, no website, and no business operations of any kind. *Id.* ¶¶ 3, 15, 29. Wulff did not disclose that she is, in fact, the Chief Legal & Administrative Officer of Vouch.

Wulff selected all four available coverage lines and completed detailed responses to over one hundred proprietary risk-assessment questions, requesting industry-professional limit and retention structures across each line—ensuring that Corgi's platform would generate the maximum breadth of proprietary underwriting output and policy documentation. *Id.* ¶¶ 2, 30–31. Plaintiffs issued Policy No. CG-DE-26-000011-01 and delivered the proprietary CORG-CGL-0001 and CORG-CGL-0100 forms and related issuance materials. *Id.* ¶ 32. Within days, Wulff demanded cancellation "effective immediately," stating she "no longer require[d] the coverage." Id. ¶ 34.

The FAC alleges the measures by which Plaintiffs protect this information. Access to the underwriting platform is conditioned on acceptance of binding Terms of Use that prohibit accessing the Site "to build a similar or competitive website, product, or service" (§ 2.2(c)); the proprietary policy forms are maintained as confidential documents "disclosed only to applicants and policyholders" and withheld from the general public; internal access to underwriting logic and pricing methodology is restricted to authorized personnel; and the questionnaire logic, pricing algorithms, and custom coverage structures are not publicly disclosed. D.I. 24 at ¶ 27.

The FAC further alleges that a Vouch sales representative subsequently sent a written comparative sales communication to a customer or prospective customer who was then actively evaluating Corgi's offering against Vouch's, asserting that the difference between Corgi's and Vouch's products is "the difference between insurance that checks a box and insurance that

4

actually pays." D.I. 24 at ¶¶ 40–42.  In context, the statement conveyed that Corgi's insurance is paper coverage that does not pay valid claims—an assertion that is false: TRRG is a licensed risk retention group legally obligated to satisfy all valid covered claims.  *Id.* ¶¶ 43–44.  On information and belief, the Vouch Entity Defendants have made the same or substantially similar statements to other customers and prospective customers as part of a comparative sales effort.  *Id.* ¶ 47.

## IV.    ARGUMENT

On a Rule 12(b)(6) motion, the Court accepts all well-pleaded allegations as true, draws all reasonable inferences in Plaintiffs' favor, and asks only whether the complaint states a plausible claim.  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220–21 (3d Cir. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The Court "may not consider matters extraneous to the pleadings" except documents integral to or explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997); *see* Fed. R. Civ. P. 12(d).  As an initial matter, Defendants' factual counter-narrative about Corgi personnel, their promise of what "the evidence will ultimately show," and their citation to an internet article, D.I. 28 at 1–2 & n.3, are clear extraneous matter.  Plaintiffs dispute those assertions, but the Court need not referee them: they play no role on this motion and should be disregarded.[1]

### A.  Counts I and II State Valid Claims for Trade Secret Misappropriation.

Count I asserts a claim for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA").  Count II asserts a trade secret misappropriation under Delaware law, specifically the Delaware Uniform Trade Secret Act ("DUTSA").  Defendants' own authority confirms that "the viability of a DUTSA claim rises and falls with a DTSA claim[.]" *Montway*

---

[1] Plaintiffs separately filed a Motion to Strike the extraneous accusations made against Corgi personnel.

ME1\62276403.v1

*LLC v. Navi Transp. Servs. LLC*, 809 F. Supp. 3d 200, 213 (D. Del. 2025).  Because Plaintiffs have stated a viable DTSA claim, as addressed below, they have also stated a viable DUTSA claim.

### 1.  Plaintiffs Identify Their Trade Secrets With Appropriate Specificity.

In *Oakwood*, the Third Circuit reversed the dismissal of a DTSA claim and "endeavor[ed] to clarify" the pleading standard Defendants now misstate. 999 F.3d at 896.  A trade secret must be identified "with enough specificity to place a defendant on notice of the bases for the claim being made against it" and "to permit the defendant to ascertain at least the boundaries within which the secret lies"—but the plaintiff "need not spell out the details of the trade secret" in a public complaint.  *Id.* at 906 (citations omitted).  The specificity inquiry, moreover, is stage-dependent: what may be demanded on a developed evidentiary record is not what Rule 8 demands of a pleading.  *See id.* (the "proper approach is clearly fact dependent"); *I-Mab Biopharma v. Inhibrx, Inc.*, 2024 WL 5335719, at *7 (D. Del. Nov. 6, 2024) ("As noted above, whether information constitutes a trade secret is a question of fact."); *see also* (*Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*, 149 F.4th 1081 (9th Cir. 2025) (sufficiency of trade secret identification is ordinarily a fact question not resolved before discovery).

The FAC satisfies the required *Oakwood* standard.  It does not gesture at "broad areas of technology" but rather identifies with reasonable particularity:

> (a) the proprietary underwriting questionnaire with over 100 specific questions across four identified coverage lines (CGL, D&O, Cyber, Tech E&O), including its question selection, sequencing, branching logic, risk factors, and weighting methodology, D.I. 24 at ¶ 25(a);
>
> (b) two specifically numbered custom policy forms, CORG-CGL-0001 (Master Declarations Page) and CORG-CGL-0100 (Commercial General Liability Insurance Policy), which the FAC distinguishes from commercially available ISO forms and describes by their unique coverage language, exclusion structures, insuring-agreement terms, retention mechanics, and definitional provisions, *id.* ¶ 25(b);
>
> (c) the pricing methodology by which Plaintiffs set premiums, retentions, limits, sublimits, and optional-coverage pricing, *id.* ¶ 25(c);
>
> (d) the platform workflow architecture, *id.* ¶ 25(d);

6

(e) the coverage architecture by which the four lines are structured, endorsed (including AI-related risk coverage), packaged, and cross-sold, *id.* ¶ 25(e); and

(f) the issuance documentation package, *id*. ¶ 25(f).

Plaintiffs further tie those trade secrets to an identifiable extraction event: Quote No. 79OM9KUJ and Policy No. CG-DE-26-000011-01. *Id.* ¶¶ 28, 32. Defendants are on notice of what secrets of Plaintiffs they are accused of misappropriating. *See Oakwood*, 999 F.3d at 906.

Defendants' cases are not to the contrary. And not all are from the pleadings stage. The *Mallet* decision vacated a preliminary injunction because the evidentiary record—not a pleading—failed to delineate the secrets with the precision needed to support injunctive relief; indeed, the court took care to explain that the required specificity varies with the procedural posture. *See Mallet & Co. Inc. v. Lacayo,* 16 F.4th 364, 380–84 (3d Cir. 2021); *id.* at n.22 ("District Courts must therefore engage with the specific facts of each case and consider the degree of specificity necessary in light of the particular industry-based context and the stage of litigation –whether that be a motion to dismiss, a discovery dispute, a motion to preliminarily enjoin a defendant from competing with the trade secret plaintiff, or a summary judgment motion."). The *Agency Solutions* decision was on a preliminary-injunction record as well. *Agency Solutions.Com, LLC v. TriZetto Group, Inc.*, 819 F. Supp. 2d 1001 (E.D. Cal. 2011). And in any event, Defendants' out-of-circuit district court decisions do not displace *Oakwood*. Moreover, Defendants' demand that the FAC needs to explain what "aspects are proprietary" or how Corgi's secrets differ "from what every online insurance company would possess," D.I. 28 at 6, was already rejected by the Third Circuit. *Oakwood* indeed condemned any "effort to blend together the identification-of-a-trade-secret element and the misappropriation element." *Oakwood*, 999 F.3d at 905 n.13, 907 (recognizing that, at the pleading stage, "only discovery will reveal exactly what the defendants are up to").

7

Courts in this District applying *Oakwood* sustain trade secret pleadings that set forth "reasonably finite" categories of information sufficient to put the defendant on notice, including categories describing a software platform's user-facing steps, displays, and outputs. *See Deloitte Consulting LLP v. Sagitec Sols. LLC*, 2023 WL 6039069, at \*3 (D. Del. Sept. 15, 2023). The FAC's six enumerated categories, anchored to named forms and a numbered transaction, are more specific still. Whether the branching logic of Corgi's questionnaire or the coverage grants of the CORG forms are "generally known" is a merits question of fact, not a pleading defect. At this stage, the FAC's allegations that the information is not generally known, is not readily ascertainable, and was developed at a cost of millions, D.I. 24 at ¶¶ 24–26, are accepted as true.

Defendants' identification argument also ignores the breadth of what the DTSA and DUTSA protect. Both statutes expressly cover a "compilation," "method," "technique," and "process." *See* 18 U.S.C. § 1839(3); *accord* 6 Del. C. § 2001(4). And it is black-letter law that a compilation may be built entirely from publicly available components—the secret is the combination. *See Callaway Golf Co. v. Dunlop Slazenger Grp. Americas, Inc.*, 318 F. Supp. 2d. 205, 213 (D. Del. 2004) ("[A] trade secret can exist in a combination of characteristics and components, each of which by itself is in the public domain, but the unified process, design, and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret."). Even if any individual underwriting question, standing alone, resembled questions asked elsewhere in the industry, that would prove nothing. Plaintiffs' trade secret is the whole: the specific selection, sequencing, branching logic, and risk-weighting of a 100-plus-question compilation engineered to assess specialized technology risk across four coordinated coverage lines. The value of that compilation lies precisely in its arrangement—an arrangement Plaintiffs spent years and millions of dollars developing, and have kept secret from its industry competitors.

8

### 2. The FAC Pleads Reasonable Secrecy Measures.

Defendants' secrecy argument rests on a false premise: that Corgi's underwriting output and policy forms are "public and available to anyone." D.I. 28 at 10.  The FAC alleges the opposite. The general public cannot browse to the CORG-CGL-0001 or CORG-CGL-0100 forms, Plaintiffs' pricing outputs, or the full underwriting flow across four coverage lines.  D.I. 24 at ¶¶ 25, 27. Those materials are generated and disclosed only to an applicant who traverses Corgi's underwriting process, supplies detailed responses to the proprietary questionnaire, and, as to the policy forms, only to an applicant whose application results in bound coverage.  *Id.* ¶¶ 19, 27(c), 32.  Defendants' manipulation of the foregoing structural secrecy measure rests at the heart of this case.  It is the reason Defendants' alleged scheme required a shell company, a pretextual application, and one hundred detailed underwriting responses supplied in service of the deception. The elaborateness of the alleged deception Defendants employed to obtain the materials is indeed powerful enough itself to demonstrate that the materials were not lying in "plain sight."  *Contra* D.I. 28 at 10.

The FAC pleads additional, complementary secrecy measures: conditioning platform access on Terms of Use that expressly forbid using the Site "to build a similar or competitive website, product, or service" (§ 2.2(c)) and forbid copying, reproducing, or distributing Site content (§ 2.2(d)); restricting internal access to underwriting logic and pricing methodology to authorized personnel; and declining to publish the questionnaire logic, pricing algorithms, or custom coverage structures.  D.I. 24 at ¶ 27.  Notwithstanding Defendants' critiques, DTSA requires "reasonable measures," not perfect ones, 18 U.S.C. § 1839(3)(A), and reasonableness is ordinarily a question of fact inappropriate for resolution on the pleadings.  Defendants' authorities prove the point.  The *Maxim* decision denied a preliminary injunction on an evidentiary record,

9

*see generally Maxim, Inc. and Maxim Licensing Inc. v. Playboy, Inc.*, 2026 WL 1361773, at *4 (S.D.N.Y. May 15, 2026)*, and *Carr* affirmed a merits disposition on a full evidentiary record, *see generally Carr v. AutoNation, Inc.*, 798 Fed. Appx. 129 (9th Cir. 2020). Neither case dismissed a complaint.

Moreover, controlled disclosure of aspects of Plaintiffs' trade secrets to bona fide policyholders does not destroy secrecy as a matter of law. Part of the definition of trade secret under DTSA is that the information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A). In other words, information known by persons who would not obtain economic value from the disclosure or use of the information, *i.e.*, an ordinary insured, does not disqualify such information as a trade secret. In any event, whether Plaintiffs' disclosure to a defined class, for a defined purpose, under contractual restrictions defeats trade secret protection is a fact issue—particularly where, as here, the FAC alleges the forms are "maintained . . . as confidential documents" and "withheld . . . from the general public." D.I. 24 at ¶ 27(c).

Finally, Defendants' assertion that Wulff never accessed Plaintiffs' "back-end," D.I. 28 at 9, attacks a claim Plaintiffs never made—and runs headlong into recent authority from this District rejecting the same argument. Plaintiffs do not allege that Wulff downloaded source code, and nothing in the DTSA or DUTSA requires it. What Plaintiffs allege is that Wulff (and through her, Defendants) extracted the protected front-end implementation, outputs, and compilations: the full questionnaire content and structure across four lines, the pricing and retention architecture reflected in the quotes and policy she procured, and the custom forms themselves—materials from which a sophisticated competitor like Vouch can reconstruct Plaintiffs' underwriting logic and

10

ME1\62276403.v1

pricing methodology.  D.I. 24 at ¶¶ 2, 30–32, 38.  *Chatham Financial Corp. v. Milhaus, LLC*, 807 F. Supp. 3d. 373, 384 (D. Del. Oct. 28, 2025) (Bibas, J., sitting by designation) is instructive. There, the Court sustained a DTSA claim alleging that a competitor exploited customer-level access to a restricted platform to copy its "applications" and "outputs"—the platform's customer-facing components.  *Id.*  As the Court explained: "A competitor need not gain access to the guts of an application to copy its proprietary functionality.  That is especially true when the front end is restricted to approved users."  *Id.*  Both points apply here with full force.  Wulff copied the customer-facing components, and—as shown above—Corgi's front end is restricted to bona fide applicants, which is why Defendants had to invent one.  *See also You Map, Inc. v. Snap Inc.*, 2021 WL 106498, at *6 (D. Del. Jan. 12, 2021) (the "visual design or functional aspects of the app's user interface" can constitute trade secrets where plaintiff took steps to keep secret), report and recommendation adopted, 2021 WL 327388 (D. Del. Feb. 1, 2021).  At minimum, the extracted materials are a protectable compilation, 18 U.S.C. § 1839(3), and the extent to which they reveal or embody Plaintiff's underlying methodology is a question of fact that cannot be resolved on the pleadings.

### 3.  The FAC Pleads Acquisition By Improper Means.

DTSA defines "improper means" to include "misrepresentation," 18 U.S.C. § 1839(6)(A), and defines misappropriation to include acquisition of a trade secret by a person who knows or has reason to know it was acquired by improper means, *id.* § 1839(5)(A).  Plaintiffs' allegations in the FAC satisfy this standard.  Plaintiffs allege Defendants created a same-day shell entity; falsely presented Augmenta as a bona fide insurance purchaser; concealed that the applicant was, in reality, the Chief Legal & Administrative Officer of Plaintiffs' direct competitor acting for the competitor's benefit; and canceled the policy once all proprietary materials were in hand.  D.I. 24

11

ME1\62276403.v1

at ¶¶ 28–38.  Concealment was not incidental—it was the scheme: the false customer profile existed to hide the true purpose.  At the pleadings stage, Plaintiffs are entitled to that reasonable inference.  Defendants' protest that Wulff "applied for insurance . . . like any other customer," D.I. 28 at 9, is a factual quarrel with the FAC's well-pleaded allegations of pretext.  D.I. 24 at ¶¶ 36–38.

### B.  Count II Should Not Be Dismissed on Extraterritoriality Grounds.

Defendants contend Count II should be dismissed because DUTSA does not apply extraterritorially and the alleged trade secret misappropriation "lacks sufficient connection to Delaware[.]"  D.I. 28 at 12–13 (citing *Montway*, 809 F. Supp. at 213, *Focus Financial Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020), and *AlixPartners, LLP v. Mori*, 2022 WL 1111404, at *18 (Del. Ch. Apr. 14, 2022)).  But every one of Defendants' cases dismissed a DUTSA claim where the only Delaware connection was a Defendant's incorporation and wholly divorced from the conduct constituting the misappropriation. This case is different in kind.  The formation of a Delaware entity is *part of* the misappropriation scheme.  Plaintiffs allege that Defendants' formation of Augmenta was itself a step in the scheme to extract Plaintiffs' trade secrets.  *See* D.I. 24 at ¶¶ 3, 15, 18, 28.  These allegations satisfy *Montway*'s own test, which asks where "the conduct . . . relevant to the misappropriation occurred[,]" 809 F. Supp. 3d at 213, and is distinct from the situation Defendants suggest where misappropriation is alleged against an existing Delaware entity.  Defendants never engage with Plaintiffs' relevant allegations, and they cite no authority supporting dismissal on extraterritoriality grounds where the formation of a Delaware entity is itself part of the "conduct . . . relevant to the misappropriation."

Defendants' fallback—that California Uniform Trade Secret Act ("CUTSA") should govern instead, D.I. 28 at 14 n.9—defeats nothing.  The Court need not resolve choice-of-law at

12

the pleading stage. *See AlixPartners, LLP v. Benichou*, 250 A.3d 775, 784 (Del. Ch. 2019). Defendants identify no material difference between the statutes in any event, and where DUTSA and CUTSA "would produce the same decision no matter which state's law is applied, there is no real conflict and a choice of law analysis would be superfluous." *Labyrinth, Inc. v. Urich*, 2024 WL 395996, at \*28 (Del. Ch. Jan. 26, 2024). Nor can Defendants win this argument based on their own say-so about where the conduct occurred. According to Defendants, the relevant question is where the extracted materials were delivered, received, analyzed, and used within the Vouch enterprise. Those facts are in Defendants' possession and should not be resolved against Plaintiff without discovery and an evidentiary record. Defendants' reliance on their Request for Judicial Notice (D.I. 29) is misplaced. A corporation's "principal address" does not necessarily establish where misappropriation occurred. Nor are Defendants entitled to inferences drawn in their favor on a motion to dismiss. *In re DaVita Inc. S'holder Derivative Litig.*, 2019 WL 1855445, at \*10, \*15 n.205 (D. Del. Apr. 25, 2019) (noting the impropriety of defendants presenting matters outside a complaint and asking the court to draw inferences in their favor on a motion to dismiss).

Finally, even if the Court concluded that DUTSA cannot reach the conduct alleged, the remedy would not be dismissal with prejudice. The proper course is dismissal of Count II without prejudice and with leave to amend to assert the corresponding claim of the jurisdiction the Court deems applicable—relief that Defendants' own choice-of-law position (insisting California law governs, D.I. 28 at 14 n.9) expressly invites.

### C. Counts III, IV, and V Are Not Preempted By Counts I and II.

Defendants assert that Counts III, IV, and V are pre-empted by the statutory trade secret claims alleged in Counts I and II. That argument fails for several reasons.

13

First, it is built on a premature and unresolved choice-of-law question. Defendants ask the Court to apply California and Delaware trade secret statutes "interchangeably," D.I. 28 at 13–14, while acknowledging in a footnote that if a conflict exists, a fact-intensive "most significant relationship" analysis is required. *Id.* at 14 n.9. That analysis—where the injury was felt, where the conduct occurred, where the parties' relationship centered—turns on facts not yet developed, including the Delaware formation and operation of the scheme's instrumentality. Choice of law of this kind is ordinarily premature on the pleadings—as recently confirmed in *Chatham,* where the Court declined to "definitively resolve which state's law applies" on a Rule 12(b)(6) motion in a closely analogous platform-misappropriation case. *Chatham*, 807 F. Supp. 3d. at 386.

Second, Plaintiffs' fraud claim (Count V) alleges wrongdoing distinct from trade secret misappropriation. Under both California and Delaware law, claims that are "independent and based on facts distinct from the facts that support the misappropriation claim" survive. *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 506 (2013). Count V alleges that Defendants defrauded an insurer into issuing an insurance policy—Policy No. CG-DE-26-000011-01— through material misrepresentations in an insurance application, and it seeks a remedy no trade secret statute provides: rescission of that policy, which by its own terms is "void in any case of material misrepresentation, concealment or fraud." D.I. 24 at ¶¶ 33, 65–68. Even if no information taken qualified as a trade secret—indeed, even if no information had been taken at all—the fraudulent procurement of an insurance contract from a regulated insurer is an independent wrong. The relief sought (rescission and policy-related damages), and the interests protected (the integrity of insurance underwriting) are likewise distinct from Plaintiffs' trade secret claims.

Third, as to civil conspiracy (Count III) and unjust enrichment (Count IV), Defendants cannot have it both ways. Their lead merits argument is that the information at issue does not

14

constitute a trade secret at all. D.I. 28 at 5–12. Yet for preemption purposes they ask the Court to hold that trade secret statutes so completely occupy this field that Plaintiffs can have no remedy for the deceptive taking of that same information if it falls short of trade secret status. Plaintiffs indeed plead unjust enrichment "[i]n the [a]lternative to Counts I and II," FAC at Count IV, and Rule 8(d)(2)–(3) entitles Plaintiffs to maintain alternative and even inconsistent theories at the pleading stage. D.I. 24 at Count IV; Fed. R. Civ. P. 8(d)(2)-(3). Unless and until it is determined that the misappropriated information constitutes a trade secret, dismissing Plaintiffs' alternative theories on preemption grounds is premature. Plaintiffs recognize that these two counts rise or fall with the Court's preemption analysis in a way the fraud claim does not. At a minimum, however, any dismissal of Counts III and IV on preemption grounds should be without prejudice, pending the determination—which Defendants themselves contest—whether the misappropriated information qualifies as a trade secret.

### D. Count V's Fraud Claim Satisfied Rule 9(b).

Rule 9(b) requires the circumstances of the fraud—not every fact of the case—to be stated with particularity, and it expressly provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The rule is satisfied by pleading the "who, what, when, where and how" of the fraud. *See U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). The FAC supplies each particular.

Who. Plaintiffs allege Wulff, acting through Augmenta and, on information and belief, at the direction and for the benefit of the Vouch Entity Defendants. D.I. 24 at ¶¶ 28, 39, 65.

What. Plaintiffs allege Augmenta misrepresented itself as an operating advisory business genuinely seeking insurance for its own business risk. *Id*. ¶¶ 29(a)–(j), 65.

15

When: Plaintiffs allege the misrepresentation occurred on February 10, 2026. *Id.* ¶ 28.

Where: Plaintiffs allege the misrepresentation is contained in Quote No. 79OM9KUJ. *Id.*

How: Plaintiffs allege the misrepresentation was made in specific application responses, including the representation that Augmenta would be providing "Advisory services," and through the concealment of the applicant's identity and competitive purpose. *Id.* ¶¶ 32–35, 66–67.

Defendants' "group pleading" objection ignores that the FAC pleads Wulff's conduct with full particularity and pleads the entity Defendants' role through her: she was the enterprise's most senior legal officer, acted within the scope of her employment and for the enterprise's benefit, and, on information and belief, at its direction—with the Vouch Entity Defendants ratifying and retaining the benefits. D.I. 24 at ¶¶ 13–14, 39. Which Vouch entities directed, received, and used the extracted information is a quintessential fact question. *See Majestic Blue*, 812 F.3d at 306–10.

Defendants' "no duty to disclose" argument, in turn, answers a claim Count V does not make. Plaintiffs' fraud claim does not rest on silence alone; it rests first on affirmative misrepresentations—a pretextual application presenting Augmenta as a genuine insurance purchaser. And once Defendants chose to speak, the law imposed a duty they cannot now disclaim. A party who speaks through a detailed application—one on which the policy states it was issued "in reliance," D.I. 24 at ¶ 33—may not tell half-truths. Having elected to make representations, Defendants were obligated to make them complete and accurate, not to construct a false overall impression through selective and misleading disclosures. Delaware law has long recognized that fraud may be accomplished not only by overt false statement but by "deliberate concealment of material facts, or by silence in the face of a duty to speak." *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983). The insurance context only sharpens the point: the policy Defendants procured is void by its own terms upon "material misrepresentation, concealment or

16

fraud." D.I. 24 at ¶ 33.  Defendants cannot obtain a policy expressly conditioned on the truthfulness of their application and then claim they owed no duty of candor in completing it.

### E.  Count VI Presents a Live Controversy.

Defendants contend Count VI is moot because "the Policy was canceled."  D.I. 28 at 19. That argument fails twice over.  Cancellation and voidness *ab initio* are different concepts with different consequences.  Cancellation operates prospectively: it ends coverage going forward. A declaration that the policy was void *ab initio* operates retroactively: it establishes that no valid contract of insurance ever existed.  *See, e.g., Ameritas Life Ins. Corp. v. U.S. Bank Nat'l Assoc.*, 2026 WL 1078632, at \*13 (D. Del. Apr. 21, 2026) (addressing in a different context that insurance policies declared void *ab initio* never legally come into effect) (citing *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr., ex rel Christiana Bank & Tr. Co.*, 28 A.3d 1059 (Del. 2011)).  The distinction between cancellation and void *ab initio* distinction is not academic in this case.  It resolves whether Defendants may claim any continuing entitlement—as a one-time policyholder— to retain the issuance materials delivered under the policy: the very forms, quotes, and outputs at the heart of Plaintiff's misappropriation claims.  Cancellation leaves that question open; voidness ab initio answers it.  The question is live, and it shapes the scope of the injunctive relief Plaintiffs seek.

Moreover, the cancellation Defendants invoke was their own doing—Wulff requested it as the final step of the scheme, once the extraction was complete. D.I. 24 at ¶¶ 34–35.  Defendants cannot manufacture a policy through fraud, harvest Plaintiff's proprietary materials under it, cancel it when the materials are in hand, and then declare the controversy over.  And Defendants' own brief confirms they deny the misappropriation and the fraud.  D.I. 28 at 1–2, 17–19.  The legal status of the transaction at the center of this case is contested on every front.  Count VI is not moot.

17

**F.  Counts VII, VIII, and IX State Actionable Trade Practice Claims.**

Counts VII through IX target Defendant's disparagement.  Count VII asserts false advertising under Section 1125(a)(1)(B) of the Lanham Act.  Count VIII asserts its state law corollary under Delaware's Deceptive Trade Practices Act ("DTPA").  And Count IX asserts common law trade libel.  For the reasons below, all three counts should survive Defendants' dismissal attempt.

**4.  Counts VII, VIII, and IX Rest On A False Statement of Fact, Not Puffery.**

Defendants argue Counts VII, VIII, and IX should be dismissed because telling a purchasing customer, in a named side-by-side comparison, that Corgi sells "insurance that checks a box" while Vouch sells "insurance that actually pays" is puffery. D.I. 28 at 19–21.  Puffery, however, is "distinguishable from misdescriptions or false representations of specific characteristics of a product," which are actionable.  *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993).  Defendants' lead case even recognizes that a statement is actionable when it makes "a specific and measurable claim, capable of being proved false, or of being reasonably interpreted as a statement of objective fact."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000).

Whether an insurer pays valid claims is one of the most specific, measurable, and material characteristics of an insurance product.  Baked into the statement that Vouch "actually pays" valid claims is the implication that Corgi does not. D.I. 24 at ¶¶ 42–43.  That assertion is verifiable—claims-payment obligations and histories are provable facts—and false—TRRG is a licensed risk retention group legally obligated to pay all valid covered claims, *id.* ¶ 44.  For Vouch to state that it "actually pays" valid claims is not at all similar to Vouch calling Corgi's product "inferior" or to say that Vouch is "better" or an "innovator."  An insurance policy is, at bottom, a contractual

18

promise to pay valid claims.  Vouch thus presented an objective, measurable accusation that Corgi violates its core contractual and regulatory obligations.  This is the antithesis of puffery.  Especially in a written, one-to-one sales communication naming Corgi, addressing specific coverage terms, and urging a purchasing decision.  *Id.* ¶¶ 41, 45.  The Third Circuit in similar circumstances found that comparative claims between competing health insurers were actionable where they conveyed factual messages about coverage and its consequences, *see U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 921–23 (3d Cir. 1990), and puffery determinations are context-dependent inquiries ill-suited to resolution on a motion to dismiss anyway, *see Uberether, Inc. v. Anitian, Inc.*, 2023 WL 1471754, at *9 (D. Del. Feb, 2, 2023) (declining to "conduct a fact-based analysis on a motion to dismiss" to conclude statements were puffery).

### 5. The FAC Adequately Pleads Facts Giving Rise to a Reasonable Inference of "Commercial Advertising or Promotion."

The FAC alleges a written communication by a Vouch representative deployed at the decisive moment of a customer's head-to-head evaluation, and further alleges—on information and belief—that the same or substantially similar statements were made to other customers and prospects as part of a comparative sales effort.  D.I. 24 at ¶¶ 40–41, 47.  Defendants' own authority recognizes that such allegations can state an actionable "commercial advertising or promotion" claim.  *See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  Two pleaded facts make an inference of wider dissemination reasonable (and likely).  First, the form of the communication—a structured, written, side-by-side product comparison—is the hallmark of an organized sales program, not a lone salesperson's improvisation.  *Id.* ¶¶ 40–41, 45. Second, the parties compete head-to-head in a defined, concentrated segment—commercial insurance for technology companies and startups—where the universe of meaningful purchasing decisions is limited and every head-to-head evaluation counts.  *Id.* ¶¶ 21–23.  How widely Vouch's

19

script traveled is not a fact Plaintiffs could know before discovery. It is a fact recorded in Vouch's own sales systems, CRM entries, and outreach records. Rule 8 does not require Plaintiffs to plead the contents of Defendants' files. It requires a plausible claim, and the FAC pleads one.

### 6. Count VIII Adequately Pleads a DTPA Claim.

Defendants' suggestion that Count VIII's DTPA claim is not premised on "reasonable apprehension of a future wrong" similarly fails because the FAC supports a reasonable inference of an ongoing comparative sales effort, not a single event. Vouch indeed competes with Corgi for the same defined universe of customers every day, and the challenged message is alleged to be part of that effort. D.I. 24 at ¶¶ 47–48, 87–88. The DTPA's remedy is a forward-looking injunction, and the apprehension the statute requires is precisely what an alleged live sales campaign supplies. To the extent the Court concludes that a Delaware territorial nexus must be pleaded with more specificity, that is a curable defect warranting leave to amend, not dismissal with prejudice.

### 7. Count IX's Trade Libel Claim Should Proceed.

The FAC pleads special damages in the form of lost sales, lost prospective customers, lost renewals, and impaired customer relationships flowing from the disparagement, D.I. 24 at ¶ 93, and it does not do so in the abstract. The FAC identifies a specific endangered transaction: the Prospect's live, head-to-head purchasing decision between Corgi and Vouch, into which the disparaging statement was injected for the express purpose of diverting the sale. *Id.* ¶¶ 40–41, 46. Malice—a "condition of a person's mind"—"may be alleged generally," Fed. R. Civ. P. 9(b), and Defendants' state-court pleading decisions cannot displace the Federal Rules' allocation. The FAC in any event pleads facts making knowledge of falsity plausible and a reasonable inference: Vouch is a sophisticated insurance enterprise that knows precisely what a licensed risk retention group is

20

and what it is legally obligated to pay.  D.I. 24 at ¶¶ 42, 44, 92.  And if the Court concludes that special damages require pleading the specific consequence of the identified transaction, that detail is quintessentially curable and warrants leave to amend, not dismissal with prejudice.

### G.  Count X's Tortious Interference Claim is Adequately Pleaded.

Defendants argue that Count X identifies no concrete business opportunity.  D.I. 28 at 24–25.  But the FAC identifies a specific prospective customer—one actively "evaluating and comparing Vouch's insurance offering against Corgi's insurance offering"—who received Defendant's false and misleading statements at the point of decision.  D.I. 24 at ¶ 40.  That is not an abstract hope of future business; it is an identified prospect, in an active head-to-head evaluation, targeted by the interference itself.  Delaware law requires no more at the pleading stage. The wrongful-means element is equally well pleaded.  The interference was accomplished through independently unlawful conduct: statements that violate the Lanham Act and the DTPA and constitute trade libel.  *Id.* ¶ 99.  Because those claims survive, the independent-wrongfulness predicate for Count X survives with them.  Defendants' argument against Count X thus collapses into their arguments against Counts VII through IX, and fails for the same reasons.  Even if the Court concluded that Count X requires greater specificity about the prospective customer, the remedy would be dismissal without prejudice and leave to amend—particularly where the customer's identity is known, and the details of Defendants' outreach reside in Vouch's own records.

### H.  Any Dismissal Should Be Without Prejudice and With Leave to Amend.

Leave to amend must be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2), and may be denied only for undue delay, bad faith, prejudice, or futility.  *Foman v. Davis*,

ME1\62276403.v1

371 U.S. 178, 182 (1962). None is present. Should the Court find any count deficient, Plaintiffs respectfully request leave to amend to cure it.

## V. CONCLUSION

For the reasons set forth herein, the motion to dismiss should be denied in its entirety. In the alternative, Plaintiffs request leave to amend.

Dated: July 31, 2026

**McCarter & English, LLP**

*/s/ Travis J. Ferguson*_____
Travis J. Ferguson (No. 6029)
Amy R. Harriman (No. 7602)
Renaissance Centre
405 North King St., 8th Floor
Wilmington, Delaware 19801
(t) 302-984-6300
(e) tferguson@mccarter.com
     aharriman@mccarter.com

*Counsel for Plaintiffs*
*Technology Risk Retention Group, Inc.*
*and Corgi Insurance Services, Inc.*

22